UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:26-cv-01458-KG-GBW |
| 14.259 ACRES OF LAND, MORE OR LESS, SITUATED IN DOÑA ANA COUNTY, STATE OF NEW MEXICO, et al. | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT ROMAN CATHOLIC DIOCESE OF LAS CRUCES'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR ORDER OF IMMEDIATE POSSESSION**

The remarkable position of the United States Government in this case is that the Declaration of Taking Act (Taking Act), 40 U.S.C. § 3111 *et seq.*, permits it to take immediate possession of a sacred site with no judicial review of whether the Government's plans for the property infringe the free exercise of religion.  In accordance with its mistaken view that religious objections have no place in a condemnation action, the Government seeks an order of immediate possession on an expedited basis. The Government's only justification for its rush is that it has already contracted with construction companies to deface Mount Cristo Rey—a holy site to Catholics and other people of faith in the borderland region—so that it can begin constructing a border wall that very likely will damage or restrict access to this sacred space and dilute the religious experience of visitors to the mountain.  The proposed wall is also contrary to Catholic values and teachings and the Diocese's sincerely held beliefs about the appropriate use of its land.  This affront to religious liberty cannot stand.  The First Amendment and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, forbid the Government from engaging in this proposed course of conduct that will substantially burden the free exercise of religion.  Contrary to the Government's arguments, the Taking Act does not extinguish the Diocese's rights under the First Amendment and RFRA.  And the Government cannot meet its burden to establish that taking immediate possession of this sacred site to build a border wall that is offensive to Catholic values and teachings is the least restrictive means of furthering its objectives— particularly where it has granted other accommodations in building the wall.

## BACKGROUND

The Government seeks to condemn Diocesan property located on Mount Cristo Rey in Sunland Park, New Mexico, for the purpose of building a border wall.  Enriquez Decl. ¶¶ 2, 8, ECF No. 22-1.  Atop the mountain and only one-quarter of a mile from the proposed construction site sits a 29-foot-tall limestone statue of Jesus Christ that serves as a shrine to thousands of faithful in the El

1

Paso and Southern New Mexico region.  Decl. of Bishop Peter Baldacchino ¶¶ 5, 14; Enriquez Decl. ¶ 8.  The shrine was the idea of a local parish priest, Father Lourdes Costa.  Bishop Baldacchino Decl. ¶ 6.  In 1933, Father Costa began preaching to his congregation about his vision of a cross on the mountaintop.  *Id.*  At Father Costa's urging, the Roman Catholic Diocese of El Paso, Texas, purchased the property in question and employed the world-famous sculptor Urbici Soler to realize Father Costa's vision.[1]  *Id.*  The monument was completed in 1939.  *Id.*

The mountaintop shrine is a pilgrimage site.  *Id.* ¶ 8.  On the feast day of Christ the King each fall, as many as 40,000 faithful climb Mount Cristo Rey to "marvel at the beauty of the monument and the view offered from the summit" and to participate in a mass.  *Upcoming Events*, MtCristoRey.com, https://perma.cc/AQ9C-2D9V (last visited June 17, 2026).  Some pilgrims make the five-mile roundtrip journey barefoot, while others crawl to the summit on their knees.  Bishop Baldacchino Decl. ¶ 8.  Thousands also ascend the mountain during another annual pilgrimage during Holy Week.  *Id.*  The most recent Holy Week pilgrimage took place above "an active construction zone," as the Government began work on nearby property.  Martha Pskowski, *Blasting Begins for Border Wall on Cherished New Mexico Mountain*, El Paso Times (Apr. 1, 2026), https://perma.cc/3KC2-SEZ3; *see generally* Decl. of Lourdes Nicolas Castanon (Treasurer of the Mount Cristo Rey Restoration Committee explaining the history and religious significance of the pilgrimages).

On May 7, 2026, the Government filed a complaint, ECF No. 1, a declaration of taking, ECF No. 2, and a notice of condemnation, ECF No. 3, in an effort to take title to and condemn Diocesan property on Mount Cristo Rey under the expedited procedures of the Taking Act, *see* 40 U.S.C. § 3114(a)–(b).  The Government also filed a motion to deposit estimated just compensation with the

---

[1] The Diocese of Las Cruces was established in 1982, assuming jurisdiction over the New Mexico counties that had previously been part of the Diocese of El Paso.  Bishop Baldacchino Decl. ¶ 1.

2

Court, as required under the Taking Act.  ECF No. 6; *see also* 40 U.S.C. § 3114(b).  The Diocese opposed the Government's motion for leave to deposit because the deposit would trigger a transfer of title, 40 U.S.C. § 3114(b)(1), "pretermit[ting]" the First Amendment and RFRA defenses that the Diocese intended to raise to the taking, ECF No. 12, at 1–2.  On June 15, 2026, the Court granted the motion for leave to deposit.  *See* ECF No. 34.  In doing so, however, the Court made clear that "allowing the deposit and subsequent transfer of title will not interfere with, alter, or nullify Defendants' right to challenge the validity of the taking." *Id.* at 6.  And the Court further explained that the right to possession that inheres once title passes to the Government "does not mean the right to immediate, actual possession," such that the granting of the deposit motion "does not destroy any avenues of relief available to Defendants pending resolution of these proceedings." *Id.* at 6–7.

Shortly after initiating this condemnation action, the Government filed and requested expedited consideration of a motion for an order of immediate possession that, if granted, would allow the Government to begin construction on Diocesan property on Mount Cristo Rey. *See* Mot., ECF No. 22.  In its motion, the Government claims that "time is of the essence" because it has already "contracted with construction companies to perform the required work, issued notices to proceed and will incur significant monetary penalties if there is a delay." *Id.* at 2; *see also* Enriquez Decl. ¶¶ 7, 10.

