UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:26-cv-01458-KG-GBW |
| 14.259 ACRES OF LAND, MORE OR | ) | |
| LESS, SITUATED IN DOÑA ANA | ) | |
| COUNTY, STATE OF NEW MEXICO, et | ) | |
| al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>DECLARATION OF BISHOP PETER BALDACCHINO</u>**

I, Bishop Peter Baldacchino, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.      I am the Bishop of the Roman Catholic Diocese of Las Cruces, New Mexico, which is comprised of 10 counties in southern New Mexico.  The Diocese of Las Cruces has served southern New Mexico since its establishment in 1982 when it assumed jurisdiction over the New Mexico counties that had previously been part of the Diocese of El Paso, Texas.

2.      I was ordained as a priest for the Archdiocese of Newark, New Jersey, in 1996 and served as the parochial vicar at Our Lady of Mount Carmel in Ridgewood, New Jersey, until 1999. I then worked as a missionary for 15 years in Turks and Caicos, where I served as Chancellor of the Roman Catholic Mission *sui* juris, and pastor of Our Lady of Divine Providence Parish.  I was ordained a bishop on March 19, 2014, and served as Auxiliary Bishop for the Archdiocese of Miami until July 2019 when I was installed as the Bishop of the Diocese of Las Cruces in 2019 and have served in that capacity ever since.

3.      As Bishop, I govern the Diocese as a successor of the Apostles of Jesus Christ. Among other duties, I am responsible for teaching the Word of God to Catholics in southern New

1

Mexico and for governing the Diocese, which includes meeting the needs of the local community, ensuring that Church teaching is transmitted and ecclesiastical laws are observed, and overseeing the administration of the Diocese's finances and property.

4.      In this case, the United States Government seeks to exercise its power of eminent domain to condemn Diocesan property for the purpose of building sections of a barrier wall along the southern border of the United States.  For the reasons stated below, I believe that this proposed taking would substantially burden the free exercise of religion by the Diocese, its parishioners, and the other faithful who seek to gather in community for prayer and liturgical celebration on Diocesan property.  Therefore, as a matter of my office as teacher of the Catholic faith, and for the protection of the faith of all Catholics in the Diocese, I must oppose the Government's efforts to take possession of a portion of the Diocesan property in order to build a border wall on the property.

5.      The Diocesan property that the Government seeks to condemn is located on Mount Cristo Rey in Sunland Park, New Mexico.  Atop the mountain stands a 29-foot-tall limestone statue of Jesus Christ that serves as a shrine and pilgrimage site to thousands of faithful in the El Paso, Texas and Southern New Mexico area.

6.      The statue was the dream of a local parish priest, Father Lourdes Costa, who in 1933 began preaching to his congregation about his vision of a cross on the mountaintop.  At Father Costa's urging, the Las Cruces Diocese's predecessor—the Diocese of El Paso—purchased the property at issue in this case and employed the world-famous sculptor Urbici Soler to realize Father Costa's vision.  The statue was completed in 1939.

7.      For generations since, Mount Cristo Rey has been a holy site of unique significance to Catholics and other people of faith in southern New Mexico—and, indeed, the border region as a whole.

8.      Each year, thousands of faithful make the five-mile roundtrip climb up Mount Cristo Rey as part of annual pilgrimages during the fall on the feast day of Christ the King, during Holy Week in the spring, as well as other pilgrimages throughout the year.  Some climb the mountain barefoot, and others crawl to the summit on their knees.  Pilgrims take in the beauty of the monument and nature that surrounds it.  Mass is celebrated for the gathering of the faithful on the altar present on the mountaintop.  The act of climbing the mountain symbolically brings pilgrims closer to God.

9.      I personally have attended many of these pilgrimages, including for the feast of Christ the King, the last Sunday in November, when I climbed with the people and celebrated Mass for the faithful who gathered.  Mount Cristo Rey occupies a unique place in the spiritual life of our community. As a mountain dedicated to Christ the King, it has long served as a place of pilgrimage, retreat, prayer, and encounter with the living God. Year after year, people come from across diocesan boundaries, across state lines, and across international borders to seek the Lord and to walk together in faith. In a world often marked by division, this place of pilgrimage reminds us of our common dignity as children of God. It is a place where diverse cultures, traditions, and peoples find communion with one another and with Christ. For this reason, Mount Cristo Rey is not merely a landmark; it is a consecrated site whose spiritual significance has touched generations and continues to serve as a place of unity in a divided world.



10.     The Government's condemnation of Diocesan-owned land on Mount Cristo Rey will substantially burden the free exercise of religion in a number of ways.

**Concern and Responsibility of the Bishop to Preserve the Sacred Space Owned by the Diocese of Las Cruces**

11.     The Government's condemnation of Diocesan property to build sections of the border wall is viewed by the Catholic faith community as an act of desecration of sacred space.

