UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA          )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )     CIVIL NO. 2:26-cv-01458-KG-GBW
                                  )
14.259 ACRES OF LAND, MORE OR LESS, )
SITUATE IN DOÑA ANA COUNTY, STATE OF )
NEW MEXICO; CATHOLIC DIOCESE OF LAS )
CRUCES; AND DOÑA ANA COUNTY        )
TREASURER.                        )
          Defendants.             )
                                  )
                                  )
                                  )

**UNITED STATES OF AMERICA'S REPLY IN SUPPORT OF ITS MOTION
FOR ORDER OF IMMEDIATE POSSESSION**

There is a fundamental problem with the Diocese's Response: every argument presumes the condemnation to be illegal, conflating the Government's statutory right to possession of the subject property with the legality of the taking. The Diocese devotes more than 100 pages of brief and supporting declarations to challenging the condemnation but fails to state any reason [other than the condemnation is illegal] to deny possession. The question of the legality of the condemnation is not before the Court.[1] Rather, the narrow question before the Court is whether

---

[1] As this Court has acknowledged, Fed. R. Civ. P. 71.1(e) requires that any defenses and objections to the condemnation must be raised in an answer to the complaint. *See* Mem. Op. and Order dated June 15, 2026 (ECF No. 34), p. 7. The Diocese accuses the United States of ignoring its First Amendment defense (Resp. at 10) and forfeiting arguments that the Government's plans are the least restrictive means of advancing a compelling interest (Resp. at 23). But at the time the Motion was filed, the Diocese had yet to actually plead any defenses in an answer to the Complaint, the only forum to do so, as mandated by Rule 71.1(e). Thus, the United States will address the Diocese's arguments challenging the underlying condemnation when the Diocese files an answer to the complaint, to which the United States will file a responsive pleading by July 20, 2026, in accordance with the Scheduling Order (ECF No. 35).

the Government is entitled to possession of land for which it now has title. *See* ECF No. 43 (docket entry regarding court registry deposit).

Congress has directed the United States to use the subject property to build necessary border barrier and roads. *See* ECF 2-1 Schedule A: Authority; Public Law 104-208, Division C, Section 102(a) ("The Attorney General…shall take such actions as may be necessary to *install additional physical barriers and roads* (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.") (emphasis added). Despite this explicit direction, the Diocese asks the Court to deny the transfer of possession of the 14.259 acres of land to the Government, without demonstrating any facts that such a transfer would harm the Diocese's access to and use of the remaining 250+ acres of its property.

To be clear, the United States does not dispute the historical and religious significance of Mount Cristo Rey, nor does it doubt the sincerity of the religious views held by the Diocese and its parishioners. Even so, neither the religious significance of the subject property nor the Diocese's opposition to the government project and the border wall are a basis to deny the instant Motion. The declarations filed in support of the Diocese's Response, while compelling in the sincerity of their religious views, underscore the absence of any physical impact on the path up Mount Cristo Rey or the shrine itself. *See, e.g.*, Bishop Baldacchino Decl. ¶ 17, ECF No. 37 ("Even if the border wall does not damage the walking paths or the statue…it will substantially impair this religious exercise by placing the wall as a visible part of Mount Crist Rey, a symbol of division and exclusion."). The patrons of the Diocese remain free to climb Mount Cristo Rey, attend Mass and pray at the statue. Mot. at 9, ECF No. 22; *see also* Enriquez Decl. ¶ 8.

Because the Diocese has failed to demonstrate any actual physical interference on Mount Cristo Rey and has failed to suggest *any* terms by which the Court could address its concerns about a transfer of possession to the United States, there is no basis to deny the Motion. The United States respectfully requests that the Court grant its Motion for Order of Immediate Possession of the subject property (described at ECF No. 2-3, hereinafter "Property").

## I.     The Declaration of Taking Act and Supreme Court Precedent Mandate the *Immediate* Transfer of Possession, even Before the Diocese is Allowed to Present its Defenses.

The Diocese dismisses the Government's inherent power of eminent domain, ignoring the Supreme Court precedent cited by the Government (*United States v. Carmack*, 329 U.S. 230, 236-37 (1946); *Albert Hanson Lumber Co. v. United States*, 261 U.S. 581, 587 (1923); *Bauman v. Ross*, 167 U.S. 548, 574 (1897)) that explicitly affirms this power, and instead, argues that the Government is somehow "disregard[ing] the Bill of Rights." Resp. at 10, ECF No. 36.

