UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. )        No. 2:26-cv-01458-KG-GBW
)
14.259 ACRES OF LAND, MORE OR )
LESS, SITUATED IN DOÑA ANA )
COUNTY, STATE OF NEW MEXICO, et )
al. )
)
Defendants. )
_____ )

**AMENDED ANSWER TO COMPLAINT IN CONDEMNATION OF
DEFENDANT ROMAN CATHOLIC DIOCESE OF LAS CRUCES**

Defendant Roman Catholic Diocese of Las Cruces (the Diocese), the owner in the above-

captioned case, hereby answers Plaintiff's Complaint in Condemnation as follows:

**RESPONSE TO THE COMPLAINT**

1.      With respect to the property referenced in Paragraph 5 of the Complaint and

described in Schedules C–E of the Complaint, the Diocese claims a full fee-simple interest in the

14.259 acres of land, more or less, affected by this condemnation suit (the Property).

2.      In response to Paragraph 1 of the Complaint, the Diocese admits that the above-

captioned matter purports to be a civil action brought by the United States of America, at the

request of the Secretary of Homeland Security, through the Acquisition Program Manager, U.S.

Border Patrol Program Management Office Directorate, U.S. Border Patrol, U.S. Customs and

Border Protection, for taking of property located in Doña Ana County, New Mexico, under its

power of eminent domain and through a Declaration of Taking, and for the determination and

1

award of just compensation.  The Diocese lacks sufficient knowledge or information to form a belief as to the truthfulness of the allegation that the Secretary of Homeland Security requested the United States to bring this action, and on that basis denies this allegation.

3.      In response to Paragraph 2 of the Complaint, that Paragraph contains only legal arguments or conclusions, which do not require a response.  To the extent any response is required, the Diocese admits the jurisdictional allegations in Paragraph 2 of the Complaint.

4.      In response to Paragraph 3 of the Complaint, that Paragraph contains only legal arguments or conclusions, which do not require a response.  To the extent any response is required, the Diocese admits that the Property has been taken by the United States "under" the statutory authority set forth in Schedule A of the Complaint, but the Diocese denies that this taking has been accomplished "in accordance with" that authority in that Plaintiff has not demonstrated the taking complies with the First Amendment or the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*, which modify the authorities set forth in Schedule A and require Plaintiff to accommodate the Diocese's sincerely held religious beliefs.

5.      In response to Paragraph 4 of the Complaint, the Diocese admits that Plaintiff purports to take the Property for the public purpose of constructing, installing, operating, and maintaining roads, fencing, vehicle barriers, security lighting, cameras, sensors, and related structures designed to help secure the U.S.-Mexico border within the State of New Mexico.  The Diocese lacks sufficient knowledge or information to form a belief as to the accuracy of that representation and therefore denies this allegation.

6.      In response to Paragraph 5 of the Complaint, the Diocese admits that Schedule C of the Complaint appears to be a legal description of the land that the United States has taken.

The Diocese lacks sufficient information as of the filing date of this Answer to admit or deny the accuracy of that description and therefore denies this allegation.

7.      In response to Paragraph 6 of the Complaint, the Diocese admits that Schedule D of the Complaint appears to be a map or plat of the land that the United States has taken.  The Diocese lacks sufficient information as of the filing date of this Answer to admit or deny the accuracy of that map or plat and therefore denies this allegation.

8.      In response to Paragraph 7 of the Complaint, the Diocese admits that Schedule E of the Complaint appears to be a legal description of the estate taken.  The Diocese lacks sufficient information as of the filing date of this Answer to admit or deny the accuracy of that description and therefore denies this allegation.

9.      In response to Paragraph 8 of the Complaint, the Diocese denies that the sum ($183,071.00) estimated by Plaintiff as just compensation, as set forth in Schedule F of the Complaint, constitutes just compensation for the land taken by the United States.  If this Court finds Plaintiff's taking to be valid, the Diocese asserts that the just compensation required under law is greater than Plaintiff alleges and has deposited.

10.      Plaintiff has not conducted a site visit for the purpose of assessing the Property's value.  It is therefore unclear on what basis Plaintiff has estimated just compensation.

