UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA )
)
Plaintiff, )
)
vs. )    Civil No. 2:26-CV-01458-KG-
)    GBW
14.259 ACRES OF LAND, MORE OR LESS, )
SITUATE IN DOÑA ANA COUNTY, STATE OF )
NEW MEXICO; CATHOLIC DIOCESE OF LAS )
CRUCES; AND DOÑA ANA COUNTY )
TREASURER, )
)
Defendants. )
)
)
)

## **PLAINTIFF UNITED STATES OF AMERICA'S MOTION FOR JUDGMENT ON THE PLEADINGS**

### I.    Introduction

On July 28, 2026, the Catholic Diocese of Las Cruces ("Diocese") filed an Amended

Answer challenging the authority of the United States to condemn 14.29 acres of land for the

construction of border wall infrastructure along the United States-Mexico border.  Am. Answer,

ECF No. 59. In this pleading, the Diocese fails to identify a legally cognizable basis to challenge

the United States' condemnation of the Subject Property. The pleadings, taken as true, present no

valid defense and confirm that judgment on the pleadings is warranted. In its Amended Answer,

the Diocese merely expands the narrative on its moral objections to CBP's[1] project, under the guise

---

[1] U.S. Customs and Border Protection ("CBP") is an agency operating under the umbrella of the
Department of Homeland Security ("DHS"). Throughout this brief, CBP is used interchangeably
with DHS.

1

of First Amendment and Religious Freedom Restoration Act ("RFRA") claims, none of which are cognizable in this Court as a legal defense to condemnation actions. Am. Answer, ¶¶ 14-16. Federal law generally recognizes only one valid objection to a condemnation proceeding: that the United States' land acquisition was not for a congressionally authorized public use. *See Wilson v. United States*, 350 F.2d 901, 906 (10th Cir. 1965) ("the nature or extent of the interest to be acquired is not reviewable"); *see also* Berman v. Parker, 348 U.S. 26, 32-33 (1954); *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240-41 (1984).

Here, in its Complaint and Declaration of Taking, the United States set forth the specific statutory authority for CBP to obtain the Subject Property to secure the United States/Mexico border within the state of New Mexico. Compl., ECF Nos. 1-1, 1-2; Dec. of Taking, 2-1, and 2-2. That alone demonstrates congressional authority for the take. While the Amended Answer contains numerous factual allegations, none of these new allegations cure the fundamental defect in its original Answer—the only valid objection to a federal condemnation action is the absence of a congressionally authorized public use, which the Diocese fails to plead.

Under such circumstances, the amended allegations remain irrelevant under Fed. R. Civ. P. 12(c). Federal courts presiding over condemnation matters routinely reject similar objections and defenses as improper or grant judgment on the pleadings as to the legality of the condemnation. *See, e.g., United States v. 14.368 Acres, More or Less*, No. 1:24-cv-00185, 2025 U.S. Dist. LEXIS 197634 (E.D. Cal. Oct. 6, 2025); *United States v. 24.728 Acres of Land, More or. Less, Situate in Starr Cty.*, No. 7:25-CV-00229, 2025 U.S. Dist. LEXIS 222050 (S.D. Tex. Oct. 15, 2025); *Wash. Metro. Area Transit Auth. v. 6,627 Square Feet of Land*, 2022 U.S. Dist. LEXIS 117864 (D.D.C.

2

July 5, 2022). Accordingly, the United States respectfully requests that the Court enter judgment on the pleadings as to the lawfulness of this condemnation. Doing so will allow the litigation to finally proceed toward establishing the amount of just compensation the United States owes for the property it has condemned, as required by the Fifth Amendment and as envisioned in the Declaration of Taking Act.

## II.    Procedural Background

On May 7, 2026, the United States filed this condemnation proceeding pursuant to the Declaration of Taking Act (the "Act"), 40 U.S.C. § 3114, to acquire 14.259 acres of land[2] ("the Subject Property") necessary for CBP to help secure the United States/Mexico border within the state of New Mexico. Pursuant to that Act, the United States' Complaint and Declaration of Taking set forth both the statutory authority for, and the public purpose of, the condemnation, among the other requisite information. *See* 40 U.S.C. § 3114(a). These pleadings state in pertinent part:

SCHEDULE A
AUTHORITY
The property is taken under and in accordance with 40 U.S.C. §§ 3113 and 3114, which authorize the condemnation of land and the filing of a Declaration of Taking; the Act of Congress approved September 30, 1996, as Public Law 104-208, Division C, Section 102, 110 Stat. 3009-546, 3009-554-55, as amended and codified at 8 U.S.C. § 1103(b) & note; and the Act of Congress approved July 4, 2025, as Public Law 119-21, tit. IX, sec. 90001, 139 Stat. 72, 357-58, which appropriated the funds that shall be used for the taking.

ECF Nos. 1-1, 2-1.

SCHEDULE B
PUBLIC PURPOSE

---

[2] The United States acquired a fee simple interest in 11.822 acres of land identified as Tract EPT-STN-2001 and 1.554 acres of land identified as Tract EPT-STN-2001-1, and a non-exclusive, perpetual access easement in 0.883 acres of land identified as Tract EPT-STN-2001.