### ARGUMENT

The Government implies (without directly stating) that under the Taking Act, depositing estimated compensation automatically gives it not just title to, but also immediate possession of part of the holy site at Mount Cristo Rey.  Mot. 5–6.  The Taking Act, it asserts, prevents the Diocese from presenting any statutory or constitutional defenses to the taking before the Government begins blasting the mountain. *Id.*  The Government also claims that its taking and defacement of Diocesan

land would not burden the exercise of religion by the Diocese, its parishioners, or other faithful—even before the Diocese has had any opportunity to prove otherwise.  *Id.* at 7.

Both parts of this argument fail.  The law, including cases cited by the Government, is clear that the Diocese is allowed to present its defenses before the Government possesses and irreparably desecrates the holy site at Mount Cristo Rey.  As the Court explained when granting leave to deposit, the right to possession under the Taking Act "does not mean the right to immediate, actual possession."  ECF No. 34, at 6.  And the Government's argument that its actions impose no substantial burden on the free exercise of religion depends on barebones assurances that cannot be taken seriously.  Even if the Government's actions posed no threat to the physical integrity of or access to the shrine atop Mount Cristo Rey—and there is good reason to fear that they will—construction of a border wall that is contrary to Catholic values and teachings would profane this holy site.  Condemnation of Diocesan land also would deprive the Diocese of its ability to act as a steward of the land.  This Court should not bless this affront to religious liberty.

## I.      The Taking Act Does Not Extinguish the Diocese's Rights Under the First Amendment and RFRA

The Government's argument that merely filing a declaration of taking and depositing estimated compensation inexorably grants it untrammeled possession of Diocesan land conflicts with both the Taking Act and RFRA, as well as this Court's opinion granting leave to deposit.  The Taking Act provides an expedited procedure for the Government to secure title to land, an easement, or a right of way for public use by filing a declaration and submitting estimated compensation.  40 U.S.C. § 3114(b)(1).  After the Government does so, a reviewing court may "fix the time within which, and the terms on which, the parties in possession shall be required to surrender possession to the petitioner."  *Id.* § 3114(d)(1); *see also* ECF No. 34, at 6 (quoting § 3114(d)(1)).  As this Court explained,

that limiting provision allows district courts to ensure that the terms of possession by the Government comply with other statutory and constitutional obligations.

A principal case cited by the Government says just that. The Government relies on a Fifth Circuit decision for the principle that the "sole defense which may be raised against the condemnation itself is that of lack of authority to take in the petitioner." Mot. 9–10 (quoting *United States v. 162.20 Acres of Land*, 639 F.2d 299, 303 (5th Cir. Unit A Mar. 1981)). In that case, the court found that the National Historic Preservation Act (NHPA) did not divest the Government of authority to condemn land, as it merely imposed an obligation on the federal agency to consider heritage issues in its decision-making process. *See 162.20 Acres*, 639 F.2d at 304 (stating that "only an express statement by Congress" would allow the statute to be used as "a defense to a condemnation itself"). But the Government omits the key second part of that holding, as this Court recognized in its prior opinion. *See* ECF No. 34, at 6. The Fifth Circuit found that although the district court could not invoke the NHPA to stop the transfer of *title*, the court could nonetheless under the Taking Act "require compliance with [NHPA] and either *withhold possession* by the government or take appropriate injunctive action to enforce its order." *162.20 Acres*, 639 F.2d at 304–05 (emphasis added). Indeed, in that case, the Government conceded that the Taking Act's language granting the court power to "fix the time . . . and the terms" of possession empowered the court to "withhold physical possession and enjoin construction or any activity . . . pending compliance with the congressional mandate." *Id.* at 304 (citation and alterations omitted). In sum:

> while the NHPA does not provide a legal shield of protection against the exercise of the federal condemnation power, it can provide the condemnee with a sword which he may use to seek judicial scrutiny of compliance with the congressional command that adverse impact upon historical features of the condemned land be mitigated.

*Id.* at 305.  The Fifth Circuit thus concluded that the Taking Act does not render NHPA "a serpent without fangs as to federal planners bent on disregard of its mandate." *Id.* at 304.

The Ninth Circuit applied the same reasoning to the National Environmental Policy Act (NEPA).  NEPA, like NHPA, requires consideration of impact before the federal government takes actions that significantly affect the environment.  As the Ninth Circuit recognized, NEPA could not be used as a defense to the "transfer of legal title," which did not itself affect the environment.  *United States v. 0.95 Acres of Land*, 994 F.2d 696, 699 (9th Cir. 1993).  Nonetheless, "[a]ctions that fall under NEPA's umbrella may immediately follow a condemnation action," and where "appropriate," "the district court may enjoin the proposed" construction project.  *Id.*; *see also, e.g., United States v. 6.584 Acres of Land*, 533 F. Supp. 3d 482, 499 (S.D. Tex. 2021) (holding that the Taking Act's conferral of power to fix the time and terms of possession allows courts to "require compliance with [a] separate statute and 'withhold possession by the government'" (citation omitted)); *United States v. 247.37 Acres of Land*, Civil Action No. 7769, 1971 U.S. Dist. LEXIS 15269, at *30 (S.D. Ohio Sept. 9, 1971) (holding that the Taking Act's language "means that if the proceeding in its present status violates some Act of Congress, a court may withhold a possessory writ until such time as the defect is rectified").  These cases stand for the straightforward principle that the Government's ability to take possession of land under the Taking Act is subject to the constraints imposed by other statutes.