12.     The Government claims that its condemnation of Diocesan property on Mount Cristo Rey to build sections of border wall will not disrupt this holy site.

13.     These assurances ring hollow in light of the Government's other actions. Former Secretary of Homeland Security Kristi Noem waived compliance with statutes and regulations that safeguard culturally, historically, and environmentally sensitive sites in connection with border-wall construction. The Government has not conducted a rigorous assessment of the impacts on the shrine, the trails leading to it, or the natural landscape surrounding it.

14.     The land that the Government seeks to condemn is only one-quarter of a mile from the shrine.  The Government has already begun blasting activity at the base of the mountain and has stated that it intends to give Mount Cristo Rey a "face lift," in a social media post that was accompanied by a video depicting a large explosion.  El Paso Sector Border Patrol (@USBPChiefEPT), X (Feb. 4, 2026, 11:48 AM), https://tinyurl.com/5n6yceea.  Such destructive activity—and callous attitude toward it—only heightens my concern that damage to the heart of the shrine – the statue of Christ on the mountaintop, the trails leading to it, or the natural landscape surrounding it will result from the Government's planned activity on Diocesan property.

15.     Moreover, the briefing to date in this case has revealed that the Government signed contracts with construction companies to perform the anticipated work on Mount Cristo Rey before it had secured title to or the right to possess the property in question.  The Government now invokes those contracts as a basis for expedited briefing and consideration of its condemnation action.  The Government's approach—to contract first and secure title later—reveals a troubling penchant for pursuing its plans in an arbitrary and capricious manner.

16.     My concerns are further reinforced by the fact that the Government recently admitted to that its border-wall construction damaged an important archeological and cultural site known as Las Playas Intaglio, which is sacred to indigenous people in the southwest Arizona, despite the Government's assurances that it would safeguard the site.  Jake Spring & John Muyskens, *Trump's Border Wall Expansion Just Bulldozed an Ancient Tribal Site*, Wash. Post (May 1, 2026), https://tinyurl.com/rdz4bw6p.  I fear that the holy site on Mount Cristo Rey will suffer similar desecration as a result of the Government's aggressive, rushed, and haphazard initiative.

17.    Even if the border wall does not damage the walking paths or the statue, it will impede the use of Mount Cristo Rey as a holy site.  Central to the holy ritual of the pilgrimage is experiencing the mountain's unique geological and ecological features, including volcanic rocks that are millions of years old, dinosaur tracks that are even older, and numerous endangered species.  Mount Cristo Rey also serves as a place of cultural and religious exchange at the tristate boundary between Texas, New Mexico, and Chihuahua, Mexico.  Construction of a border wall along the side of the mountain threatens to substantially impair this religious exercise by placing the wall as a visible part of Mount Cristo Rey, a symbol of division and exclusion.

**A Border Wall on Mount Cristo Rey Would Serve as a Counter-Sign to Catholic Teachings**

18.    I believe that a border wall on Mount Cristo Rey would serve as a counter-sign to the teachings of the Catholic Church.  The Catholic Church recognizes and teaches "universality": that all people share a common humanity of equal dignity, and that the basic goods of human life such as food, water, shelter, and freedom to worship cannot be morally denied to those in need.  As Pope Leo XIV has taught, "in every rejected migrant, it is Christ himself who knocks at the door of the community."  Pope Leo XIV, Apostolic Exhortation *Dilexi Te* ¶ 75, Vatican (Oct. 4, 2025), https://perma.cc/39KY-52PP.  These teachings are not novel for the Catholic Church.  Pope Francis likewise explained that migration is an issue of fundamental importance for the Catholic community because many migrants face life-threatening conditions of the cruelest kind.  Thus, the Church's responsibility to protect and defend the poor migrant population is closely related to its moral responsibility to protect and defend the life of the unborn.  Human life is equally sacred, including the lives of the unborn and the migrant poor.  Pope Francis, Apostolic Exortation *Gaudete et Exsultate* (Mar. 19, 2018), https://perma.cc/G2ZD-9DJ7.  And as Pope Pius XII reminded Catholics nearly 75 years ago, "there never has been a period during which the Church

6

has not been active in behalf of migrants, exiles and refugees." Pope Pius XII, *Exsul Familia Nazarethana Apostolic Constitution* (Aug. 1, 1952), https://perma.cc/5HTE-XJ8Y.

19.    The border wall is the antithesis of and an obstacle to this message of human solidarity that Catholic moral teaching requires. A wall sets up a dangerous barrier between peoples, contrary to the principle that human beings have a collective responsibility to one another. It isolates us from the suffering of others.

20.    In my judgment as Bishop, I consider a border wall likely to increase human suffering in the local community and in the world, in contravention of Catholic moral principles. The foundation of Catholic social teaching is that all human life is sacred and that the dignity of the human person is the moral foundation for society. This belief extends from the first moment of existence, continues throughout each person's life, and extends to the end of life. While a wall is not an intrinsic evil, I believe that the building of a border wall will inevitably lead to an increase in physical harm and death to migrants, including innocent children and families.