Nonetheless, the Government agrees with the Diocese that the Declaration of Taking Act ("Act"), 40 U.S.C. § 3114, authorizes the court to "fix the time within which, and the terms on which, the parties in possession shall be required to surrender possession to the petitioner . . . " Resp. at 4 quoting § 3114(d)(1). While the Court maintains this vital role in ensuring an orderly transfer of possession, the Act does not permit the denial of possession altogether. *See In re United States*, 257 F.2d 844, 846 (5th Cir. 1958) ("'The court does not award the right of possession nor adjudge the title…The law gives the right of possession, apparently without the necessity of any court order, though it is orderly and decent to get one.'" (quoting *Dade Cty. v. United States*, 142 F.2d 230, 231 (5th Cir. 1944))). But that is exactly what the Diocese seeks here, conflating this Court's authority to set reasonable terms of possession with the power to enjoin the taking.

The central purpose of the Act's provision granting *immediate* possession is so that government projects can proceed in a timely manner. *United States v. Miller*, 317 U.S. 369, 381 (1943) ("The purpose of the statue is twofold. First, to give the Government *immediate* possession of the property….") (emphasis added); *see also, e.g.*, *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984) (explaining that, upon the filing of the declaration of taking and deposit of the estimated just compensation, "[t]itle and right to possession thereupon vest immediately"); *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, 825 (4th Cir. 2004) (internal citations omitted) ("In a [Declaration of Taking Act] case the government exercises its right to immediate possession with minimal judicial oversight. Title and the right to possession vest in the government immediately upon the filing of a declaration and the requisite deposit…the government takes possession of the condemned property as a matter of course, unless the landowner or occupant demonstrates some undue hardship that warrants a delay."); *McKendry v. United States*, 219 F.2d 357, 358 (9th Cir. 1955) (explaining that Congress passed the Declaration of Taking Act "for the express purpose of allowing the government possession and use of the land involved without awaiting termination of interminable litigation").

A district court may not refuse an order of possession under the Act. *See In re United States*, 257 F.2d at 848; *see also United States v. Cobb*, 328 F.2d 115, 116 (9th Cir. 1964) (citing *In re United States*, finding that the district court was not empowered to deny the Government's motion for possession or set aside the declaration of taking based on a finding of lack of good faith because "[T]he statute contains no such provision. If such power exists it must be implied."). The Court has the authority to set the terms of possession, but any authority to prevent the United States from obtaining possession altogether is limited to a finding that the taking was conducted illegally—without proper authority or public purpose. *See In re United States v. 101.88 Acres of*

4

*Land, etc.,* 616 F.2d 762, 767 (5th Cir. 1980) (when the government specifies the nature and extent of the interests to be acquired in its complaint for condemnation, a court has no power to increase or decrease them, only to inquire whether the use authorized for the taking is a public use) (citation omitted)).

Here, the Diocese does not challenge the authority for the taking as set forth in Schedule A of the Declaration of Taking nor does it assert that the taking does not have a valid public purpose. In fact, the Diocese concedes that this taking is for a clear public purpose—securing the United States' border with Mexico. Resp. at 20, ECF. No. 36 ("The Diocese 'recognize[s] that the United States has the right to protect its sovereignty by reasonable means and to secure its borders.'"). Rather, the Diocese's objection to the taking is that the proposed border wall is fundamentally "inconsistent with Catholic values." *Id*. at 7. In other words, the Diocese objects to the government project itself, not the authority for the project. Such an objection is not a valid defense to the transfer of possession; the Diocese's remedy lies with the legislature which authorized the project.

Just as the Diocese conflates the Government's statutory right to possession with the legality of the taking, the Diocese also conflates the caselaw that requires government compliance with certain environmental and historical laws as part of the terms for possession with a non-existent "limiting provision" that acts as a bar to possession. Resp. at 4-5. In *United States v. 162.20 Acres of Land*, 639 F.2d at 304–05 (5th Cir. 1981), the court held that the National Historic Preservation Act ("NHPA") was not a defense to a federal condemnation action because "only an express statement by Congress that NHPA noncompliance is a defense to a condemnation itself would be sufficient to achieve that result." *Id*. at 304. That said, the court found that NHPA could be used to *guide* the terms of possession, not prohibit it entirely. *Id*. at 305. Similarly, in *United*

*States v. 0.95 Acres of Land*, 994 F.2d 696 (9th Cir. 1993), landowners challenged the government's taking of their land by invoking the National Environmental Policy Act ("NEPA") as a defense and claiming that full NEPA compliance was required. *0.95 Acres of Land*, 994 F.2d at 697. The district court agreed and vacated the declarations of taking and the orders of possession. *Id*. On appeal, the Ninth Circuit reversed the district court's order, holding that NEPA cannot be a defense to the condemnation action. *Id*. at 699. Actions that fall under NEPA's umbrella may be challenged following the condemnation. *Id*.