11.      Moreover, in another recently filed condemnation action, the United States has estimated just compensation for 7.259 acres of land owned by the State of New Mexico and located along the U.S.-Mexico border and near the Property to be $798,500.00.  Complaint in Condemnation ¶¶ 5, 8 & Scheds. C & F, *United States v. 7.529 Acres of Land*, No. 2:26-cv-1938

(D.N.M. June 16, 2026), ECF No. 1.  In other words, the United States estimates a nearby tract of land roughly one-half the size of the Property to be more than four times as valuable.

12.    Paragraph 9 of the Complaint is admitted.

13.    Paragraph 10 of the Complaint is admitted.

## OBJECTIONS AND AFFIRMATIVE DEFENSES

14.    As a separate and first affirmative defense to the Complaint and the purported cause of action contained therein, Plaintiff's taking is unconstitutional and not for a congressionally authorized public purpose under the First Amendment's Free Exercise Clause.

15.    As a separate and second affirmative defense to the Complaint and the purported cause of action contained therein, Plaintiff's taking is invalid and not for a congressionally authorized public purpose under RFRA.  42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a . . . defense in a judicial proceeding and obtain appropriate relief against a government.").

16.    As a separate and third affirmative defense to the Complaint and the purported cause of action contained therein, the Diocese alleges that "just compensation" for the Property exceeds $183,071.00.

### Facts Supporting the Diocese's Religious Defenses

17.    In support of the First Amendment and RFRA affirmative defenses, the Diocese further alleges the following facts.  With respect to the third affirmative defense concerning just compensation, the Diocese reserves the right to present additional evidence on the amount of compensation to be paid at the jury trial on compensation, should this case proceed to that point. *See* Fed. R. Civ. P. 71.1(3)(3) ("But at the trial on compensation, a defendant—whether or not it

has previously appeared or answered—may present evidence on the amount of compensation to be paid and may share in the award.").

18.     The proposed taking would substantially burden the free exercise of religion by the Diocese, its parishioners, and the other faithful who seek to gather in community for prayer and liturgical celebration on Diocesan property.  Therefore, for the protection of the faith of all Catholics within the Diocese, the Diocese must formally oppose the Government's efforts to take possession of a portion of the Diocesan property in order to build a border wall on the property.

19.     The Diocesan property that the Government seeks to condemn is located on Mount Cristo Rey in Sunland Park, New Mexico.  Atop the mountain stands a 29-foot-tall limestone statute of Jesus that serves as a shrine and pilgrimage site to thousands of faithful in the El Paso, Texas, and Southern New Mexico area.

20.     The statue was the dream of a local parish priest, Father Lourdes Costa, who in 1933 began preaching to his congregation about his vision of a cross on the mountaintop. At Father Costa's urging, the Las Cruces Diocese's predecessor—the Diocese of El Paso— purchased the property at issue in this case and employed the world-famous sculptor Urbici Soler to realize Father Costa's vision.  The statue was completed in 1939.

21.     For generations since, Mount Cristo Rey has been a holy site of unique significance to Catholics and other people of faith in southern New Mexico—and, indeed, the border region as a whole.

22.     Each year, thousands of faithful make the five-mile roundtrip climb up Mount Cristo Rey as part of annual pilgrimages during the fall on the feast day of Christ the King, during Holy Week in the spring, as well as other pilgrimages throughout the year.  Some climb

the mountain barefoot, and others crawl to the summit on their knees.  Pilgrims take in the beauty of the monument and nature that surrounds it.  Mass is celebrated for the gathering of the faithful on the altar present on the mountaintop.  The act of climbing the mountain symbolically brings pilgrims closer to God.

23.     Mount Cristo Rey occupies a unique place in the spiritual life of the community. As a mountain dedicated to Christ the King, it has long served as a place of pilgrimage, retreat, prayer, and encounter with the living God.  Year after year, people come from across diocesan boundaries, across state lines, and across international borders to seek the Lord and to walk together in faith.  In a world often marked by division, this place of pilgrimage reminds us of our common dignity as children of God.  It is a place where diverse cultures, traditions, and peoples find communion with one another and with Christ.  For this reason, Mount Cristo Rey is not merely a landmark; it is a consecrated site whose spiritual significance has touched generations and continues to serve as a place of unity in a divided world.