> The public purpose for which said property is taken is to construct, install, operate, and maintain roads, fencing, vehicle barriers, security lighting, cameras, sensors, and related structures designed to help secure the United States/Mexico border within the state of New Mexico.

ECF Nos. 1-2, 2-2.

The remainder of the United States' Complaint and Declaration of Taking includes each of the documents required by both the Act and FED. R. CIV. P. 71.1. *Compare* ECF Nos. 1-2 with 40 U.S.C. § 3114(a) and FED R. CIV. P. 71.1(c). Also, as required by the Act, the United States included an estimate of just compensation, which in this case is $183,071. ECF No. 2-6; 40 U.S.C. § 3114(a)(5). The United States deposited that sum into the Court registry on June 24, 2026, at which time the United States acquired title to the Subject Property by operation of law. *See* ECF No. 10, 40 U.S.C. § 3114(b)-(c).

On July 6, 2026, the Diocese filed an answer in which it listed general "responses" to each paragraph in the United States' Complaint and asserted three "objections and affirmative defenses" to the condemnation. ECF No. 46. The Diocese objects to the condemnation on three grounds: (1) the taking's alleged unconstitutionality under the First Amendment's Free Exercise Clause; (2) the taking's alleged invalidity under RFR, 42 U.S.C. 2000bb-1(c); and (3) that just compensation for the Subject Property exceeds the United States' estimate of just compensation. *See id*. On July 28, 2026, the Diocese filed an Amended Answer, restating the same three affirmative defenses but adding new factual allegations, all of which are irrelevant to the validity of the condemnation: e.g.: an extensive history of Mount Cristo Rey, pilgrimage practices thereon, and Catholic doctrine (¶¶ 18–46); the border wall's symbolism as a "counter-sign" to Church teaching (¶¶ 26, 33–39); prior DHS actions, contracts, and environmental waivers (¶¶ 27–30); and allegations about the Church's stewardship obligations and canon-law requirements for the disposition of Church-owned land (¶¶ 40–46).

4

As discussed below, federal law recognizes only one valid basis for a landowner to object to a condemnation filed pursuant to the Declaration of Taking Act: that the United States' acquisition is not for a Congressionally authorized public use. Here, Congress has authorized CBP to condemn property for the purpose of constructing, installing, operating, and maintaining infrastructure designed to help secure the United States/Mexico border, meaning that the Diocese's objections fail as a matter of law. 8 U.S.C. § 1103(b) & note; Pub. L. 119-21, tit. IX, sec. 90001, 139 Stat. 72, 357-58.

## III.    Legal Standard

Congress intended the Declaration of Taking Act to be an "expeditious procedure" to acquire the lands necessary for a public purpose. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 4 (1984). After the filing of the Declaration of Taking and the deposit of the estimated value of the land in the Court Registry, the "subsequent judicial proceedings" determine "the exact value of the land" and the landowner is "awarded the difference (if any) between the adjudicated value of the land and the amount already received by the owner, plus interest on that difference." *United States v. 50 Acres of Land*, 469 U.S. 24, 26 n. 3 (1984) (citing *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984)).

FED. R. CIV. P. 71.1 governs all federal condemnation proceedings. FED. R. CIV. P. 71.1(a). It provides that any defendant with "an objection or defense to the taking" of the property must, "within 21 days after being served," serve an answer to the complaint identifying "the property in which the defendant claims an interest," the "nature and extent of that interest," and any and all "objections and defenses" the defendant has to the taking. FED. R. CIV. P. 71.1(e)(2). "A defendant waives all objections and defenses not stated in its answer," and "[n]o other pleading or motion asserting an additional objection or defense is allowed." FED. R. CIV. P. 71.1(e)(3). "After the

pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). Judgment on the pleadings is proper when, taking all the allegations in the pleadings as true, the moving party has clearly established that no material issue of fact remains to be resolved, and the party is entitled to judgment as a matter of law. *Heisinger v. Vill. of Tularosa,* No. 22-CV-0366 KG/GBW, 2023 U.S. Dist. LEXIS 49429, at *3 (D.N.M. Mar. 22, 2023).

In condemnation proceedings, "[t]he only question for judicial review" at the pleading stage is "whether the purpose for which the property was taken is for a Congressionally authorized public use." *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993); *Shoemaker v. United States,* 147 U.S. 282, 298 (1893) ("while the courts have power to determine whether the use for which private property is authorized by the legislature to be taken is in fact a public use, yet, if this question is decided in the affirmative, the judicial function is exhausted. . .); *see also United States v. 397.51 Acres*, 692 F.2d 688, 692 (10th Cir. 1982) ("In the absence of bad faith, a condemnation for a public use is a matter for the legislative branch and not open to judicial determination. The nature or extent of the interest to be acquired is not reviewable.")

A recent Eastern District of California decision in  a pending condemnation proceeding, applying this standard, is instructive. *United States v. 14.368 Acres, More or Less*, 2025 LX 465165 (E.D. Cal. Oct. 6, 2025). There, the court granted the United States' motion for judgment on the pleadings, emphasizing that, "A federal court has jurisdiction to review only one aspect of condemnation actions: is the purpose for which the property was taken a Congressionally authorized public use?" *Id.* at *7 (quoting *0.95 Acres of Land*, 994 F.2d at 699). The court went on to explain:

> [i]t is uncontroverted that the courts are not vested with authority judicially to review the power of Congress to authorize acquisitions of land. Once an

administrative agency designated by Congress has been delegated authority to take lands for a public use, the courts have no jurisdiction to review actions of that administrative agency in its determination as to the parcels of land that are or are not necessary to the project. The necessity of taking or appropriating private property for public use is legislative in nature and one over which the courts lack jurisdiction.