These cases unravel the Government's position that the only defenses available to the Diocese against dispossession from a portion of its holy site are "(1) whether the acquisition was authorized by Congress and (2) whether it was for a public purpose."  Mot. 9.  The Diocese has every right to demand the Government comply with federal law before the Diocese surrenders even a square inch of its sacred land.  Here, that means the Government must comply with RFRA before it can take the Diocese's land.  And as explained below, the destruction of parts of Mount Cristo Rey only one-

6

quarter mile from the historic statue of Christ the King, for purposes of constructing a border wall inconsistent with Catholic values and teaching, will burden the Diocese's religious practice under RFRA. *See infra* pp. 13–22. Indeed, the Government concedes that "Congress has the power to limit the sovereign right of eminent domain to protect individual rights," but insists—without citation to authority—that "it declined to do so when it passed RFRA." Mot. 11. That position is unsupportable given that RFRA's sweeping language constrains the use of all other federal statutes, including the Taking Act, when necessary to protect the free exercise of religion. And indeed, RFRA imposes far more extensive obligations than the other statutes that courts have expressly concluded can provide grounds for denying or limiting possession under the Taking Act.

"RFRA is no ordinary statute," but a "'super-statute.'" *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (citation omitted), *aff'd*, 573 U.S. 682 (2014). It "applies to *all* Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" RFRA's date of enactment. 42 U.S.C. § 2000bb-3(a) (emphasis added). Thus, RFRA "cut[s] across all other federal statutes . . . and modif[ies] their reach." Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 253 (1995). RFRA prohibits the Government from "substantially burden[ing] a person's exercise of religion" unless it demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000bb-1(a)–(b). A person so burdened "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb-1(c).

Under its plain text, RFRA's application here is obvious. RFRA's substantive limitation on government action far exceeds the modest procedural requirements of NEPA and the NHPA, which courts have found sufficient to withhold possession under the Taking Act. Here, the Government is

7

attempting to take actions that the Diocese has forcefully and consistently asserted will substantially burden its exercise of religion and that of its parishioners and other faithful. In the course of "a judicial proceeding" in which the Government seeks leave to engage in such actions—this litigation— the Diocese is raising that violation as a "defense" and seeks to "obtain appropriate relief." *See id.* § 2000bb-1. That is, the Diocese asks this Court to invoke its statutory power to fix the time and terms of possession to "withhold physical possession and enjoin construction or any activity" that would burden its religious practice in violation of RFRA. *See 162.20 Acres*, 639 F.2d at 304.

The Tenth Circuit has indicated that RFRA is an available defense against condemnation when raised in the course of statutorily authorized procedures. In *Thiry v. Carlson (Thiry III)*, 78 F.3d 1491 (10th Cir. 1996), homeowners sued under RFRA to enjoin the Kansas Department of Transportation from condemning a portion of their land as part of a project to expand U.S. Highway 24. The land contained the gravesite of the homeowners' stillborn daughter, which would have to be relocated to accommodate the project. *Id.* at 1493. After an exhaustive review of the facts, the Tenth Circuit concluded that the condemnation would not substantially burden the plaintiffs' exercise of their religion, which allowed for movement of gravesites when necessary. *Id.* at 1496. Notably, however, at no point during that litigation did either the district court or the Tenth Circuit suggest that RFRA was inapplicable to condemnation proceedings. *See generally Thiry v. Carlson (Thiry II)*, 891 F. Supp. 563 (D. Kan. 1995); *Thiry v. Carlson (Thiry I)*, 887 F. Supp. 1407 (D. Kan. 1995). If RFRA did not apply, the courts would not have had to wade into thorny questions of whether the religious practices of grieving parents would be burdened by the forced relocation of their child's grave.

Similarly, in *Adorers of the Blood of Christ v. FERC*, 897 F.3d 187 (3d Cir. 2018), the Third Circuit affirmed an order dismissing a religious organization's suit to enjoin the Government's grant of a right to condemn the plaintiffs' land to a private company for construction of a gas pipeline under the

8

Natural Gas Act (NGA).  But as in *Thiry*, neither the district court nor the Third Circuit adopted the position that RFRA is inapplicable to condemnation proceedings.  Instead, the courts found that the plaintiff's suit was improper because it was obligated to raise its RFRA and constitutional arguments in the course of the procedures mandated by the NGA.  Far from circumventing RFRA, "the NGA merely provides for complementary procedural requirements that a claimant must adhere to when exercising their RFRA right to a 'judicial proceeding.'" *Id.* at 193 (quoting 42 U.S.C. § 2000bb-1(c)).

The case law is clear that this Court is empowered under the Taking Act to withhold the Government's possession of Diocesan land in compliance with RFRA, and that these proceedings are the proper place for the Diocese to make the argument that the Government's proposed actions burden its religious practice before irreparable harm to Mount Cristo Rey occurs.  *See* ECF No. 34, at 6 (explaining that "the deposit and transferring title to the United States is in no way a final or irrevocable action that would deprive Defendants of an opportunity to contest the validity of the taking").  The Diocese's rights "would be rendered moot and beyond the power of any court to rectify if they could not be heard at once and before they have been dispossessed." *United States v. Certain Land of Manhattan*, 332 F.2d 679, 680 (2d Cir. 1964).  This Court should decline to grant the Government possession until the Diocese's RFRA arguments are resolved on the merits.