21.    I recognize that the United States has the right to protect its sovereignty by reasonable means and to secure its borders; this is recognized in Catholic teaching.

22.    But the erection of a physical symbol of division and dehumanization on the holy site of Mount Cristo Rey would shatter the sacredness of that cherished place, especially where there are alternative means of patrolling the border. A barrier that prevents victims of government tyranny, gang violence, domestic abuse, and economic insecurity from seeking what is in many cases life-saving refuge in the United States cannot be reconciled with Catholic teachings.

23.    The presence of an edifice so inconsistent with Catholic values on Mount Cristo Rey will desecrate that holy site and dilute the religious experience that pilgrims seek when summiting the mountain. That harm will be especially acute in light of the mountain's historical,

7

cultural, and religious significance as a symbol of unity and shared heritage amount of the borderland communities.

**The Diocese Must Steward Its Land Consistent with Catholic Teachings**

24.    As the head of the Diocese, I have a moral obligation to uphold Catholic social teaching in all of my actions, including in my stewardship of Diocese-owned lands.

25.    It is the longstanding practice of Dioceses throughout the nation to impose restrictions on land sales and leases to ensure that the Church's property is used in a manner that is consistent with Catholic principles.  Because the Diocese of Las Cruces is relatively young and assumed control of land previously owned by the Diocese of El Paso, it has not transferred or leased a great deal of its own property.  But to take one example from a sister Diocese, the Diocese of Austin, Texas, conveyed a parcel of land in 2015 to a couple and included restrictive covenants in the deed baring the land from being used as a "'pay day' lending facility" or as a "'head shop' or other business engaged in the sale of drug paraphernalia," among other prohibited uses.  Ex. 1. Similarly, when the Diocese of Buffalo, New York, conveys land, it includes restrictive covenants in deeds prohibiting any church buildings located on the property from being used for any "religious rituals, rites, worship, or other organized form(s) of liturgy or religious practice where such use(s) would be contrary to the Code of Canon Law of the Roman Catholic Church."  Ex. 2. And in a 1999 land transfer, the Diocese of Brownsville, Texas, prohibited a regional academic health center run by the University of Texas System from using the property to perform abortions and euthanasia.  *See* Ex. 3.

26.    If the Government sought to purchase land from the Diocese, my obligation as a steward of Diocesan land would require me to restrict the future use of the land to build a border wall.  But the Government's exercise of eminent domain would prevent the Diocese from ensuring

8

that its land is used by successor landowners in a manner consistent with Catholic teachings and values.

27.     Further, the very act of condemnation is contrary to the canonical requirements of the Catholic Church.  If the Diocese were to engage in a sale of this land, it would be required to seek approval from the Vatican's Dicastery of the Clergy.  In that request, the Bishop would be required to present support for the sale of the asset; to have the asset appraised; to negotiate a purchase price at least equal to the appraised price (presumably fair market value); to meet with and receive the affirmative consultation of the Diocesan College of Consultors and the Diocesan Finance Council, as well as the inclusion of the legal restrictions for use of the land by the purchaser to prohibit purposes contradictory to the teachings of the Catholic Church, as noted above.  As the Diocese has not agreed to sell this land, these procedures have not and will not take place, as the condemnation process does not allow for them.

28.     For all of the aforementioned reasons, the Government's condemnation of Diocesan land for the purpose of constructing a border wall would substantially burden the free exercise of religion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June 17, 2026

+Peter Baldacchino

Bishop Peter Baldacchino, Declarant

9

# EXHIBIT 1

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## SPECIAL WARRANTY DEED

**Date:**

**Grantor:** The Most Reverend Joe S. Vásquez, Bishop of the Catholic Diocese of Austin and his successors in office

**Grantor's Mailing Address:** 6225 U.S. Highway 290 E, Austin, Texas 78723

**Grantee:** Harold L. Chapman, Jr. and wife, Tracy R. Chapman

**Grantee's Mailing Address:** 7555 FM 970, Florence, Texas 76527

**Consideration:** Ten and No/100 Dollars ($10.00) and other good and valuable consideration

**Property (including any improvements):**

Lots 12, C.M. STAPP'S SUBDIVISION, according to the map or plat thereof, recorded in Cabinet A, Slide 107, Plat Records, Williamson County, Texas; SAVE AND EXCEPT any portion conveyed to the State of Texas by deed recorded in Volume 354, Page 426, Deed Records, Williamson County, Texas.

**Reservations from Conveyance:** None.

**Exceptions to Conveyance and Warranty:**

(1) All restrictions, covenants, conditions, rights-of-way, assessments, outstanding royalty and mineral reservations and easements, if any, affecting the above described property that are valid, existing and properly of record and subject, further, to taxes for the year 2014 and subsequent years.