Contrary to the Diocese's assertion that the foregoing cases support the proposition that "the Government's ability to take possession of land under the Taking Act is subject to the constraints imposed by other statutes" (Resp. at 6), these cases cement the Government's inherent power of eminent domain and separate that power from the procedural, cultural and environmental regulations of NEPA or NHPA. At most, the cases cited by the Diocese indicate that compliance with these statutes could be used to guide the terms of possession, not to prohibit possession altogether.

To date, the Diocese has refused to propose or negotiate any terms of possession that would address its alleged concerns, because it does not want the United States to ever gain possession of the property and construct border wall on it. The United States first reached out to the Diocese as far back as September 2024 to discuss CBP's plans for the Property and attempt to negotiate a right-of-entry for survey to assess the Property as part of the project. Enriquez Supp. Decl. ¶ 12. CBP scheduled a meeting with the Diocese in January 2025 but shortly before the meeting, the Diocese unilaterally cancelled it without explanation. *Id*. at ¶ 13. Additionally, as part of the due diligence for the project, from June to July 2025, CBP sought public input on the potential impacts to the environment, culture, and commerce, including potential socioeconomic impacts, and

quality of life. Enriquez Supp. Decl. ¶¶ 10-11. CBP compiled the feedback received during the comment period into a Stakeholder Feedback Report, which was used to inform the project's environmental planning process. Stakeholder Feedback Report for Border Barrier Construction in Doña Ana County, NM, p. 6 (Nov. 14, 2025), https://www.cbp.gov/document/environmental-assessments/border-barrier-construction-do-ana-county-new-mexico-june-2025, https://perma.cc/XS9C-F8GT ("CBP has determined that the barrier construction will have no adverse impact on the routine pilgrimages nor the historic and cultural significance of Mount Cristo Rey.").

Now, the Diocese asks this Court to substitute its own judgment for that of the Government's regarding the necessity and placement of border infrastructure. *See* Resp. at 22-24, Bishop Hunn Decl. ¶ 7 ("There is also substantial reason to question whether the proposed construction is necessary to achieve legitimate border security objectives at this specific location."). The Supreme Court's decision in *Berman v. Parker*, 348 U.S. 26 (1954) prohibits courts from second-guessing the Government's judgment in such a manner:

> It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

*Id*. at 36.

II. **The Diocese offers no evidence that a transfer of possession of 14.259 acres on the south side of the 268.36-acre parcel would impact the shrine or access to it on the north side of the mountain.**

The Diocese argues that construction of a border wall, *ipso facto,* "very likely will damage or restrict access to this sacred space." Yet nowhere in the almost 100 pages of Response and supporting declarations does the Diocese explain how such damage or restricted access will occur.

Instead, the Diocese alleges that the entire mountain is affected, simply by its status as a religious site. Resp. at 16 (And "[t]he mountain is not incidental to the religious practice; it is the practice." Bishop Hunn Decl. ¶ 5. And the Diocese cites to inapposite case law, *162.20 Acres*, 639 F.2d at 304–05, and *0.95 Acres of Land*, 994 F.2d at 699, to assert that a court can block the transfer of possession. Resp. at 6. As explained above, these cases highlight the Diocese's misunderstanding of federal condemnation law. Rather than block the transfer of possession, the Court's purview is to determine when and how the transfer of possession should occur by balancing the equities at stake between the public's need for transfer of possession and any undue hardship potentially caused to the current occupants. Here, the Diocese has alleged that the project infringes on its free exercise of religion. But that is not a bar to a transfer of possession, it is a defense to the condemnation, and the Government will address that defense(s) at the appropriate time. If the Court determines that the condemnation is legal, then all of the Diocese's arguments in its Response necessarily fail.