24.     The Government's condemnation of Diocesan-owned land on Mount Cristo Rey will substantially burden the free exercise of religion in a number of ways.

25.     First, the Government's defacement of Mount Cristo Rey to construct the border wall would jeopardize the mountaintop shrine and access to it.

26.     The Government's condemnation of Diocesan property to build sections of the border wall is viewed by the Catholic faith community as an act of desecration of sacred space.

27.     The Government claims that its condemnation of Diocesan property on Mount Cristo Rey to build sections of border wall will not disrupt this holy site.  But these assurances cannot be credited in light of the Government's other actions.  Former Secretary of Homeland

Security Kristi Noem waived compliance with statutes and regulations that safeguard culturally, historically, and environmentally sensitive sites in connection with border-wall construction. The Government has not conducted a rigorous assessment of the impacts on the shrine, the trails leading to it, or the natural landscape surrounding it.

28.    The land that the Government seeks to condemn is only one-quarter of a mile from the shrine.  The Government has already begun blasting activity at the base of the mountain and has stated that it intends to give Mount Cristo Rey a "face lift," in a social media post that was accompanied by a video depicting a large explosion.  El Paso Sector Border Patrol (@USBPChiefEPT), X (Feb. 4, 2026, 11:48 AM), https://tinyurl.com/5n6yceea.  Such destructive activity—and callous attitude toward it—only heightens the Diocese's concern that damage to the heart of the shrine—the statute of Christ on the mountaintop, the trails leading to it, or the natural landscape surrounding it—will result from the Government's planned activity on Diocesan property.

29.    Moreover, the Government signed contracts with construction companies to perform the anticipated work on Mount Cristo Rey before it had secured title to or the right to possess the property in question, reflecting an arbitrary and capricious mode of decision-making.

30.    The Diocese's concerns are further reinforced by the fact that the Government recently admitted to that its border-wall construction damaged an important archeological and cultural site known as Las Playas Intaglio, which is sacred to indigenous people in southwest Arizona, despite the Government's assurances that it would safeguard the site.  Jake Spring & John Muyskens, *Trump's Border Wall Expansion Just Bulldozed an Ancient Tribal Site*, Wash. Post (May 1, 2026), https://tinyurl.com/rdz4bw6p.  The Diocese reasonably fears that the holy

7

site on Mount Cristo Rey will suffer similar desecration as a result of the Government's aggressive, rushed, and haphazard initiative.

31.     Second, even if the border wall does not damage the walking paths or the statue, it will impede the use of Mount Cristo Rey as a holy site.

32.     Central to the holy ritual of the pilgrimage is experiencing the mountain's unique geological and ecological features, including volcanic rocks that are millions of years old, dinosaur tracks that are even older, and numerous endangered species.  Mount Cristo Rey also serves as a place of cultural and religious exchange at the tristate boundary between Texas, New Mexico, and Chihuahua, Mexico.  Construction of a border wall along the side of the mountain threatens to substantially impair this religious exercise by placing at the center of it a symbol of division and exclusion.

33.     The Diocese believes that a border wall on Mount Cristo Rey would serve as a counter-sign to the teachings of the Catholic Church.  The Catholic Church recognizes and teaches "universality": that all people share a common humanity of equal dignity, and that the basic goods of human life such as food, water, shelter, and freedom to worship cannot be morally denied to those in need.  As Pope Leo XIV has taught, "in every rejected migrant, it is Christ himself who knocks at the door of the community."  Pope Leo XIV, Apostolic Exhortation *Dilexi Te* ¶ 75, Vatican (Oct. 4, 2025), https://perma.cc/39KY-52PP.

34.     These teachings are not novel for the Catholic Church.  Pope Francis likewise explained that migration is an issue of fundamental importance for the Catholic community because many migrants face life-threatening conditions of the cruelest kind.  Thus, the Church's responsibility to protect and defend the poor migrant population is closely related to its moral

responsibility to protect and defend the life of the unborn.  Human life is equally sacred, including the lives of the unborn and the migrant poor.  Pope Francis, Apostolic Exortation *Gaudete et Exsultate* (Mar. 19, 2018), https://perma.cc/G2ZD-9DJ7.  And as Pope Pius XII reminded Catholics nearly 75 years ago, "there never has been a period during which the Church has not been active in behalf of migrants, exiles and refugees."  Pope Pius XII, *Exsul Familia Nazarethana Apostolic Constitution* (Aug. 1, 1952), https://perma.cc/5HTE-XJ8Y.