*14.368 Acres* at \*7-8 (quoting *United States v. 80.5 Acres*, 448 F.2d 980, 983 (9th Cir. 1971)); *see also Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240-41 (1984).

Thus, when the complaint and declaration of taking demonstrate that a condemnation is for a congressionally authorized public use, judgment on the pleadings in the United States' favor is proper as to all landowner objections or affirmative defenses challenging the condemnation's legality. *See id.* at \*5-17. Furthermore, as explained below, each of the Diocese's objections and defenses independently fail as a matter of law. A court may enter judgment on *all* improper objections, defenses, and allegations in a condemnation—not just affirmative defenses. *United States v. 14.02 Acres of Land*, 547 F.3d 943, 956, n. 4. (9th Cir. 2008).

## IV. Argument

Because the United States condemned the Subject Property for a congressionally authorized public use, the Diocese's objections and affirmative defenses to the legality of this condemnation lack any basis in law. Accordingly, judgment on the pleadings in favor of the United States on the issue of the condemnation's legality is appropriate. Once the Court has ruled on the legality of the condemnation, it may then resolve the United States' outstanding motion for possession and determine the amount of just compensation the United States owes for the land it has acquired, as required by the Fifth Amendment and as envisioned in the Declaration of Taking Act. *See* U.S. Const. amend V; 40 U.S.C. § 3114(c)(1).

**A.  This condemnation is for a congressionally authorized public use.**

Congress authorized this condemnation to secure the nation's southern border; the United States' Complaint and Declaration of Taking both recite the statutory authority underlying this federal exercise of eminent domain. *See* ECF Nos. 1-1, 2-1. The Diocese admits that the Subject Property is the location of illegal entry into the United States. *See* Am. Answer at ¶¶ 33-38. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Division C, Section 102, 110 Stat. 3009-546, 3009-554-55, as amended and codified at 8 U.S.C. § 1103(b) & note (Sept. 30, 1996), specifically authorizes DHS to acquire by purchase, gift, or condemnation:

> [A]ny interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the [Secretary of DHS] deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter. [3]

With respect to fencing and related infrastructure, Congress directed that the Secretary of DHS:

> *[S]hall take such actions as may be necessary to install additional physical barriers* and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

8 U.S.C. § 1103(b) & note A (Sept. 30, 1996) (emphasis added).

Here, Congress appropriated funds to DHS for the following elements of the border infrastructure and wall system:

> (1) Construction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers.
> (2) Access roads.

---

[3] The text in 8 U.S.C. § 1103(b), (g)(1) and certain provisions in the Note to 8 U.S.C. §1103 refer to the Attorney General's authority to acquire land for border security purposes. That said, the relevant functions of the Attorney General concerning immigration and border security have been transferred to DHS. See 6 U.S.C. §§ 202(2), 251, 552(d), 557.

(3) Barrier system attributes, including cameras, lights, sensors, and other detection technology.

(4) Any work necessary to prepare the ground at or near the border to allow U.S. Customs and Border Protection to conduct its operations, including the construction and maintenance of the barrier system.

Pub. L. 119-21, tit. IX, sec. 90001, 139 Stat. 72, 357-58 (July 4, 2025).

It is undisputed that this condemnation is for a public purpose—to secure the United States' borders. Am. Answer, ¶ 5 ("The Diocese recognizes that the United States has the right to protect its sovereignty by reasonable means and to secure its borders…"). The United States condemned the Subject Property, on behalf of DHS, "to construct, install, operate, and maintain roads, fencing, vehicle barriers, security lighting, cameras, sensors, and related structures designed to help secure the United States/Mexico border within the state of New Mexico." ECF Nos. 1-2, 2-2. This is plainly a public use consistent with the requirements of federal condemnation law. *United States v. Bennett*, 145 F.4th 618, 623 (5th Cir.  2025); *see also United States v. 1.16 Acres of Land,* 585 F. Supp. 2d 901, 905 (S.D. Tex. 2008) (explaining the statutory layout of the need for border wall and the judiciary's limited role in second guessing it)*; Berman*, 348 U.S. at 32-33; *Midkiff*, 467 U.S. at 240-41. As the Fifth Circuit in *Bennett* recently explained, "[b]order control achieves the public purposes of preventing illegal entry into the United States, human trafficking, and the importation of illegal narcotics. Preventing crime and harm to the public is a quintessential purpose." *Bennett*, 145 F.4th at 623.