At a minimum, the Government's actions must comply with the First Amendment.  "The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs," and "[o]ur Constitution forecloses any attempt to revise that judgment." *United States v. Stevens*, 559 U.S. 460, 470 (2010).  The Amendment was "[p]remised on mistrust of governmental power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).  And at the core of the Amendment's protection is "[t]he principle that government may not enact

9

laws that suppress religious belief or practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993).

The Government all but ignores the Diocese's separate First Amendment defense, mentioning it only in passing. *See* Mot. 10. According to the Government, "[e]minent domain is an innate right of the sovereign," and "[n]either the First Amendment nor RFRA supersede this inherent right." *Id.* Suggesting that the Government has "innate" power to disregard the Bill of Rights is a bold statement. The case that the Government cites for this proposition does not remotely support it. The Sixth Circuit's decision in *Prater v. City of Burnside*, 289 F.3d 417 (6th Cir. 2002), is irrelevant in every respect. A church sued a city over the "decision to develop a previously dedicated roadway located between two lots owned by the Church." *Id.* at 422. The court began by rejecting the church's claim under the Takings Clause on the ground that the roadway was not the church's property. *Id.* at 427. Accordingly, the case did not involve eminent domain at all, much less the interaction between eminent domain and the First Amendment. The Court went on to reject the church's claim under the Free Exercise Clause, but it did so on the merits, holding that the church "failed to raise a genuine issue of material fact as to whether the [c]ity engaged in religious discrimination," not because the First Amendment had no application in the condemnation context. *Id.* at 430. To the contrary, courts actually considering whether the First Amendment can constrain the power of eminent domain have held that it does. *See, e.g.*, *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 869–72 (2d Cir. 1988).

The Constitution is this Nation's supreme law. Neither Congress when enacting statutes nor the President or his subordinates in executing them can ignore the First Amendment. And the Taking Act is no less subject to the Constitution than any other statute. To hold otherwise "would subvert the very foundation of all written constitutions" by "giving to the legislature a practical and real

10

omnipotence, with the same breath which professes to restrict their powers within narrow limits." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

## II.    The Government's Proposed Taking and Desecration of Mount Cristo Rey Would Violate the First Amendment and RFRA

Under both the First Amendment and RFRA, the Government's condemnation is subject to and fails strict scrutiny.  Starting with the Constitution, the Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly," but "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022).  The Supreme Court has held that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).  But a law does not qualify as "generally applicable" if it provides "'a mechanism for individualized exemptions.'" *Id.* (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990)).

The Government's effort to take immediate possession of Mount Cristo Rey triggers the individualized-exception carveout from *Smith* and thus strict scrutiny.  Before the Supreme Court's recent ruling in *Fulton*, decisions from the Tenth Circuit had "rejected a *per se* approach" "requiring that any land use regulation which permits any secular exception satisfy a strict scrutiny test to survive a free exercise challenge." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006).  But the Supreme Court's more recent Free Exercise Clause precedent, particularly cases striking down land-use policies implemented during the COVID-19 pandemic, explicitly reject the Tenth Circuit's prior approach.  The Supreme Court has now held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise,"

and "[i]t is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) (per curiam).

The Government's border-wall construction has treated comparable secular interests more favorably than the Diocese's religious objections, and the Government must therefore satisfy strict scrutiny to justify condemning Mount Cristo Rey.  Over the past few months, while the Government has been rushing past every obstacle in its single-minded pursuit of border-wall construction on Diocese property, it has taken a very different tack in response to secular objections to wall construction raised in West Texas.  Earlier this year, U.S. Customs and Border Protection (CBP)'s plans to build the wall through Big Bend National Park "was met with a visceral, bipartisan outcry against the assault of unnecessary, expensive, large-scale, and highly destructive border infrastructure within the National Park," including from "[f]ive sheriffs from the Big Bend area [who] publicly made the point that this one-size-fits-all approach to border security makes no sense in the park."  Decl. of Robert J. Krumenaker ¶ 4; *see also* Anna Giaritelli, *Trump's Top Border Official, Rodney Scott, Unpacks Wins and Path Forward*, Wash. Exam'r (May 4, 2026), https://perma.cc/296B-RP2C.  Based on that public outcry, DHS announced that "there would be no 30-foot steel wall built in Big Bend Ranch State Park, Big Bend National Park or the Black Gap Wildlife Management Area, instead prioritizing 'sensors and cameras' and 'low-profile' vehicle barriers."  Sam Karas, *Former National Park Superintendents Ask DHS Not to Waive Laws for Border Wall Construction*, Big Bend Sentinel (May 27, 2026), https://perma.cc/475B-KW9Q.  Although "[t]he fight to keep Big Bend wild is far from over," Krumenaker Decl. ¶ 9, CBP has confirmed, at least for now, that plans to build a 30-foot wall through Big Bend National Park are off, meaning that well over 100 miles of the border will be exempt from

wall construction, *see* Ayden Runnels, *Big Bend Border Wall Plans Canceled for National Park After Backlash, Border Patrol Commissioner Says*, Tex. Trib. (May 8, 2026), https://perma.cc/724G-9QLR.

The Government's provision of that secular exemption for the Big Bend region treats secular activities within the National Park more favorably than religious exercise at Mount Cristo Rey. That differential treatment triggers strict scrutiny.

The Government's proposed course of conduct also implicates RFRA. Congress enacted RFRA to restore the "compelling interest test" that predated the Supreme Court's narrowing of the First Amendment's religious-liberty safeguards in *Smith*. 42 U.S.C. § 2000bb(a)(4), (b)(1). Like the standard that remains applicable in First Amendment challenges to individualized assessments such as the Government's attempted condemnation here, RFRA prohibits the Government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," *id.* § 2000bb-1(a), unless the Government's actions are "the least restrictive means of furthering" "a compelling governmental interest," *id.* § 2000bb-1(b).