(2) Matters reflected on survey prepared by Live Oak Surveying, Dean Woodley, RPLS No. 5086, dated December 9, 2013.

(3) The covenants, restrictions, and conditions set forth in the attached Exhibit A.

**Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever.**

Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Grantor but not otherwise.

**GRANTOR**
MOST REVEREND JOE S. VÁSQUEZ, BISHOP OF THE CATHOLIC DIOCESE OF AUSTIN AND HIS SUCCESSORS IN OFFICE

By the Most Reverend Daniel E. Garcia, Auxiliary Bishop and Vicar General of the Catholic Diocese of Austin and attorney in fact for the Most Reverend Joe S. Vásquez

STATE OF TEXAS     §
COUNTY OF TRAVIS   §

This instrument was acknowledged before me on the __19th__ day of September, 2015, by the Most Reverend Daniel E. Garcia as attorney in fact on behalf of the Most Reverend Joe S. Vásquez, Bishop of the Catholic Diocese of Austin, and his Successors in Office.

JANICE M. INGRAM
Notary Public, State of Texas
My Commission Expires
May 13, 2017

_Janice M. Ingram_
Notary, State of Texas
My commission expires:

**Exhibit A - To Special Warranty Deed**

For the benefit of the Most Reverend Joe S. Vásquez, Bishop of the Catholic Diocese of Austin, and his Successors in Office, and for the benefit of Santa Rosa Catholic Church – Andice, Texas, the following restrictive covenants on the real property conveyed by this deed are imposed, but only to the extent described below:

(1) The Property conveyed by this deed may not be used or leased for any purpose or in any manner for or in connection with any of the following uses (collectively, the "**Restrictions**"):

(a) any type of sexually oriented business including, without limitation, any establishment featuring nude or topless performances, massage parlors, modeling studios, tanning salons, bookstores or video sales or rent stores primarily engaged in the sale or lease of sexually explicit materials; provided, that, nothing herein shall prohibit "incidental" (defined below) sales or rentals of videos;

(b) any bar, restaurant or other business which derives more than 50% of its revenues from the sale of alcohol;

(c) any pool hall or other establishment primarily engaged in gaming or gambling activities;

(d) any tattoo parlor, pawn shop, or "pay-day" lending facility;

(e) any "head shop" or other business engaged in the sale of drug paraphernalia; or

(f) any business, establishment, agency or other organization which offers, promotes or is otherwise involved in human abortion, sterilization, euthanasia, cloning, artificial insemination, artificial contraception, terrorism, violence against innocent persons, satanic practices, mind control, cult practices, or death by means other than natural causes.

(2) 'Incidental' sales or rentals means sales and rentals which, in the aggregate, do not account for more than 10% of the total revenues derived from the operation of the business conducted by the applicable owner or tenant.

(3) Grantor may exercise all remedies available to it under law or equity to prevent any person from violating the Restrictions and to collect damages for such violations.

(4) The Restrictions run with the land for the benefit of Most Reverend Joe S. Vásquez, Bishop of the Catholic Diocese of Austin, and his Successors in Office, and for the benefit of Santa Rosa Catholic Church – Andice, Texas. The Restrictions are binding on Grantee and all subsequent owners of the Property, as well as their successors and assigns.

(5) The Restrictions may be amended or deleted only by written agreement, duly recorded, by and between the owner(s) of the Property and the Most Reverend Joe S. Vásquez, Bishop of the Catholic Diocese of Austin or his successors in office.

(6) If any part of the Restrictions is declared invalid or unenforceable by judgment or court order, such declaration shall not affect any other part of the Restrictions and the remaining part of the Restrictions shall remain in effect.

(7) If any time Grantor fails to enforce the Restrictions, whether or not any violations of the Restrictions are known, such failure shall not constitute a waiver or estoppel of the right to enforce the Restrictions."

# EXHIBIT 2

RESTRICTIVE COVENANTS

A.    Grantor is a religious corporation operated under the auspices of the Roman Catholic Church and the [Description of Buildings – Church Building, Convent, Rectory, etc.] now existing upon the real property upon which a church or other place of worship is located to be conveyed hereby, including any buildings or structures which are physically attached to same (each of the foregoing hereinafter referred to as a "Church Building" and collectively referred to as the "Church Buildings") have been identified with it by reason of its long-continued ownership and use by Grantor.  It is therefore of the utmost importance to Grantor that the Church Building(s) not be used or altered in any way that would violate any of the covenants and/or restrictions set forth below.  Grantor would not have entered into this Contract if Grantee had been unwilling to accept a Deed containing said covenants and restrictions.  For the avoidance of doubt, these covenants and/or restrictions shall apply only to Church Buildings, not to vacant or unimproved real property, or to any buildings constructed on vacant or unimproved real property.