The construction of border barrier is a component of this country's national security strategy dating back 30 years and across multiple presidential administrations. After the enactment of the Secure Fence Act of 2006, signed by President George W. Bush, successive administrations—both Democratic and Republican—have overseen the construction, maintenance and expansion of border wall across the Southwest to establish operational control over U.S. land and maritime borders. The current acquisition is a continuation of this well-established Congressional mandate to secure the border by closing a critical physical gap in the binational border grid, which effectively funnels traffic and unauthorized crossings along the base of the mountain through the gap. Enriquez Supp. Decl. ¶ 8. The gap occurs in an approximately 1-mile stretch between existing border barrier to the east and west of the mountain that can be seen from

the top of Mount Cristo Rey. *Id*. Around 2017, the United States constructed wall west of Mount Cristo Rey. In 2019, a private group built the segment of wall to the east of the mountain. The Diocese argues at length that the border wall will "profane" its property (Resp. at 4, 14, 19), but the existing border barrier is already clearly visible from the site, as seen in this recent photo:



Angela Kocherga, *Catholic Diocese fights federal government's effort to seize 'holy site' for border wall project*, KTEP Public Media (May 21, 2026), https:// https://perma.cc/U2B8-TUJQ.

The security risks that result from this gap in border wall are well known and even acknowledged on the Mount Cristo Rey homepage, which is run by the Mount Cristo Rey Restoration Committee:

> "Due to the proximity of Mexico on the Southern edge of the mountain, visitors are cautioned not [to] climb alone and always go in groups. Vandalism, assaults and robberies

are still an ongoing problem and visitors are encouraged to visit on days when organized events are being held and security is on site."

https://MtCristoRey.com, https://perma.cc/H5RT-KZYA (last visited June 28, 2026).

Construction of border barrier on the property will not impact the shrine of Mount Cristo Rey, the pilgrimage to the shrine, or any religious practices on the Diocese's land. The shrine is located at an elevation of 4,675 feet and an elevation gain of 820 feet. *Quick Facts*, https://MtCristoRey.com, https://perma.cc/H5RT-KZYA (last visited June 28, 2026). The Diocese offers no evidence that construction at the base of the mountain, *at least 400 feet below*, would physically impact the shrine. *See* Enriquez Supp. Decl. ¶ 14. The subject property abuts the United States-Mexico border at the base of the south side of the mountain; the entrance to the shrine and the start of the pilgrimage are located on the north side of the mountain. Enriquez Supp. Decl. ¶ 14. All construction will occur at least 1050 feet away from the shrine. *Id*.

Congress's direction to the Government regarding this project is clear: build necessary border barrier and roads. *See* ECF 2-1 Schedule A: Authority; Public Law 104-208, Division C, Section 102(a) The transfer of possession is necessary to allow the United States to fulfill its statutory duty to build border barrier on the Property. Despite the Diocese's misplaced reliance on unrelated controversies in other regions, the undisputed fact remains: the United States' project will not physically prevent a single person from practicing their religion on Mount Cristo Rey.

### Conclusion

For these reasons, the United States respectfully requests that the Court grant this motion and enter an order granting the United States immediate possession of the condemned estates described in Schedule E of the Declaration of Taking.

DATED: July 6, 2026                                Respectfully submitted,

UNITED STATES OF AMERICA

By: /s/ Charlotte Huffman

CHARLOTTE HUFFMAN (IL Bar No. 6296779)
ANNELISE M. PINTO (CA Bar No. 353929)
Trial Attorneys, U.S. Department of Justice
Land Acquisition Section
Environment & Natural Resources Division
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Tel: (202) 305-5160
Fax: (202) 514-8865
E-mail: charlotte.huffman@usdoj.gov
        annelise.pinto@usdoj.gov

ANDREW A. SMITH (NM Bar No. 8341)
Senior Trial Attorney
Environment and Natural Resources Division
United States Department of Justice
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
Tel: (505) 224-1468
Fax: (505) 346-7205
E-mail: andrew.smith@usdoj.gov

*Attorneys for Plaintiff United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing United States' Reply in Support of Its Opposed Motion for Order of Immediate Possession using the CM/ECF system and served a copy on all parties who are registered users of the CM/ECF system and entitled to receive automated notice of this filing.

Dated: July 6, 2026

*/s/ Charlotte Huffman*
Charlotte Huffman
United States Department of Justice