35.     The border wall is the antithesis of and an obstacle to this message of human solidarity that Catholic moral teaching requires.  A wall sets up a dangerous barrier between peoples, contrary to the principle that human beings have a collective responsibility to one another.  It isolates us from the suffering of others.

36.     The Diocese considers a border wall likely to increase human suffering in the local community and in the world, in contravention of Catholic moral principles.  The foundation of Catholic social teaching is that all human life is sacred and that the dignity of the human person is the moral foundation for society.  This belief extends from the first moment of existence, continues throughout each person's life, and extends to the end of life.  While a wall is not an intrinsic evil, the Diocese believes that the building of a border wall will inevitably lead to an increase in physical harm and death to migrants, including innocent children and families.

37.     The Diocese recognizes that the United States has the right to protect its sovereignty by reasonable means and to secure its borders; this is recognized in Catholic teaching.

38.     But the erection of a physical symbol of division and dehumanization on the holy site of Mount Cristo Rey would shatter the sacredness of that cherished place, especially where

9

there are alternative means of patrolling the border.  A barrier that prevents victims of government tyranny, gang violence, domestic abuse, and economic insecurity from seeking what is in many cases life-saving refuge in the United States cannot be reconciled with Catholic teachings.

39.    The presence of an edifice so inconsistent with Catholic values on Mount Cristo Rey will desecrate that holy site and dilute the religious experience that pilgrims seek when summiting the mountain.  That harm will be especially acute in light of the mountain's historical, cultural, and religious significance as a symbol of unity and shared heritage among the borderland communities.

40.    Third, the Diocese has a moral obligation to uphold Catholic social teaching in all of its actions, including its stewardship of Diocese-owned lands.

41.    It is the longstanding practice of Dioceses throughout the nation to impose restrictions on land sales and leases to ensure that the Church's property is used in a manner that is consistent with Catholic principles.  Because the Diocese of Las Cruces is relatively young and assumed control of land previously owned by the Diocese of El Paso, it has not transferred or leased a great deal of its own property.

42.    But to take one example from a sister Diocese, the Diocese of Austin, Texas, conveyed a parcel of land in 2015 that included restrictive covenants in the deed barring the land from being used as a "'pay day' lending facility" or as a "'head shop' or other business engaged in the sale of drug paraphernalia," among other prohibited uses.

43.    Similarly, when the Diocese of Buffalo, New York, conveys land, it includes restrictive covenants in deeds prohibiting any church buildings located on the property from

being used for any "religious rituals, rites, worship, or other organized form(s) of liturgy or religious practice where such use(s) would be contrary to the Code of Canon Law of the Roman Catholic Church."

44. And in a 1999 land transfer, the Diocese of Brownsville, Texas, prohibited a regional academic health center run by the University of Texas System from using the property to perform abortions and euthanasia.

45. If the Government sought to purchase land from the Diocese, it would be religiously obligated to restrict the future use of the land to build a border wall. But the Government's exercise of eminent domain would prevent the Diocese from ensuring that its land is used by successor landowners in a manner consistent with Catholic teachings and values.

46. Further, the very act of condemnation is contrary to the canonical requirements of the Catholic Church. If the Diocese were to engage in a sale of this land, it would be required to seek approval from the Vatican's Dicastery of the Clergy. In that request, the Bishop would be required to present support for the sale of the asset; to have the asset appraised; to negotiate a purchase price at least equal to the appraised price (presumably fair market value); and to meet with and receive the affirmative consultation of the Diocesan College of Consultors and the Diocesan Finance Council; in addition to the inclusion of the legal restrictions for use of the land by the purchaser to prohibit purposes contradictory to the teachings of the Catholic Church, as noted above. As the Diocese has not agreed to sell this land, these procedures have not and will not take place, as the condemnation process does not allow for them.

**Law Supporting the Diocese's Religious Defenses**

47.     The taking substantially burdens the Diocese's exercise of religion because it "prevents participation in conduct motivated by a sincerely held religious belief." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013), *aff'd*, 573 U.S. 682 (2014).