The Diocese's Amended Answer, notably, does not question Congress's statutory authorization of the taking or the stated public purpose of this condemnation as described in the United States' Complaint or Declaration of Taking. Rather, the Diocese alleges that the First Amendment or the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*, *modify* the authorities set forth in Schedule A and require the United States to accommodate the

Diocese's sincerely held religious beliefs. Am. Answer, ¶ 4. But a plain reading of the relevant statutes demonstrates this condemnation to be congressionally authorized. And CBP acquiring land for border security is clearly rationally related to a conceivable public purpose. *Tamez v. Chertoff*, 2009 U.S. Dist. LEXIS 148454, at *17 (S.D. Tex. Jan. 27, 2009) ("[s]ecuring the border is obviously a 'conceivable public purpose' and the Government's exercise of its eminent domain power to investigate and acquire property to secure the border is certainly rationally related to that purpose.") (citation omitted); *see Midkiff*, 467 U.S. 229 at 241 ("Where the exercise of the eminent domain power is rationally related to a conceivable public purpose, a compensated taking is not prohibited by the Public Use Clause."). Accordingly, as a matter of law, and as established by the pleadings, this condemnation is for a congressionally authorized public use.

### B. Neither the First Amendment nor the Religious Freedom Restoration Act is a Defense to the Federal Government's Proper Exercise of Eminent Domain.

The Diocese asserts that the United States' taking is unconstitutional under the First Amendment's Free Exercise Clause and invalid under RFRA. Objs. And Aff. Defenses at ¶¶ 14-15. District courts regularly reject constitutional challenges in other condemnations, including condemnations nearly identical to this one where the United States has condemned land along the United States-Mexico border for the construction of border barrier. *See United States v. 24.728 Acres of Land, More or Less, Situate in Starr Cnty., Texas*, 2025 U.S. Dist. LEXIS 222050, at *6-7 (S.D. Tex. Oct. 15, 2025); *United States v. 23.311 Acres of Land*, No. 7:19-CV-00407, *13-4 (S.D. Tex. Mar. 4, 2020).

Moreover, the Diocese's reliance on the First Amendment and RFRA fails because neither claim is a defense to the United States' exercise of its federal condemnation power. The central premise of the Diocese's Amended Answer is that their land should be granted special protection from condemnation because it is owned by a religious entity. That premise is wrong and

10

unsupported by any federal case law. The First Amendment is not a shield from condemnation; it does not grant churches or newsrooms or places of assembly immunity from the sovereign power of condemnation. The only constitutional limitation on the United States' eminent domain power is the just compensation clause of the Fifth Amendment, which provides that when the Government exercises its sovereign right, it must pay the landowner just compensation for the land it has acquired.

The Diocese is not the first religious institution from whom the federal government has condemned land. Going only by reported opinions, it is at least the sixth. *See United States v. 564.54 Acres of Land, More or Less, In Monroe & Pike Ctys., Com. of Pennsylvania,* 506 F.2d 796 (3d Cir. 1974) (condemnation of recreational camps owned by Southeastern Pennsylvania Synod of the Lutheran Church); *United States v. 3.25 Acres of Land, etc., in Seneca Cnty., N.Y.,* 53 F. Supp. 884 (W.D.N.Y. 1943) (condemnation of property owned by First Baptist Church of Romulus); *United States v. Grace Evangelical Church of S. Providence Ridge,* 132 F.2d 460 (7th Cir. 1942) and *United States v. Two Acres of Land, More or Less, in Will Cnty., Ill.,* 144 F.2d 207 (7th Cir. 1944) (condemnation of church for construction of World War II ordinance factory); *United States v. Eighty Acres of Land in Williamson Cnty.,* 26 F. Supp. 315 (E.D. Ill. 1939) (condemnation of land for reservoir that would result in destruction of churches and burial grounds); *United States v. 4.43 Acres of Land, More or Less, Situate in Tarrant Cnty., State of Tex.,* 137 F. Supp. 567, 571 (N.D. Tex. 1956) (condemnation of easement over Hillcrest Baptist Church and other properties allowing for flight of military aircraft at low altitude).

In none of those cases did a federal court invalidate the United States' condemnation of church property—or suggest that the First Amendment offers any protection against such takings. If the Diocese's First Amendment defense had legal merit, federal courts would have blocked each

11

of those condemnations. Instead, the only issue in every case was whether there was a valid public purpose and the amount of just compensation owed to the church.

In *Williamson County,* the court considered a motion to dismiss filed by the landowner, in which the landowner argued, *inter alia*, that the condemnation was unconstitutional in part because the taking would destroy several churches and burial grounds. 26 F. Supp. at 317. The court denied the motion to dismiss, finding that the authority for the taking was "supported by impregnable legislation, administrative and judicial authority...the acts, conclusions and other exercise of powers under the legislation here in question of and by the Acting Secretary of Agriculture were as lawful and effectual as if the Secretary himself had acted." *Id*. at 318–19. Put differently, it did not matter that the condemnation included a church, only that it was effected pursuant to a valid statute and by an official acting with proper authority.

In *564.54 Acres of Land*, the Third Circuit explicitly discussed the First Amendment without using it as a basis to invalidate the condemnation. There, the United States condemned several recreational camps owned and operated by the Lutheran Synod. The parties disputed the proper measure of just compensation. The United States contended that the measure should be the land's fair market value, meaning that just compensation would be what someone would pay for an unprofitable camp. The Lutheran Synod contended that just compensation should be the value of a substitute facility because the fact that the camps are unprofitable ignores how they are used by the religious organization. The court opined on the proper determination of just compensation, explaining:

> Whether the Lutheran Synod operates camping facilities at a loss because it believes camping builds character, or because it feels a charitable obligation to afford recreational opportunities to persons who would not otherwise be able to afford them, it seems clear that the reason for operating the camps is related to the Synod's religious mission. Thus the question presented is the extent to which owners of single purpose facilities, operated not-for-profit for a religious or

12

charitable purpose (and having no ready market) are entitled to be indemnified when the federal government condemns the facilities. A closely analogous case would be the condemnation of an ancient church building still in active use for religious purposes.