Under both the First Amendment and RFRA, the Government's proposed condemnation is unlawful and must not be permitted. *See Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1197 (10th Cir. 2015) (applying the same standard to RFRA and First Amendment claims), *vacated on other grounds sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam). The motion for immediate possession should be denied.

**A. The Government's Condemnation of Diocesan Land and Defacement of Mount Cristo Rey Substantially Burden the Free Exercise of Religion.**

A "government act imposes a 'substantial burden' on religious exercise if it: (1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent

13

to engage in conduct contrary to a sincerely held religious belief." *Hobby Lobby*, 723 F.3d at 1138 (citation modified). The Government's proposed conduct here imposes the second type of substantial burden in at least three ways. First, despite its assurances to the contrary, the Government's plans to deface Mount Cristo Rey so that it can build a border wall jeopardize the mountaintop shrine and access to it. Second, the border wall that the Government plans to construct is contrary to Catholic values and teachings that migrants must be protected and defended. The presence of the border wall on the holy site of Mount Cristo Rey would profane the site and dilute the religious experience for any faithful who are still able to access the shrine. Finally, the Government's condemnation of the land, including its effort to take immediate possession, will deprive the Diocese of its ability to act as a steward of its land by ensuring that successor landowners do not use Diocesan property in ways that are inconsistent with Catholic values and teachings.

     **1. The Government's Defacement of Mount Cristo Rey to Construct a Border Wall Would Jeopardize the Mountaintop Shrine and Access to It**

Mount Cristo Rey is a site of unique significance to Catholics and other people of faith in southern New Mexico—and, indeed, the border region as a whole. Bishop Baldacchino Decl. ¶ 7; Castanon Decl. ¶ 10; Decl. of Bishop Michael Buerkel Hunn ¶¶ 4–5. Each year, thousands of faithful make the five-mile journey to the mountaintop shrine and back during the fall feast day of Christ the King and during Holy Week in the spring. Bishop Baldacchino Decl. ¶ 8. Some pilgrims climb the mountain barefoot, while others crawl on their knees. *Id.* Pilgrims take in the beauty of the monument and the nature that surrounds it, and they participate in mass. *Id.*; *see also* Castanon Decl. ¶ 8 ("When I get up to the top of the mountain, I feel like I can touch God's face. It is inspirational to me, and helps keep me going."); Decl. of Bishop Mark Seitz ¶ 8 ("Mount Cristo Rey brings spiritual joy and healing to those who journey to its heights."). "The sanctity of the natural landscape is central to the

religious experience of attending the shrine," and "[p]eople who come to worship and celebrate mass are awed by the beauty of the surrounding area and the mountain itself." Castanon Decl. ¶ 11; *see also* Bishop Hunn Decl. ¶ 5. The Government's plans to build a border wall on Mount Cristo Rey physically threaten this sacred site and access to it, and therefore risk "prevent[ing] participation" in the deeply meaningful pilgrimages and associated religious activities that occur there. *Hobby Lobby*, 723 F.3d at 1138 (citation omitted); *see also Kennedy*, 597 U.S. at 543 ("Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head.").

Courts have found that condemnation amounts to a substantial burden where, as here, the property in question has unique significance to the religious community in question. In *Pillar of Fire v. Denver Urban Renewal Authority*, 509 P.2d 1250 (Colo. 1973) (en banc), for example, the Colorado Supreme Court found that the State was required to "show a substantial interest without a reasonable alternate means of accomplishment if the state is to be constitutionally allowed to take the birthplace of the Pillar of Fire Church, which is alleged to be *sui generis*." *Id.* at 1253. Other decisions are in a similar vein. *See Yonkers Racing Corp.*, 858 F.2d at 869–72 (remanding First Amendment claim where a seminary that was the "only facility in the Archdiocese for the training of new priests" asserted that condemnation of its property for construction of public housing would disrupt the "quietude" necessary for its religious purpose); *Chabad Lubavitch of the Beaches, Inc. v. Inc. Vill. of Atl. Beach*, No. 22-CV-4141, 2022 WL 22946691, at *2, 8 (E.D.N.Y. Sept. 6, 2022) (preliminarily enjoining a municipality's condemnation of property purchased by the Hasidic Jewish group Chabad because it would "burden Chabad's religious exercise by . . . eliminating its highly visible presence in the Village"—a "very important" part of the group's mission to reach nonpracticing Jews); *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1226–27 (C.D. Cal. 2002)

15

(preliminarily enjoining a municipality's condemnation of property that a church had purchased to build a larger facility sufficient to accommodate its growing membership because "meeting in one location at one time, as well as providing numerous ministries, are central to [the church's] faith," and no alternative site that met the church's needs was available at least within a five-year time horizon).

In contrast, as discussed *supra* p. 8, the Tenth Circuit found no substantial burden imposed by condemnation of a parcel of land where a couple's stillborn daughter was buried because their faith traditions "allow for the moving of gravesites when necessary." *Thiry III*, 78 F.3d at 1496. But that reasoning does not apply here. The shrine on Mount Cristo Rey—much less the mountain itself—cannot simply be moved. The mountaintop shrine is a pilgrimage site that has played a unique role in the borderland community for generations. Bishop Baldacchino Decl. ¶ 7; Castanon Decl. ¶ 10; Bishop Hunn Decl. ¶¶ 4–5. It is a place of cultural and religious exchange at the tristate boundary between Texas, New Mexico, and Chihuahua, Mexico. Bishop Baldacchino Decl. ¶ 17. And "[t]he mountain is not incidental to the religious practice; it is the practice." Bishop Hunn Decl. ¶ 5. Nothing can replace this "*sui generis*" holy site. *Pillar of Fire*, 509 P.2d at 1253.