B.    Grantee acknowledges and agrees that the Deed to be delivered pursuant to this Contract shall contain the following restrictions and covenants which shall run with the land for a period of **[twenty-five (25) years] [forty (40) years]** from the date of recording of the Deed, or until such time as the Church Buildings have been razed in their entirety, and be binding on the Grantee and its heirs, distributees, beneficiaries, executor(s) and/or administrator(s), invitees, lessees, successors, and assigns:

I.    The Grantee recognizes that the Grantor is a religious corporation operated under the auspices of the Roman Catholic Church and that the Church Building(s) hereby conveyed are identified with it by reason of the Grantor's long-continued ownership of such property.  The Grantee accordingly recognizes and agrees that: (a) the covenants and restrictions contained herein shall run with the land and shall be binding on the Grantee, its heirs, distributees, beneficiaries, executor(s) and/or administrator(s), invitees, lessees, successors, and assigns; and (b) any violation of any of the covenants in subparagraphs II, III, IV, V, VI, VII, and VIII of this Section would be seriously damaging and harmful to the reputation and standing of the Grantor as such a religious corporation and shall constitute a breach of this Contract; and

II.    The parties acknowledge and agree that the entire name or title of Grantor, or material portion thereof, or any abbreviations, derivations, or combination or part thereof, including but not limited to the word "Catholic", belong exclusively to the Grantor, which reserves and retains the sole and exclusive right to the use of said name or title.  The Grantee agrees that, upon transfer of property title from Grantor to Grantee herein, the Grantee shall rename the property and shall use only that new name.  The Grantee agrees that it shall not use, identify, or refer to said reserved name or title in any manner whatsoever.

21491593.v3

III.        In all uses of the Church Building(s) herein conveyed or to be conveyed, the Grantee shall be mindful and respectful of the religious and historical tradition and significance of the Church Building(s) on the property and the former use of the Church Building(s) and, shall not use or permit the use of such the Church Building for religious rituals, rites, worship, or other organized form(s) of liturgy or religious practice where such use(s) would be contrary to the Code of Canon Law of the Roman Catholic Church, as interpreted; and

IV.        The Grantee shall not use or permit the Church Building(s) to be used for any purposes either by speech or action which would bring discredit, ridicule, criticism, and/or scandal upon said history and tradition or upon the Roman Catholic Church; and

V.        The Grantee covenants that it shall not use or permit the Church Building(s) to be used for a church, edifice, or place for a congregation, society, or other assemblage of persons to meet for divine worship or other religious observances or activities promoted or defined as Roman Catholic but not possessing the express ecclesiastical and civil approvals of the Roman Catholic Church and of Canon Law of the Roman Catholic Church and the Religious Corporations Law of New York; and

VI.        The Grantee covenants that it shall not permit or conduct any obscene performances in violation of Section 235.00 of the New York Penal Code on the premises hereby conveyed (land and Church Buildings) or permit them to be used for any obscene or pornographic purposes or activities including, without limitation, the sale or distribution of any obscene or pornographic material, a topless bar, x-rated movie theater, or similar establishment, or an astrology or fortune telling establishment.  The terms "obscene material" and "performances" shall be defined for purposes of this covenant as they are defined in Section 235.00 of the New York Penal Code; and

VII.        Grantee covenants that it shall not use, permit, or suffer a Church Building hereby conveyed to be used or occupied for or in connection with, or in support of or affiliated with, or for the performance of, euthanasia and/or assisted suicide, or abortions or for any abortion-related services and/or activities, or for performance of any procedures or any services or activities related to family planning, counseling or advice related to or promoting abortions or family planning, sterilization, artificial insemination, and/or euthanasia, or for the prescribing and/or dispensing of an abortifacient if such conduct violates the moral tenets or beliefs of the Roman Catholic Church and/or the Diocese of _____, or the rules and regulations thereof as promulgated from time to time, and the "Ethical and Religious Directives for Catholic Health Care Services" issued by the United States Catholic

Conference, as those doctrines and directives are modified, revised, and/or amended from time to time, for as long as any such Church Building(s) shall stand.  The Grantee shall not place any signs, literature, or advertising relating to such prohibited activities on the property or distribute the same on the property; and

VIII.        The Grantee covenants that it shall not use, permit, or suffer any Church Building(s) hereby conveyed, and which such Church Buildings were actually utilized for worship purposes, to be used or occupied for purposes of a night club, bar, banquet facility, or restaurant licensed to sell or serve alcohol, a casino, or other similar establishment.

C.    The covenants and restrictions set forth in Sections A and B herein shall each run with the land as delineated above and shall bind the Grantee and its heirs, distributees, beneficiaries, executor(s) and/or administrator(s), invitees, lessees, successors, and assigns and any violation of any of these covenants and/or restrictions shall, in addition to any other remedies the Grantor may have in law or equity, entitle the Grantor and its successors and assigns to a permanent injunction in any court of competent jurisdiction in the State of New York enforcing these covenants.