48.     As noted above, the Government's proposed conduct here imposes this substantial burden in at least three ways.  First, despite its assurances to the contrary, the Government's plans to deface Mount Cristo Rey so that it can build a border wall jeopardize the mountaintop shrine and access to it.

49.     Second, the border wall that the Government plans to construct is contrary to Catholic values and teachings that migrants must be protected and defended.  The presence of the border wall on the holy site of Mount Cristo Rey would profane the site and dilute the religious experience for any faithful who are still able to access the shrine.

50.     Finally, the Government's condemnation of the land, including its effort to take immediate possession, will deprive the Diocese of its ability to act as a steward of its land by ensuring that successor landowners do not use Diocesan property in ways that are inconsistent with Catholic values and teachings.

51.     In light of that substantial burden on the Diocese's exercise of religion, the taking violates the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

52.     The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly," but "does perhaps its most important work by protecting the ability of

those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022).

53.     The Supreme Court has held that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). But a law does not qualify as "generally applicable" if it provides "'a mechanism for individualized exemptions.'" *Id.* (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990)).

54.     The Government's taking of Diocesan property in this case does not meet *Fulton*'s requirements for two reasons.  First, decisions to condemn land are necessarily individualized assessments, rather than laws of general applicability.  Second, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise," and "[i]t is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) (per curiam).  Here, the Government has declined to build the border wall along various stretches of the U.S.-Mexico border based on secular considerations, but it has not treated the Diocese's religious exercise as favorably.  That differential treatment triggers strict scrutiny.

55.     The taking also violates RFRA, which Congress enacted to restore the "compelling interest test" that predated the Supreme Court's narrowing of the First Amendment's religious-liberty safeguards in Smith.  42 U.S.C. § 2000bb(a)(4), (b)(1).

56. "RFRA is no ordinary statute," but a "'super-statute.'"  *Hobby Lobby*, 723 F.3d at 1146 (10th Cir. 2013) (citation omitted).  It "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" RFRA's date of enactment.  42 U.S.C. § 2000bb-3(a) (emphasis added).

57. RFRA prohibits the Government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," *id.* § 2000bb-1(a), unless the Government's actions are "the least restrictive means of furthering" "a compelling governmental interest," *id.* § 2000bb-1(b).

58. The taking substantially burdens the Diocese's religion, and the Government's actions are not the least restrictive means of further a compelling governmental interest. The taking therefore violates RFRA.

## JURY DEMAND

59. Should this Court find Plaintiff's taking to be valid, the Diocese requests a trial by jury on the issue of just and adequate compensation.  *See* Fed. R. Civ. P. 71.1(h)(1)(B).

## REQUEST FOR RELIEF

WHEREFORE, the Diocese respectfully requests that this Court enter judgment in its favor and:

    a. Declare Plaintiff's taking to be invalid;

    b. Divest the United States of title to the Property;

    c. Deny Plaintiff possession of the Property;

    d. Condition any order granting possession on Plaintiff refraining from constructing a border wall on the Property or engaging in any other activity on the Property

that is not narrowly tailored to any compelling governmental interest that Plaintiff might assert;

e.  Award the Diocese just compensation for any taking allowed in this action;

f.  Award the Diocese reasonable costs and attorney's fees;

g.  Grant the Diocese such other relief as the Court deems just and proper.

Dated: July 28, 2026                    Respectfully submitted,

*/s/ Jonathan L. Backer*

Jonathan L. Backer*
Mary B. McCord*
William Powell*
Seth Wayne
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, DC  20001
(202) 662-4912
sw1098@georgetown.edu

*/s/ Kathryn Brack Morrow*

Kathryn Brack Morrow
MANN MORROW, PLLC
1730 Tierra de Mesilla, Suite 4
Las Cruces, NM 88005
Phone: 575-440-0300
Katy.Morrow@MannMorrow.com

*Admitted pro hac vice*

*Attorneys for Defendant Roman Catholic Diocese of Las Cruces*

15

## CERTIFICATE OF SERVICE

I hereby certify that, on July 28, 2026, I electronically filed the foregoing with the Clerk of the Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

/s/ Jonathan L. Backer
Jonathan L. Backer