*564.54 Acres of Land*, 506 F.2d at 798–99.

The Third Circuit fully understood the religious nature of the land at issue and yet, at no point did it entertain the idea that the First Amendment would act as a defense against the condemnation. *See id.* Instead, it explained that the only way the First Amendment might be an issue is if the United States had specifically chosen to condemn privately owned religious "community facilities" rather than state or municipally owned ones as a way of paying a reduced amount of just compensation. *Id.* at 801, n. 4. Here, given that the United States-Mexico border is the Diocese's southern property line, the United States' selection of this land to build border infrastructure is obvious and there literally is no alternate property – owned by a municipality or anyone else – on which to build this segment of the border fence.

As the Supreme Court has repeatedly held, the only defense to a federal condemnation action is either the lack of congressional authorization or public purpose. *Berman*, 348 U.S. at 32 (citing *Old Dominion Land Co. v. U.S.*, 269 U.S. 55, 66, (1925)). In the few instances where landowners have alleged a constitutional violation because of a federal eminent domain action, the courts reject those defenses, stating that it is not the judiciary's role to second guess the directives of Congress.

> [T]he legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation … . This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one.

*Id*.

If a condemnation action is legally authorized by Congress, it is valid and not subject to judicial

review. *See  Williamson County* , 26 F. Supp. At 320  ("If the purposes are public and within the legislative powers of Congress, and within the purview of valid existing federal legislation…the government has the lawful right to proceed thereunder regardless of any view whatsoever this court may have with reference to the wisdom or feasibility of the particular project.).

Regardless of any religious implications, courts have consistently emphasized that in challenges to federal takings, the constitutionality of the authorizing statute remains the primary focus. *See Williamson County* at 317-19 (holding that despite defendants' allegations that the taking would destroy churches and burial grounds, the authority for the taking was 'supported by impregnable legislation, administrative and judicial authority'). Similarly, in *Adorers of the Blood of Christ United States Province v. Transcon. Gas Pipe Line Co LLC*, 53 F.4th 56, 60 (3d Cir. 2022), the defendants raised First Amendment and RFRA claims to challenge a federal taking for a fossil fuel pipeline they asserted violated their religious beliefs. Although the court's decision centered on a procedural error—defendants' failure to first seek review before the relevant energy commission—the underlying rationale applies here: parties may not invoke other federal statutes to circumvent "the specific procedure prescribed by [Congress.]" *Id*.

Likewise, the Fifth Circuit has also concluded that collateral statutory noncompliance cannot serve as a defense to a federal condemnation. In <u>United States v. 162.20 Acres of Land, More or Less, Situated in Clay Cnty., State of Miss.</u>, 639 F.2d 299, 304 (5th Cir. 1981), the court held that alleged noncompliance with the National Historic Preservation Act ("NHPA") could not defeat a federal taking, emphasizing that the district court's authority in such proceedings is limited to determining whether Congress authorized the taking. *Id*. The court further explained that only an express statement from Congress could transform NHPA noncompliance into a defense to condemnation. *Id*. Just as NHPA noncompliance cannot be a defense to federal condemnation

14

absent an express congressional directive, it follows that RFRA likewise would require explicit authorization to operate as a bar to federal condemnation.

For the foregoing reasons, neither the First Amendment nor RFRA can be the basis for invalidating a condemnation for a congressionally authorized public purpose.

**C. Even assuming *arguendo* that the First Amendment and RFRA could serve as valid defenses to a federal condemnation, the Diocese's claims fail under Supreme Court and Tenth Circuit precedent.**

While the Diocese may sincerely view the presence of a border wall as a 'counter-sign' to Catholic teachings, the Free Exercise Clause of the First Amendment and RFRA protect the exercise of religion—such as pilgrimages, prayer, assembly—not the subjective comfort of the observer. The mere presence of a nearby government project, even one the Diocese finds ideologically inconsistent with its values, does not constitute a 'substantial burden' on its ability to practice its faith.

The Diocese relies on *Hobby Lobby v. Sebellius*, 723 F.3d 1114, 1139 (10th Cir. 2013), *aff'd*, 573 U.S. 682 (2014) to assert that the taking substantially burdens its exercise of religion because it "prevents participation in conduct motivated by a sincerely held religious belief." Am. Answer, ¶ 47. But *Hobby Lobby* does not stand for the proposition that any alleged ideological objection qualifies as a substantial burden. As the Tenth Circuit explained, the analysis does not turn on whether a government action operates directly or indirectly, but rather on the *coercion* the claimant feels to violate its core tenets. *Id*. at 1139 (emphasis added).