The Government insists in conclusory fashion that its proposed course of conduct "will not impact the Diocese's access or use of Mount Cristo Rey" and that the mountaintop shrine "will be accessible in the same manner as it had been prior to the taking." Mot. 9; *see also* Enriquez Decl. ¶ 8. There are several reasons to doubt the Government's representations. First, former Secretary of Homeland Security Kristi Noem waived compliance with a host of statutes and regulations that safeguard culturally, historically, and environmentally sensitive sites in connection with border-wall construction. 90 Fed. Reg. 23534 (June 3, 2025). The Government therefore did not undertake the careful review that ordinarily would accompany a federal construction project of this sort. Without such a review, the harms that the Government's actions will inflict on the mountaintop shrine, access

16

to the same, and the natural landscape that inspired its creation in the first place are simply unknowable. Accordingly, there is no reason for this Court to credit the Government's barebones assurances regarding the impact of wall construction on the shrine or access paths.

Second, the Government has shown little respect for Mount Cristo Rey in the preliminary phases of its work in the area. In February 2026, CBP released a promotional video on social media depicting a large explosion. El Paso Sector Border Patrol (@USBPChiefEPT), X (Feb. 4, 2026, 11:48 AM), https://tinyurl.com/5n6yceea. The text accompanying the video brags that "[s]ections of Mt. Cristo Rey in Santa Teresa will undergo a face lift." *Id.* Of course, the only face on Mount Cristo Rey is that of Christ the King. In addition, the Government now admits that it "contracted with construction companies" and "issued notices to proceed" with work on Mount Cristo Rey before even securing title to the property in question. Mot. 2. This contract-first, secure-title-later approach reflects an arbitrary and capricious mode of decision-making.

Third, the Government recently irreparably damaged another sacred site, despite having given similar assurances that it would protect the site during border-wall construction. A fish-shaped geoglyph called an Intaglio that is sacred to O'odham tribes in southwest Arizona is in the footprint of a secondary border wall that the Government is currently constructing. Decl. of Christina C. Bell Andrews ¶¶ 7, 10. When she learned of the Government's plans, Christina C. Bell Andrews, the chair of an organization established to advocate for tribal recognition of the Hia-Ced O'odham people called Hia-Ced Hemajkam, LLC, wrote a letter to CBP to share her concerns that the secondary border wall threatened the Intaglio, as well as other sacred places and landscapes to the O'odham people. *Id.* ¶ 10 & Ex. 1. Paul Enriquez, who appears to be same person as the Government's declarant in this case, responded on behalf of CBP, assuring Andrews that the agency had "made the construction team aware of the importance of the Intaglio" and that the team would "avoid this cultural resource."

17

*Id.* ¶ 11 & Ex. 2.  Unsatisfied with CBP's response, Andrews sent three additional letters warning CBP of the threat that the border-wall construction posed to the Intaglio and other sacred sites.  *Id.* ¶¶ 12–13 & Exs. 3–5.  Despite CBP's assurances, it bulldozed directly through the Intaglio.  *Id.* ¶¶ 14–15 & Ex. 6; *see also* Jake Spring & John Muyskens, *Trump's Border Wall Expansion Just Bulldozed an Ancient Tribal Site*, Wash. Post (May 1, 2026), https://tinyurl.com/rdz4bw6p.  As this episode demonstrates, the Government's assurances that it will protect sacred sites during border-wall construction cannot be trusted.

 

If more reason for skepticism were needed, the past year and a half has shattered the "presumption of regularity" that once attached to the Government's actions.  *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926); *see also* Ryan Goodman et al., *The 'Presumption of Regularity' in Trump Administration Litigation*, Just Sec. (4th ed. Mar. 19, 2026), https://perma.cc/Y3SY-FESW (quantifying the "growing set of cases that had squarely raised the presumption of regularity as a live concern" and courts' findings "in increasingly explicit terms, that the government can no longer demand the degree of deference it once received").

Take two noteworthy judicial opinions issued in recent weeks.  In holding that the U.S. Department of Justice (DOJ) had issued a subpoena for minor patients' medical records without a congressionally authorized purpose, in bad faith, and in violation constitutional privacy rights, a court found that DOJ "ha[d] proven unworthy of [the court's] trust at every point in th[e] case" and that

18

"'the presumption of regularity . . . no longer holds.'" *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 26-mc-0007, 2026 WL 1392565, at *1, 10 (D.R.I. May 14, 2026) (brackets omitted) (quoting *United States v. Oregon*, No. 25-CV-1666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026)).  And in dismissing the Government's criminal prosecution of Kilmar Armando Abrego Garcia—the El Salvadoran national that the United States unlawfully deported to his home country for indefinite detention in the notorious CECOT prison—another court found that the Government had "failed to rebut the presumption of vindictiveness" that its actions toward Abrego Garcia established.  *United States v. Abrego Garcia*, No. 25-cr-115, 2026 WL 1454303, at *3 (M.D. Tenn. May 22, 2026).  No deference is warranted to the Government's assurances here.