In the event that any of the above separate and distinct restrictions and/or covenants are adjudged invalid or unenforceable, such adjudication shall in no matter affect the other restrictions, which shall remain in full force and effect as if the portion(s) so adjudged invalid or unenforceable were not originally a part thereof.

The foregoing restrictions and/or covenants may be removed in the sole discretion of the Grantor and/or, in the case where the Grantor is no longer a functioning Roman Catholic Church, by any successor corporation to the Grantor, and/or, in any case, by the Diocese of _____, upon application by an interested party.  The Grantor, upon application by an interested party, shall also provide its opinion of whether a proposed use constitutes a violation hereof to interested parties, including contract vendees, lessees, and/or potential Grantees at foreclosure sales.

[Remainder of Page Intentionally Blank; Signature Page Follows]

21491593.v3

IN WITNESS WHEREOF, Grantor and Grantee have hereunto set its hand and seal on the _____, 20__.

Grantor:                                              Grantee:

_____                    _____


By: _____              By:   _____
    (Most Reverend) _____          Name:
    President                                            Title:

21491593.v3

# EXHIBIT 3

VOL. 5667 PAGE 310

OFFICIAL RECORDS   27014

Southern Texas Title Co.

G.F. No. 98-55653B Kg

## GENERAL WARRANTY DEED

STATE OF TEXAS      §
§
COUNTY OF CAMERON      §

**Effective Date:**     June 21, 1999

**Grantor:**      THE MOST REVEREND RAYMUNDO J. PEÑA, as BISHOP OF THE ROMAN CATHOLIC DIOCESE OF BROWNSVILLE and for his successors in office

**Grantor's Mailing Address (including county):**

Pastoral Center
P.O. Box 2279
1910 East Elizabeth Street
Brownsville, Cameron County, Texas 78520
Attention: Bishop Raymundo J. Peña

**Grantee:**      VALLEY BAPTIST MEDICAL CENTER

**Grantee's Mailing Address:**

2101 Pease Street
P.O. Drawer 2588
Harlingen, Cameron County, Texas 78551
Attention: Mr. Ben McKibbens

**Property (including any improvements):**

A 7.630 acre tract of land, more or less, described on Exhibit "A" attached hereto and incorporated herein for all purposes, together with all rights and interests appurtenant thereto, including all of Grantor's right, title and interest in and to adjacent streets, alleys, rights-of-way and any adjacent strips or gores of real estate ("Land"), all improvements located on the Land ("Improvements"), and all rights, titles and interests appurtenant to the Land and Improvements.

**Reservations from and Exceptions to Conveyance and Warranty:**

GENERAL WARRANTY DEED (7.630 ACRES)
PAGE 1 OF 8

INITIALS

VOL. 5667 PAGE 311

All easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded restrictions, reservations, covenants, conditions, oil and gas leases, mineral severances, and other instruments, other than liens and conveyances, that affect the Property; rights of adjoining owners in any walls and fences situated on a common boundary; any discrepancies, conflicts, or shortages in area or boundary lines; any encroachments or overlapping of improvements; and all rights, obligations, and other matters emanating from and existing by reason of the creation, establishment, maintenance and operation of any municipal and/or other governmental authorities.

This conveyance is further made subject to those items specifically listed on Exhibit "B" attached hereto and incorporated herein for all purposes.

**WHEREAS**, the 75th Texas Legislature enacted Senate Bill 606 (now codified as Sections 74.611 through 74.615, Texas Education Code and referred to herein as the "Act") which authorized The University of Texas System (the "University") to establish a regional academic health center serving Cameron, Hidalgo, Starr and Willacy Counties in the Lower Rio Grande Valley of Texas, which the Act states may be used for the purposes of providing undergraduate clinical education, graduate education including residency training programs, or other levels of medical education in those counties; and

**WHEREAS**, the University, acting through its Board of Regents, designated the University of Texas Health Science Center at San Antonio as its component institution with responsibility for oversight of the regional academic health center facilities in Harlingen, Cameron County, Texas; and

**WHEREAS**, the University issued a Request for Proposal for the purpose of seeking to enter into agreements and other contractual arrangements for the establishment of an affiliation for the development of undergraduate and graduate medical education and other health professions education programs of the highest quality and to accept the donation of suitable sites for the location of facilities throughout the region for the regional academic health center; and

**WHEREAS**, Grantor owns the Property and entered into an Option Agreement with Grantee for the sale of the Property by Grantor to Grantee, and Grantee, based on said Option Agreement, offered to donate the Property to the University for the purposes of the Act and in response to the University's Request for Proposal and to provide a location for facilities of a regional academic health center in Harlingen, Cameron County, Texas; and

**WHEREAS**, the University accepted the proposal and offer of Grantee for the donation of the Property for the hereinabove described purposes, and Grantee has

**GENERAL WARRANTY DEED (7.630 ACRES)**
**PAGE 2 OF 8**

INITIALS:

VOL. 5667 PAGE 312

exercised its option to purchase the property from Grantor and now desires to purchase the Property for the purpose of donating the Property to the University for said purposes;

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and value of which are hereby acknowledged, Grantor GRANTS and CONVEYS to Grantee the Property, provided and on condition that the Property is used by Grantee and its successors and assigns subject to the conditions, reservations and exceptions expressly set forth herein.