Unlike the plaintiff in *Hobby Lobby*, the Diocese is not facing a mandatory regulatory fine, nor is the Government forcing the Diocese to affirmatively perform an act that violates its faith. Here, the government action is a partial taking of a specific tract of land for a congressionally authorized border infrastructure project. The proposed barrier will not physically interfere with the

15

shrine or access to it. *See* ECF No. 1-4. The Diocese has not presented any well-pleaded facts to support an allegation that the Government's acquisition of only 5.3% of its land imposes a substantial burden on the religious exercise that takes place over 1,000 feet away. Instead, the Diocese asks this Court to disregard the direction of Congress based on a blanket reproach of "the Government's other actions." Am. Answer, ¶ 27. As established by the Declaration of Taking, the Project  has been specifically designed to ensure that all current religious access remains completely undisturbed.  ECF No. 2-4. The Diocese has offered no evidence to rebut CBP's plans. Even if the Diocese could assert such claims, they are insufficient to challenge a condemnation for a congressionally authorized and funded public purpose.

As the Supreme Court has made clear, the Free Exercise Clause "simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448 (1988) (quoting *Roy*, 476 U.S. at 699). "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.*

Similarly, the Diocese's RFRA claims also fail because it has pled no facts demonstrating that the Government has substantially burdened its religious exercise by constructing border wall more than 1,000 feet away from the Cristo Rey shrine. Am. Answer, ¶28. The threshold inquiry under RFRA is whether the government act in question substantially burdens a person's religious practice; if it does not, RFRA does not apply. *Thiry v. Carlson*, 78 F.3d 1491, 1494 (10th Cir. 1996). Claimants carry the burden of proof.

In order to exceed RFRA's "substantial burden" threshold, the Tenth Circuit requires that the government regulation--

16

> [M]ust significantly inhibit or constrain conduct or expression that manifests some central tenet of . . . [an individual's] beliefs; must meaningfully curtail [an individual's] ability to express adherence to his or her faith; or must deny [an individual] reasonable opportunities to engage in those activities that are fundamental to [an individual's] religion.

*Thiry v. Carlson*, 78 F.3d 1491, 1493 (10th Cir. 1996) (quoting *Werner v. McCotter* 49 F.3d at 1480) (citations omitted). The Diocese has not alleged facts showing that acquiring land to secure the southern border makes it difficult to "express adherence" to its beliefs. Without supporting facts, the Diocese simply concludes that the Government's plans "jeopardize the mountaintop shrine and access to it." Am. Answer, ¶48. Yet no part of the border wall comes remotely within reach of the shrine or the public paths on the Subject Property. ECF No. 2-4.

Just like the plaintiffs in *Thiry*, the Diocese may continue to exercise its religious practices on Mount Cristo Rey freely and without constraint, exactly as it did before the Government filed this action. The Diocese readily admits that "Each year, thousands of faithful make the five-mile roundtrip climb up Mount Cristo Rey as part of annual pilgrimages…" Am. Answer, ¶ 22.

Finally, the Supreme Court has long established that the mere "dilution" or diminishment of a religious experience does not constitute a "substantial burden" under RFRA or the First Amendment. *See Lyng*, 485 U.S. at 439. In *Lyng*, the Supreme Court rejected plaintiff tribes' challenge to a Forest Service logging road through an area they considered sacred. Id. at 442-43. The Court emphasized that even if the government's actions "virtually destroy[s]" the tribal members' ability to practice their religion, it does not violate the Free Exercise Clause or RFRA unless it coerces individuals into violating their beliefs or penalizes them for their faith. Id. at 449, 451–52 (quoting opinion below, *Nw. Indian Cemetery Prot. Ass'n v. Peterson*, 795 F.2d 688, 693 (9th Cir. 1985)). Similarly,  the Project in this case imposes no such compulsion or penalty, and thus, the Diocese's claims—even assuming arguendo they could challenge the Federal Government's condemnation authority, which they cannot—fail as a matter of law.

17

**D. The cases cited by the Diocese involve direct coercion or discriminatory burdens that are entirely absent here.**

The Diocese attempts to bolster its defenses with recent high-profile Supreme Court decisions analyzing the free exercise of religion. Am. Answer, ¶¶ 53-54 (citing *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021); *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) (per curiam); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)). Yet none of these authorities support the proposition that the First Amendment or RFRA can invalidate a neutral federal eminent domain action. Instead, a careful examination of these cases reveal facts entirely distinct from the present dispute: instances where a state or local government implemented targeted laws or enforced discriminatory restrictions that directly compelled individuals to abandon their religious practices, penalized them for exercising their faith, or treated secular activity more favorably than religious exercise.

For example, *Fulton v. City of Philadelphia* dealt with the city of Philadelphia's refusal to contract with a foster care agency affiliated with the Roman Catholic Archdiocese unless the agency agreed to certify same-sex couples as foster parents. 593 U.S. 522. The city's refusal forced the Archdiocese into an ultimatum: undermine its mission of providing children with foster homes or approve of relationships inconsistent with Catholic teachings; either situation forced the Archdiocese to affirmatively act in a way that was opposite to its beliefs. *Id*. In contrast, here, the Government is not forcing the Diocese to affirmatively act in opposition to its beliefs.

In *Tandon v. Newsom,* the Court struck down California's restrictions on private at-home gatherings during COVID-19, because the State limited religious gatherings more strictly than comparable secular activities like grocery shopping. 593 U.S. at 62. The Court held that California's different treatment of religious and secular uses triggered strict scrutiny, and the State had not shown that less restrictive means would undermine public health. *Id*. Therefore, the Court

18

held that the State's restriction infringed on claimant's right to free exercise by preventing gatherings for religious purposes. *Tandon*, 593 U.S. at. 64. Here, by contrast, the federal condemnation does not regulate religious gatherings, impose any burden on religious practice, or treat the Diocese differently from secular landowners.