### 2. The Border Wall Would Profane Mount Cristo Rey

Even if the construction of a border wall on Mount Cristo Rey would not physically damage the mountaintop shrine or access to it, the presence of the wall would profane this sacred site and "dilute the religious experience" for the faithful who visit it.  Bishop Baldacchino Decl. ¶ 23; Bishop Hunn Decl. ¶ 6 (stating that the Government's actions would "alter[] the character of the pilgrimage route, damage[] the integrity of the sacred landscape, and transform[] a place of prayer into a militarized zone"); Bishop Seitz Decl. ¶ 8 ("A high imposing wall on this mountain would be a scar on this place of natural beauty and sacred significance."); Castanon Decl. ¶ 14 ("Ever since they first started blasting on the south side of the *Sierra*, it looks like there is a scar on the mountain. . . . The visual disturbance significantly affects the sanctity of the site.").

The wall is "a counter-sign to the teachings of the Catholic Church."  Bishop Baldacchino Decl. ¶ 18.  "[U]niversality," the principle that "all people share a common humanity of equal dignity" is a core tenet of the Catholic faith.  *Id.*; *see also* Catechism of the Catholic Church ¶ 831, https://perma.cc/HS5X-RX98 ("[T]he Church is catholic because she has been sent out by Christ on

19

a mission to the whole of the human race."). Based on this principle, "basic goods of human life such as food, water, shelter, and freedom to worship cannot be morally denied to those in need." Bishop Baldacchino Decl. ¶ 18. This core principle has informed the Catholic Church's longstanding advocacy for migrants, exiles, and refugees. *Id.* As Pope Leo XIV has taught, "in every rejected migrant, it is Christ himself who knocks at the door of the community." Pope Leo XIV, Apostolic Exhortation *Dilexi Te* ¶ 75, Vatican (Oct. 4, 2025), https://perma.cc/39KY-52PP. Pope Francis likewise taught that all human life is equally sacred, including the lives of the unborn and the migrant poor. Pope Francis, Apostolic Exortation *Gaudete et Exsultate* (Mar. 19, 2018), https://perma.cc/G2ZD-9DJ7.

A border wall that physically bars refugees from accessing this land of plenty cannot be reconciled with these teachings. Bishop Baldacchino Decl. ¶ 19. In contrast to the Catholic Church's message of common human dignity, the wall "isolates us from the suffering of others." *Id.* The Diocese "recognize[s] that the United States has the right to protect its sovereignty by reasonable means and to secure its borders." *Id.* ¶ 21; *accord* Bishop Seitz Decl. ¶ 5. "But the erection of a physical symbol of division and dehumanization on the holy site of Mount Cristo Rey would shatter the sacredness of that cherished place, especially where there are alternative means of patrolling the border." Bishop Baldacchino Decl. ¶ 22. Construction of the border wall on Mount Cristo Rey would thus "desecrate that holy site" and the sacred religious activities in which pilgrims take part. *Id.* ¶ 23.

The border wall is also a physical symbol of the Government's dehumanizing treatment of migrants writ large. Just weeks ago, the White House released a webpage featuring a Star Wars-like word crawl stating that "[a]liens have been walking among us." *They Walk Among Us*, WhiteHouse.gov, https://perma.cc/29V7-K96K (last visited June 17, 2026). But the White House referred not to extraterrestrial intelligence, but to human migrants. "If you've witnessed an Alien abduction, do not

20

be alarmed," the webpage states. *Id.* "The Alien is in good hands. We will take care of it . . . and return it safely to its place of origin." *Id.* What could be more dehumanizing—literally—than referring to a human being as "it"? The wall is a physical manifestation of this Government's attitude toward migrants. Nothing could be less Catholic.

RFRA and the First Amendment preclude the Government from forcing pilgrims communing with God on Mount Cristo Rey to confront this ugly and immoral message.

### 3. Condemnation Will Prevent the Diocese from Stewarding Its Land

Condemnation of Diocesan land also will "prevent[]" the Diocese from acting as steward of its land consistent with Catholic teachings and values. *Hobby Lobby*, 723 F.3d at 1138 (citation omitted). When Catholic institutions convey or lease land, they often impose restrictions on successor landowners to ensure that land for which those institutions have been responsible is used in a manner consistent with Catholic teachings and values. Bishop Baldacchino Decl. ¶ 25. For example, when the Diocese of Austin, Texas, conveyed some of its property in 2015, it prohibited the land from being used as, among other things, a "'pay day' lending facility" or as a "'head shop' or other business engaged in the sale of drug paraphernalia." *Id.* Ex. 1. Other Dioceses have similarly included conscience-based restrictive covenants in their land transfers. *See id.* Ex. 2 (restrictive covenants that the Diocese of Buffalo, New York, sets forth in land transfers, including a prohibition on church buildings being used for non-Catholic religious rituals), Ex. 3 (Diocese of Brownsville, Texas, prohibiting land transferred to a medical center from being used to perform abortions or euthanasia). Because of its youth and acquisition of its property from the Diocese of El Paso, Texas, the Diocese of Las Cruces has not transferred or leased a great deal of its property. *Id.* ¶ 25. But if the Government sought to purchase land from the Diocese, Catholic teachings and values would require it to similarly

21

restrict the Government from using the land to construct a border wall for all of the reasons previously explained. *Id.* ¶ 26; *see also supra* pp. 19–21.