TO HAVE AND TO HOLD the Property, together with all and singular, the rights and appurtenances thereto or in anywise belonging, unto Grantee and Grantee's successors or assigns, forever; and Grantor does hereby bind Grantor and Grantor's successors and assigns to WARRANT and FOREVER DEFEND, all and singular, the Property to Grantee and Grantee's successors and assigns, against every person whomsoever, lawfully claiming or to claim the same.

PROVIDED, however, that this conveyance of the Property is made by Grantor on the condition that the Property shall not be used for the performance of abortions or euthanasia, as those terms are defined herein (the performance of abortions or euthanasia being referred to herein as "Prohibited Purposes"). For purposes of this condition:

(a)    the term "abortion" shall be defined to mean the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus, and

(b)    the term "euthanasia" shall be defined to mean an action or omission intended to cause death in order to alleviate suffering, including the intentional promotion or assistance of the commission of suicide by another, but does not include the withholding or withdrawing of life-sustaining procedures from a patient in accordance with Chapter 672 of the Texas Health and Safety Code, as it may be amended from time to time.

The language contained in this paragraph of this General Warranty Deed is intended to create and does create a condition subsequent, and it is the intent of Grantor to convey to Grantee a fee simple subject to a condition subsequent. The condition subsequent contained in this General Warranty Deed is for the sole benefit and protection of Grantor and Grantor's successors in office, is not intended to create any rights or benefits for any other person or entity, and is enforceable only by Grantor or Grantor's successors in office. Said condition subsequent and Grantor's right of re-entry shall automatically terminate on the thirtieth (30th) anniversary of the Effective Date of this General Warranty Deed.

In the event that the Property is used for a Prohibited Purpose without the written

GENERAL WARRANTY DEED (7.630 ACRES)
PAGE 3 OF 8

INITIALS:


VOL. 5667 PAGE 313

consent of Grantor, Grantor shall provide Grantee, or the then owner of the Property, as applicable, with written notice specifying the occurrence or occurrences which constitute a violation of the Prohibited Purposes and this condition subsequent. Upon its receipt of any such written notice, Grantee or the then owner of the Property, as applicable, shall take action to immediately cure the violation and shall, in no event, have more than thirty (30) days within which to cure such violation. Ceasing the action identified in Grantor's written notice and taking all reasonable steps to avoid any future violations shall constitute a satisfactory cure. In the event that Grantee or the then owner of the Property, as applicable, shall fail to cure such violation within such period of time, Grantor shall have the right to re-enter and assume ownership of that portion of the real Property and improvements that is being used in violation of the Prohibited Purposes.

Any notice required or permitted to be delivered under this General Warranty Deed shall be deemed received when actually delivered by hand delivery, facsimile transmission, or overnight courier, or three days after it is deposited in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to:

(a)   Grantor or Grantee, as the case may be, at the address stated on the first page of this General Warranty Deed, or

(b)   if to the University, to the attention of the Executive Director of the Real Estate Office, 210 West 6th Street, Austin, Travis County, Texas 78701, or

(c)   If to a successor in title to Grantee, to such address as may be contained in any deed or instrument recorded in the Official Records of Cameron County, Texas and conveying title to the Property, or a portion thereof, to such successor.

EXECUTED on the date set forth in the acknowledgment line below, to be effective for all purposes as of the Effective Date.

THE MOST REVEREND RAYMUNDO J. PEÑA, as BISHOP OF THE ROMAN CATHOLIC DIOCESE OF BROWNSVILLE and for his successors in office

By: _____

Bishop Raymundo J. Peña

GENERAL WARRANTY DEED (7.630 ACRES)
PAGE 4 OF 8

INITIALS:

VOL. 5667 PAGE 314

STATE OF TEXAS          §
                       §
COUNTY OF CAMERON       §

This instrument was acknowledged before me on the 24th day of June, 1999, by Raymundo J. Peña, Bishop of the Roman Catholic Diocese of Brownsville, on behalf of and as the act and deed of the Bishop and the Roman Catholic Diocese of Brownsville.