Similarly, in *Roman Catholic Diocese of Brooklyn*, a church and synagogue sued New York for imposing occupancy restrictions on houses of worship during COVID-19 while allowing secular businesses to operate without comparable limits. 592 U.S. at 17. As in *Tandon*, the Court held that the State's regulation was not neutral and therefore subject to strict scrutiny; the State could not show how the regulation was narrowly tailored to a compelling state interest when occupancy was limited in some places and not others. *Id*. at 18-9. Nothing in the instant federal land acquisition resembles such discrimination. The condemnation statute applies uniformly, does not single out religious property for unfavorable treatment, and does not affect how, when, or where religious exercise occurs.

Finally, *Kennedy v. Bremerton* tackled the question of a government employee's personal religious expression at the workplace. 597 U.S. 507. In that case, a school district fired a football coach after praying on the field during a game, because the school district feared his speech would be attributable to them and thus in violation of the Establishment Clause. *Id*. The Court held that because he was operating in his capacity as a private citizen, the school's individualized restrictions violated his First Amendment rights to Free Exercise and Free Speech. *Id*. The Diocese faces no comparable restriction. The Government is not penalizing their religious exercise, regulating religious expression, or interfering with any religious practice.

In short, the cases cited by the Diocese protect against direct government coercion, penalties for religious adherence, and targeted discrimination. None of those circumstances are

19

present here. The instant federal land acquisition is a neutral, generally applicable action that affects property ownership, not religious exercise. It leaves untouched all religious access to and activities at the shrine, including the pilgrimage route. *See* ECF No. 2-4. The Government is not forcing the Diocese to abandon its values or preventing the Diocese from acting in ways that align with their religion. The Diocese is not restricted at all by this condemnation; it remains fully free to practice its faith as it had before, because the taking does not interfere with the pilgrimage route, legal access to the shrine, or the shrine itself. *Id*. Unlike *Fulton* and *Tandon*, where the government prevented the exercise of religion through targeted regulations, the Government's action here imposes no burden on religious exercise; the Diocese retains all of its First Amendment rights that it had prior to the taking.

Ultimately, the operating statute is neutral and does not trigger heightened scrutiny under the Free Exercise Clause. The Diocese's assertion that the Government treated it unfavorably by choosing to build border barrier on this particular site while "declin[ing] to build the border wall along various stretches of the U.S.-Mexico border based on secular considerations..." is inaccurate. Amended Answer, ¶ 54. The Diocese does not identify the "stretches" it is referring to, but even assuming such stretches exist, that does not support the Diocese's argument. Congress delegated to DHS the sole authority to determine which specific parcels are "necessary" for border infrastructure. *See* Public Law 104-208, Division C, Section 102, 110 Stat. 3009-546, 3009-554-55. Site selection decisions for border infrastructure fall squarely within that delegation and are not subject to judicial second-guessing. *See Berman,* 348 U.S. at 32 *(*"The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one."). Policy preferences about where border barriers are most effective do not convert a neutral land-acquisition determination into religious discrimination absent evidence that the choice was

20

made *because* of religion. Further, when Congress has chosen to prohibit construction in particular locations—whether for secular or non-secular reasons—it has done so expressly. *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 231, 133 Stat. 13 (2019).[4] Congress could have excluded Mount Cristo Rey from the current appropriations bill for border infrastructure. Congress declined to do so. *See* Pub. L. 119-21, tit. IX, sec. 90001, 139 Stat. 72, 357-58 (2025).

None of the Diocese's cited cases involve a federal condemnation, and the Diocese has not identified any basis to invalidate this one. As discussed earlier, a condemnation cannot be set aside where Congress has authorized the purpose and provided funding. It is not for the Court to question the legislature's policy judgments, and if Congress had intended to exempt the Diocese's property—or any other religious institution—from acquisition, it could have done so in the authorizing statute, as it has done in prior appropriations. Because Congress did not exclude Mount Cristo Rey, the condemnation is valid. Accordingly, the Court should grant the Government's motion for judgment on the pleadings and allow this matter to proceed to determine the just compensation owed to the Diocese for the property acquired.

### E. The alleged inadequacy of the estimate of just compensation is not a valid defense to the taking.

A court lacks jurisdiction to review the adequacy of the United States' deposit of estimated just compensation. *See In re United States*, 257 F.2d 844, 858-59 (1958). The purpose of a condemnation proceeding is to determine actual just compensation, rather than estimated just compensation. "[T]he deposit of estimated compensation by the government is 'no evidence of value' and has 'no bearing whatsoever on value.'" *Evans v. United States*, 326 F.2d 827, 829 (8th

---

[4] "None of the funds made available by this Act or prior Acts are available for the construction of pedestrian fencing— (1) within the Santa Ana Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge."