The Government's exercise of eminent domain, however, precludes the Diocese from exercising this type of control over the land transfer. This, too, substantially burdens the Diocese's free exercise of religion. As the Court has recognized, even now that the Government has taken title, the Court retains power to protect the Diocese's religious interests. It can and should deny the motion for immediate possession. ECF No. 34, at 6. And ultimately, the Taking Act "preserves Defendants' right to challenge the taking and, should they succeed on the merits, allows the Court to divest the United States of title to the property." *Id.*

### B. The Government Cannot Meet Its Burden to Establish that Its Planned Border-Wall Construction Is Narrowly Tailored to a Compelling Governmental Interest

Because condemnation of Diocesan land to build a border wall will substantially burden the free exercise of religion, RFRA and the First Amendment "require[] *the government* to demonstrate" that its proposed course of conduct is "'the least restrictive means of advancing a compelling interest." *Hobby Lobby*, 723 F.3d at 1143 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006)). In assessing the importance of an asserted government interest, courts must "'look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* (quoting *O Centro*, 546 U.S. at 431). "The interest must also be narrowly tailored." *Id.* Thus, the Government carries the burden to demonstrate "with 'particularity how [even] admittedly strong interest[s]' 'would be adversely affected by granting [an] exemption.'" *Id.* (first and second alterations in original) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972)).

In contesting the Diocese's First Amendment and RFRA defenses in its motion for an order for immediate possession, the Government fails to advance an argument—let alone evidence—that its plans for the Diocese's property are narrowly tailored to a compelling government interest. The Government has therefore forfeited its opportunity to make that case. *Carillo v. Penn Nat'l Gaming, Inc.*, 172 F. Supp. 3d 1204, 1215 (D.N.M. 2016) ("[T]he general rule in the Tenth Circuit 'is that a party waives issues and arguments raised for the first time in a reply brief.'" (quoting *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 767 n.7 (10th Cir. 2009))). Regardless, the public record amply demonstrates that the Government's proposed course of action is anything but narrowly tailored.

The Government contends that "[t]his specific area is needed for construction of border barrier to secure the border with Mexico and deter smuggling and illegal entry." Mot. 2. The Diocese, of course, does not contest that the Government has a compelling interest in the "safety and . . . integrity of our borders." *Nat'l Treas. Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989). But that does not mean that a single, unbroken border wall across the entire 1,951-mile U.S.-Mexico border is necessary, let alone narrowly tailored to that interest. Nor does asserting that interest excuse the Government from demonstrating how it would be "adversely affected" by granting an exception for this particular holy site. *Hobby Lobby*, 723 F.3d at 1143 (quoting *Yoder*, 406 U.S. at 236). Indeed, the Government—including this Administration—has previously granted such exceptions. There is no reason why it cannot do so for Mount Cristo Rey.

In 2019, Congress passed—and President Trump signed into law—an appropriations act that expressly barred the use of "funds made available by th[at] Act or prior Acts" for construction of the border wall at five specific sites in Texas. Pub. L. No. 116-6, Div. A, § 231, 133 Stat. 13, 28 (2019). Notably, one of those exemptions resolved the Government's efforts to condemn a sister Diocese's land over religious liberty objections for construction of a segment of border wall that would have

severed the Catholic community in that area from a historic chapel that the community considered to be its "mother church."  *See* Def. Roman Catholic Diocese of Brownsville's Supp. Br. in Opp'n to Pl.'s Mot. for Immediate Possession at 3–5, *United States v. 65.791 Acres of Land*, No. 18-cv-329 (S.D. Tex. Dec. 31, 2018).

Moreover, as set forth above, *see supra* pp. 12–13, the current Administration has exempted over 100 miles of land in the vicinity of Big Bend National Park from border-wall construction.  Over that large swath of land, the Government has apparently concluded that less intrusive "'sensors and cameras' and 'low-profile' vehicle barriers'" will provide adequate border security.  Karas, *supra*.  If such less restrictive alternatives are sufficient over a more than 100-mile stretch of land, then the Government must explain why they are insufficient for the 1.3-mile stretch at issue here.  *See* Bishop Hunn Decl. ¶ 7 ("There is also substantial reason to question whether the proposed construction is necessary to achieve legitimate border security objectives at this specific location" because "Mount Cristo Rey is steep, difficult terrain and the border could be managed there by means other than a border wall.").  That conclusion is reinforced by the Government's claimed achievement of "[t]welve straight months of ZERO releases at the border" without desecrating Mount Cristo Rey.  Press Release, U.S. Dep't of Homeland Sec., Trump Administration Delivers a Full Year of Zero Releases at the Border (May 15, 2026), https://perma.cc/6M2W-YC9A.  This record clearly demonstrates that the Government can achieve border security while also accommodating the Diocese's sincerely held religious beliefs.  RFRA and the First Amendment require the Government to do so.

## CONCLUSION

This Court should deny the Government's motion for an order of immediate possession.

Dated: June 19, 2026

Respectfully submitted,

*/s/ Jonathan L. Backer*

Jonathan L. Backer*
Mary B. McCord*
William Powell*
Seth Wayne
INSTITUTE FOR CONSTITUTIONAL
 ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, DC  20001
(202) 662-4912
sw1098@georgetown.edu

*/s/ Kathryn Brack Morrow*

Kathryn Brack Morrow
MANN MORROW, PLLC
1730 Tierra de Mesilla, Suite 4
Las Cruces, NM 88005
Phone: 575-440-0300
Katy.Morrow@MannMorrow.com


*\*Admitted pro hac vice*

*Attorneys for Defendant Roman Catholic Diocese of Las Cruces*

25

## CERTIFICATE OF SERVICE

I hereby certify that, on June 19, 2026, I electronically filed the foregoing with the Clerk of the Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

/s/ Jonathan L. Backer
Jonathan L. Backer

26