CLARA M. MARTINEZ
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-26-99

Notary Public in and for The State of Texas

AFTER RECORDING, RETURN TO:

Randolph Kimble Whittington
Attorney at Law
2014 East Harrison Street
Harlingen, Texas 78550

**GENERAL WARRANTY DEED (7.630 ACRES)**
**PAGE 5 OF 8**

INITIALS:


VOL. 5667 PAGE 315

## EXHIBIT "A"
## GENERAL WARRANTY DEED
### THE MOST REVEREND RAYMUNDO J. PEÑA, as BISHOP OF THE ROMAN CATHOLIC DIOCESE OF BROWNSVILLE and for his successors in office to VALLEY BAPTIST MEDICAL CENTER

### Legal Description of Property

A 7.630 acre tract of land, more or less, out of Block One Hundred Seventy-Nine (179), San Benito Land and Water Company's Subdivision, City of Harlingen, Cameron County, Texas, as recorded in Volume 1, Page 6 of the Map Records of Cameron County, Texas, said 7.630 acre tract of land being more particularly described as follows:

COMMENCING at the Southwest corner of said Block 179, said corner being within the right of way of 77 Sunshine Strip (Highway Business 77); THENCE, South 59 degrees 17 minutes East, with and along the South line of said Block 179, a distance of 330.00 feet to a point; THENCE, North 30 degrees 43 minutes East, parallel to the West line of said Block 179, at a distance of 23.70 feet passing a ½ inch steel rod found on the North right of way line of said 77 Sunshine Strip, and the Southwest corner of Uhlhorn Subdivision as recorded in Volume 22, Page 37 of the Map Records of Cameron County, Texas, at a distance of 323.70 feet passing a ½ inch steel rod found on the Northwest corner of Lot 1 of said Uhlhorn Subdivision, at a distance of 343.70 feet passing the Northwest corner of said Uhlhorn Subdivision, and Southwest corner of New Parish Subdivision as recorded in Cabinet 1, Slot 434-A of the Map Records of Cameron County, Texas, a total distance of 443.70 feet to a ½ inch steel rod set on the Northwest corner of said New Parish Subdivision, said corner also being the Southwest corner and POINT OF BEGINNING of the tract of land herein described;

THENCE, continuing North 30 degrees 43 minutes East, parallel to the West line of said Block 179, a distance of 876.30 feet to a ½ inch steel rod set for the Northwest corner of this tract;

THENCE, South 59 degrees 17 minutes East, parallel to the South line of said Block 179, a distance of 188.58 feet to a ½ inch steel rod set for a corner of this tract;

THENCE, South 14 degrees 17 minutes East, a distance of 169.71 feet to a ½ inch steel rod set for a corner of this tract;

GENERAL WARRANTY DEED (7.630 ACRES)
PAGE 6 OF 8

INITIALS:

**VOL. 5667 PAGE 316**

THENCE, South 59 degrees 17 minutes East, parallel to the South line of said Block 179, a distance of 91.42 feet to a ½ inch steel rod set on the West right of way line of Tennessee Avenue (60.00 foot right of way) (not being used) for the Northeast corner of this tract;

THENCE, South 30 degrees 43 minutes West, with and along the West right of way line of said Tennessee Avenue, a distance of 756.30 feet to a ½ inch steel rod set for the Southeast corner of this tract, said corner also being the Northeast corner of said New Parish Subdivision;

THENCE, North 59 degrees 17 minutes West, with and along the North line of said New Parish Subdivision, a distance of 400.00 feet to the POINT OF BEGINNING and containing 7.630 acres of land, more or less.

**GENERAL WARRANTY DEED (7.630 ACRES)**
**PAGE 7 OF 8**

INITIALS:



VOL. 5667 PAGE 317

## EXHIBIT "B"
## GENERAL WARRANTY DEED
### THE MOST REVEREND RAYMUNDO J. PEÑA, as BISHOP OF THE ROMAN CATHOLIC DIOCESE OF BROWNSVILLE and for his successors in office to VALLEY BAPTIST MEDICAL CENTER

### Reservations and Exceptions to Conveyance and Warranty

(1)    Overhead High Voltage Electric Powerlines and Power Poles as shown on Survey, dated September 22, 1998, prepared by Martin, Brown and Perez Engineering-Surveying, Job No. 98-7821.

(2)    Right of way easement, dated December 11, 1947, executed by Jack Elliott and F. L. Flynn to Central Power and Light Company, recorded in Volume 431, Page 505, Deed Records of Cameron County, Texas.

GENERAL WARRANTY DEED (7.630 ACRES)
PAGE 8 OF 8

INITIALS

**VOL. 5667 PAGE 318**

27014

FILED FOR RECORD

AT_____

1999 JUN 24  P 4: 44

JOE G. RIVERA
CLERK COUNTY COURT
CAMERON COUNTY, TEXAS

BY_____DEPUTY

STATE OF TEXAS
COUNTY OF CAMERON
  I hereby certify that this instrument was FILED on the
date and at the time stamped hereon by me and was duly
RECORDED in the Volume and page of the named RECORDS
of Cameron County, Texas as stamped hereon by me

County Clerk
Cameron County, Texas