Cir. 1964) (citation omitted). Just compensation is a judicial rather than an administrative determination. *See Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327 (1893) . "The legislature may determine what private property is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial." *Id*. If it is later determined at trial that the amount deposited was less than the just compensation owed, the United States must deposit the deficiency, plus pay interest on the amount not previously deposited. 40 U.S.C. §§ 3114 and 3116; *City of Oakland v. United States*, 124 F.2d 959, 964 (9th Cir. 1942). As this case proceeds, the Diocese will have an opportunity to present evidence in support of their position on the amount of just compensation owed for the property taken. But they may not challenge the estimate of just compensation deposited in their Answer or raise it as a defense to the taking. *24.728 Acres of Land,* 2025 U.S. Dist. LEXIS 222050, at *5. "Defects in the just compensation estimate, to the extent they exist, are not a defense to a condemnation action." *Id.* (citing *23.311 Acres of Land*, 2020 U.S. Dist. LEXIS 148938 at *13-4 (first citing 40 U.S.C. § 3114(a)(5) and then citing *In re United States*, 257 F.2d at 858 ("Congress plainly gave the acquiring authority, not the courts, the function of estimating just compensation . . . "))).

## V.    Judgment on the pleadings is appropriate.

Because the pleadings demonstrate this condemnation to have been for a congressionally authorized public use, and because the Diocese has presented no legally valid objection to the United States' exercise of eminent domain, judgment on the pleadings as to the condemnation's legality is appropriate. *See, e.g., 14.368 Acres,* 2025 U.S. Dist. LEXIS 197634, at *27; *United States v. 14.02 Acres of Land,* 2004 U.S. Dist. LEXIS 33293 (E.D. Cal. June 18, 2004); *24.728 Acres of Land,* 2025 U.S. Dist. LEXIS 222050, at *6-7; *United States v. An Easement & Right-of-*

22

*Way Over 3.28 Acres of Land, More or Less, in Lee Cnty., Mississippi*, 2017 WL 916415, at \*6 (N.D. Miss. Mar. 7, 2017); *6,627 Square Feet of Land*, 2022 U.S. Dist. LEXIS 117864, at \*15-28; *United States v. 2.9 Acres of Land*, 554 F. Supp. 529, 531 (D. Mont. 1982); *Calf Island Cmty. Tr., Inc. v. Young Mens Christian Assoc. of Greenwich*, 392 F. Supp. 2d 241, 246-52 (D. Conn. 2005).

The Court's granting of judgment on the pleadings will not impair the Diocese's ability to receive just compensation for the United States' acquisition of the Subject Property, as required by the Fifth Amendment. Indeed, Rule 71.1 guarantees it that right even if it had not filed an answer at all: "[A]t the trial on compensation, a defendant—whether or not it has previously appeared or answered—may present evidence on the amount of compensation to be paid and may share in the award." FED. R. CIV. P. 71.1(e)(3). Instead, by ruling on the lawfulness of the condemnation now, the Court will ensure that the ligation remains focused on the issue of just compensation, resulting in the Diocese efficiently receiving any additional funds it may be owed.

## VI.        Conclusion

Congress authorized CBP to condemn property for border security. *See* 8 U.S.C. § 1103(b) & note. This taking serves a valid and congressionally authorized public use: the construction, installation, operation, and maintenance of roads, fencing, vehicle barriers, security lighting, cameras, sensors, and related structures designed to help secure the United States/Mexico border in New Mexico. Accordingly, the condemnation, filed consistent with the requirements of the Declaration of Taking Act, is lawful.

Federal law recognizes no additional objections that would bar the Government's exercise of eminent domain. The Diocese's objections rest not on any actual burden to religious exercise but on disagreement with the political symbolism of a border barrier—which is a policy debate for

Congress, not a cognizable defense under the First Amendment or RFRA. Congress authorized CBP to condemn land needed for border security, and CBP identified the Subject Property to close a gap in the existing border barrier and reduce illegal crossings. The taking will not affect the Diocese's use or access to Mount Cristo Rey, and CBP has sought to fulfill its statutory mandate while minimizing any impact on the Diocese. In all respects, this is a lawful condemnation for an authorized public purpose.

For these reasons, the United States respectfully requests that the Court grant its motion for judgment on the pleadings, hold that the condemnation is lawful, and conclude that the Diocese's Amended Answer presents no valid objections or affirmative defenses. Such a ruling will properly narrow the proceedings—including discovery and motion practice—to the sole remaining issue: determining just compensation for the United States' acquisition of the Subject Property.

DATED: August 11, 2026      Respectfully submitted,

             UNITED STATES OF AMERICA

             By: s/ Annelise M. Pinto

             CHARLOTTE HUFFMAN
             Bar No. 6296779 (IL)
             ANNELISE M. PINTO
             Bar No. 353929 (CA)
             Land Acquisition Section
             Environment & Natural Resources Division
             P.O. Box 7611
             Ben Franklin Station
             Washington, D.C. 20002
             Telephone: (202) 305-0282
             Facsimile: (202) 514-8865
             E-mail: charlotte.huffman@usdoj.gov
             annelise.pinto@usdoj.gov
             *Attorneys for Plaintiff United States of America*

24

25

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 11, 2026, I electronically filed the foregoing United States'

Motion for Judgment on the Pleadings using the CM/ECF system and served a copy on all parties

who are registered users of the CM/ECF system and entitled to receive automated notice of this

filing.

<div align="center" style="display:inline-block; margin-left:auto;">

*/s/ Annelise M. Pinto*
ANNELISE M. PINTO
U.S. Department of Justice

</div>