UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br>14.259 ACRES OF LAND, MORE OR LESS, SITUATED IN DOÑA ANA COUNTY, STATE OF NEW MEXICO, et al.<br><br>Defendants. | No. 2:26-cv-01458-KG-GBW |

**DEFENDANT ROMAN CATHOLIC DIOCESE OF LAS CRUCES'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**

## INTRODUCTION

The Government seeks to exercise its power of eminent domain to seize a portion of Mount Cristo Rey, a holy pilgrimage site, from the Diocese of Las Cruces in order to build a border wall. In its amended answer, ECF No. 59, the Diocese asserts defenses to the taking under Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, and the First Amendment. The Government now moves for judgment on the pleadings, arguing that the Diocese's defenses are irrelevant because the power of eminent domain overrides the right to free exercise of religion enshrined in RFRA and the First Amendment. According to the Government, "the only valid objection to a federal condemnation action is the absence of a congressionally authorized public use," such that RFRA and the First Amendment are not "cognizable" as "a legal defense to condemnation actions." MJP 2, ECF No. 62. The inescapable implication of the Government's position is that if Congress authorized the Executive Branch to bulldoze every Catholic church in the United States and replace them with parks, the religious rights of the faithful would have no role to play.

The Diocese disagrees. "The Framers created a Federal Government of limited powers, and assigned to th[e] Court[s] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012). RFRA and the First Amendment protect the right to free exercise of religion against all infringement by the government. The Diocese's religious rights are as "cognizable" in a condemnation case as in any other. *Contra* MJP 2. On the merits, the Diocese's religious defenses are sufficient to survive a motion for judgment on the pleadings because construction of the border wall on Mount Cristo Rey would substantially burden the Diocese's religious exercise. The Government's motion for judgment on the pleadings should be denied.

**BACKGROUND**

The Government filed this action in an effort to condemn a portion of Mount Cristo Rey in Sunland Park, New Mexico, for the purpose of building a border wall. Enriquez Decl. ¶¶ 2, 8, ECF No. 22-1. Atop the mountain and only one-quarter of a mile from the proposed construction site sits a 29-foot-tall limestone statue of Jesus Christ that serves as a shrine to thousands of faithful in the El Paso and Southern New Mexico region. Am. Answer ¶ 19; Enriquez Decl. ¶ 8. The shrine was the idea of a local parish priest, Father Lourdes Costa. Am. Answer ¶ 20. In 1933, Father Costa began preaching to his congregation about his vision of a cross on the mountaintop. *Id.* At Father Costa's urging, the Roman Catholic Diocese of El Paso, Texas, purchased the property and employed the world-famous sculptor Urbici Soler to realize Father Costa's vision. *Id.* The monument was completed in 1939. *Id.*

Now owned by the Diocese of Las Cruces, New Mexico, the mountaintop shrine is a pilgrimage site. *Id.* ¶¶ 20, 22. On the feast day of Christ the King each fall, as many as 40,000 faithful climb Mount Cristo Rey to "marvel at the beauty of the monument and the view offered from the summit" and to participate in a mass. *Upcoming Events*, MtCristoRey.com, https://perma.cc/AQ9C-2D9V. Some pilgrims make the five-mile roundtrip journey barefoot, while others crawl to the summit on their knees. Am. Answer ¶ 22. Thousands also ascend the mountain during another annual pilgrimage during Holy Week. *Id.* The most recent Holy Week pilgrimage took place above "an active construction zone," as the Government began work on nearby property. Martha Pskowski, *Blasting Begins for Border Wall on Cherished New Mexico Mountain*, El Paso Times (Apr. 1, 2026), https://perma.cc/3KC2-SEZ3.

On May 7, 2026, the Government filed a complaint, ECF No. 1, a declaration of taking, ECF No. 2, a notice of condemnation, ECF No. 3, and a motion to deposit estimated just compensation,

ECF No. 6, in an effort condemn Diocesan property on Mount Cristo Rey under the expedited procedures of the Declaration of Taking Act, *see* 40 U.S.C. § 3114(a)–(b). On June 15, 2026, the Court granted the motion for leave to deposit. *See* ECF No. 34. But in doing so, the Court made clear that "allowing the deposit and subsequent transfer of title will not interfere with, alter, or nullify Defendants' right to challenge the validity of the taking." *Id.* at 6. And the Court further explained that the right to possession that inheres once title passes to the Government "does not mean the right to immediate, actual possession," such that the granting of the deposit motion "does not destroy any avenues of relief available to Defendants pending resolution of these proceedings." *Id.* at 6–7.

The Government has now filed two additional motions. First, the Government filed a motion for an order of immediate possession that, if granted, would allow the Government to begin construction on Diocesan property on Mount Cristo Rey during the pendency of this litigation, before the Court determines the lawfulness of the taking. *See* Possession Mot., ECF No. 22. In response, the Diocese argues that the law "is clear that the Diocese is allowed to present its defenses before the Government possesses and irreparably desecrates the holy site at Mount Cristo Rey." Opp'n to Possession Mot. 4, ECF No. 36. That motion is fully briefed and remains pending. In addition, the Government has filed a motion for judgment on the pleadings, which asks the Court to rule that the taking is valid as a matter of law, without giving the Diocese an opportunity to take discovery or otherwise develop evidence in support of the religious affirmative defenses asserted in the Diocese's amended answer. *See* MJP 23–24.

## STANDARD OF REVIEW

"A motion for judgment on the pleadings should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (internal

quotation marks omitted). The court must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." *Id.* (internal quotation marks omitted).

In this District, the standard for reviewing a motion for judgment on the pleadings depends on which party filed the motion. "[A] *defense* motion for judgment on the pleadings," which challenges the sufficiency of the allegations in the plaintiff's complaint, is reviewed "using the same standard of review applicable to a Rule 12(b)(6) motion" to dismiss, namely the plausibility standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239, 1240–41 (10th Cir. 2005) (emphasis added) (internal quotation marks omitted). But "courts in the District of New Mexico have declined to extend the heightened pleading standard in *Twombly* and *Iqbal* to affirmative defenses" when assessing a plaintiff's motion challenging the sufficiency of the defendant's answer. *See Maturin v. T-Mobile USA, Inc.*, No. 24-CV-1125, 2025 WL 693113, at *2 (D.N.M. Mar. 4, 2025).

Whereas Rule 8 requires that a complaint include "a short and plain statement of the claim showing that the pleader *is entitled to relief*," Fed. R. Civ. P. 8(a)(2) (emphasis added), a defendant in its answer need only "state in short and plain terms its defenses to each claim asserted against it," without establishing entitlement to relief, Fed. R. Civ. P. 8(b)(1)(A); *see also* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ."). Based on that textual difference, a plaintiff's motion for judgment on the pleadings should be granted only if the answer's "legal insufficiency is clearly apparent and 'there are no questions of fact, . . . any questions of law are clear and not in dispute, and . . . under no set of circumstances could the defenses succeed.'" *Maturin*, 2025 WL 693113, at *3 (quoting *Friends of Santa Fe Cnty. v. LAC Mins., Inc.*, 892 F. Supp. 1333, 1343 (D.N.M. 1995)); *see also Lane v. Page*, 272 F.R.D. 581, 594 (D.N.M. 2011); *United States*

*ex rel. Tenn. Valley Auth. v. Easements & Rts.-of-Way Over 5.82 Acres of Land, More or Less, in Loudon Cnty., Tenn.*, No. 3:24-cv-00080, 2025 WL 3034982, at *2 (E.D. Tenn. Oct. 30, 2025) (applying this standard to deny judgment on the pleadings in a condemnation proceeding).

**ARGUMENT**

The Government makes two basic arguments. Neither justifies judgment on the pleadings. First, the Government contends that neither RFRA nor the First Amendment can provide a defense to the exercise of eminent domain. Although that is at least the sort of purely legal argument that theoretically could justify judgment on the pleadings, it is incorrect. The Government must follow the Constitution and federal law, even when taking property. Second, the Government contends that the Diocese's religious defenses fail on the merits. But this argument cannot justify judgment on the pleadings because it depends on a version of facts other than those pleaded in the Diocese's answer, which must be taken as true for purposes of the Government's motion. The Diocese has adequately alleged that the taking of a portion of Mount Cristo Rey for border-wall construction would impose a substantial burden on its religious exercise.

## I. An Exercise of Eminent Domain Must Comply with RFRA and the First Amendment.

**1.** As the Diocese explained when opposing the Government's motion for immediate possession, *see* Opp'n to Possession Mot. 4–11, RFRA and the First Amendment protect against all forms of government action that infringe the free exercise of religion and may provide valid "defense[s] to the United States' exercise of its federal condemnation power," *contra* MJP 10. "RFRA is no ordinary statute," but a "super-statute." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (internal quotation marks omitted), *aff'd*, 573 U.S. 682 (2014). It "applies to *all* Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before

or after" RFRA's date of enactment. 42 U.S.C. § 2000bb-3(a) (emphasis added). RFRA therefore "cut[s] across all other federal statutes" including the Declaration of Taking Act, "and modif[ies] their reach." Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 253 (1995). The statute prohibits the Government from "substantially burden[ing] a person's exercise of religion" unless it demonstrates that the burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000bb-1(a)–(b). A person so burdened "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb-1(c).

Under its plain text, RFRA applies in this case. The Diocese has forcefully and consistently asserted that condemnation of a portion of Mount Cristo Rey will substantially burden its exercise of religion in several different ways. *See* Am. Answer ¶¶ 24–46. In the course of "a judicial proceeding" in which the Government seeks leave to engage in such actions—this litigation—the Diocese is raising that violation as a "defense" and seeks to "obtain appropriate relief." *See id.* § 2000bb-1(c). It strains credulity for the Government to argue that RFRA is simply switched off when the Government invokes the power of eminent domain. As the Diocese previously explained, "the Government must comply with RFRA before it can take the Diocese's land." Opp'n to Possession Mot. 6.

Consistent with RFRA's text, the Tenth Circuit has indicated that RFRA is an available defense against condemnation. In *Thiry v. Carlson* (*Thiry III*), 78 F.3d 1491 (10th Cir. 1996), homeowners sued under RFRA to enjoin the Kansas Department of Transportation from condemning a portion of their land as part of a project to expand U.S. Highway 24. The land contained the gravesite of the homeowners' stillborn daughter, which would have required relocation to accommodate the project. *Id.* at 1493. After an exhaustive review of the facts, the Tenth Circuit concluded that the condemnation would not substantially burden the plaintiffs' exercise of their religion, which allowed

for movement of gravesites when necessary. *Id.* at 1496. Notably, however, at no point during that litigation did either the district court or the Tenth Circuit suggest that RFRA was inapplicable to condemnation proceedings. *See generally Thiry v. Carlson* (*Thiry II*), 891 F. Supp. 563 (D. Kan. 1995); *Thiry v. Carlson* (*Thiry I*), 887 F. Supp. 1407 (D. Kan. 1995). If RFRA did not apply, the courts would not have had to wade into the thorny merits questions concerning the religious burden at issue.

At a minimum, the Government's actions must comply with the First Amendment. "The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs," and "[o]ur Constitution forecloses any attempt to revise that judgment." *United States v. Stevens*, 559 U.S. 460, 470 (2010). The Amendment was "[p]remised on mistrust of governmental power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). And at the core of the Amendment's protection is "[t]he principle that government may not enact laws that suppress religious belief or practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993).

The Constitution is this Nation's supreme law. Neither Congress when enacting statutes nor the President or his subordinates in executing them can ignore the First Amendment. And the Declaration of Taking Act is no less subject to the Constitution than any other statute. To hold otherwise "would subvert the very foundation of all written constitutions" by "giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). Based on those bedrock principles of constitutional law, courts that have addressed whether the First Amendment can constrain the power of eminent domain have held that it does. *See, e.g.*, *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 868–72 (2d Cir. 1988). This Court should follow suit.

**2.** The Government seeks to evade these foundational principles of the rule of law by citing various lines of inapposite condemnation cases. But not a single one of the Government's cases says that RFRA and the First Amendment are invalid defenses in a condemnation action. The complete lack of on-point precedent alone precludes the Government from meeting its burden to show that "any questions of law are clear and not in dispute." *Lane*, 272 F.R.D. at 587 (quoting *Friends of Santa Fe Cnty.*, 892 F. Supp. at 1343).

The Government first claims that '[d]istrict courts regularly reject constitutional challenges in other condemnations, including condemnations nearly identical to this one" that involve the border wall. MJP 10. As proof of this "regular[]" practice, the Government cites two unpublished decisions from the Southern District of Texas. Neither case held that constitutional challenges to a taking are impermissible. The answers in both cases asserted that the taking was "unconstitutional" and "violate[d] the due process clause," without specifying the nature of the violation. *United States v. 24.728 Acres of Land, More or Less, Situate in Starr Cnty., Tex.*, No. 7:25-CV-00229, 2025 WL 3146046, at *3 (S.D. Tex. Oct. 15, 2025); *accord United States v. 23.311 Acres of Land*, No. 7:19-CV-00407, 2020 WL 4724332, at *7 (S.D. Tex. Mar. 4, 2020). In both cases, the court struck several other affirmative defenses on the ground that they were "not a proper defense to a condemnation action." *24.728 Acres*, 2025 WL 3146046, at *2; *accord 23.311 Acres*, 2020 WL 4724332, at *5–7. But in both cases, the court did *not* strike the constitutional defenses on that basis. Instead, the court held that the constitutional defenses were "impermissibly vague" because they "lack[ed] factual support and fail[ed] to provide fair notice to the Government." *24.728 Acres*, 2025 WL 3146046, at *3; *accord 23.311 Acres*, 2020 WL 4724332, at *7 ("These purported affirmative defenses are conclusory in nature and are not supported by factual allegations"). Far from showing that RFRA and the First Amendment are not cognizable defenses to a taking, these cases actually *support* the Diocese's position its defenses may be raised in

condemnation proceedings, so long as they are adequately pleaded, which the Diocese's are. *See* Am. Answer ¶¶ 17–46.

The Government next attacks a strawman. It states incorrectly that "[t]he central premise of the Diocese's Amended Answer is that their land should be granted special protection from condemnation because it is owned by a religious entity." MJP 10. The Diocese has never said any such thing. Its position is not that land is exempt from eminent domain simply because it happens to be owned by a religious organization. Rather, the Diocese's claim is that a taking is unlawful if it substantially burdens religious exercise and if the Government cannot satisfy strict scrutiny. *See* Am. Answer ¶¶ 47–58. There are many situations in which taking property from a religious entity would have no meaningful effect on its exercise of religion.

The cases that the Government cites merely because they involved property taken from religious entities, *see* MJP 11, are wholly beside the point. In none of those cases did the landowner even raise a religious defense to the taking. The courts deciding those cases thus had no occasion to even consider the availability of religious defenses, much less to reject them. Indeed, in all but one of these cases, the landowner raised no defenses to the taking at all, instead disputing only the amount of just compensation. *See United States v. 564.54 Acres of Land, More or Less, in Monroe & Pike Cntys., Pa.*, 506 F.2d 796 (3d Cir. 1974) (considering only the amount of just compensation); *United States v. 3.25 Acres of Land, etc., in Seneca Cnty., N.Y.*, 53 F. Supp. 884 (W.D.N.Y. 1943) (same); *United States v. Grace Evangelical Church of S. Providence Ridge*, 132 F.2d 460 (7th Cir. 1942) (same); *United States v. Two Acres of Land, More or Less, in Will Cnty., Ill.*, 144 F.2d 207 (7th Cir. 1944) (same); *United States v. 4.43 Acres of Land, More or Less, Situate in Tarrant Cnty., Tex.*, 137 F. Supp. 567 (N.D. Tex. 1956) (same). In the single case in which the landowner in did raise a constitutional defense to the taking, *United States v. Eighty Acres of Land in Williamson Cnty., Ill.*, 26 F. Supp. 315 (E.D. Ill. 1939), the argument was not based on

the First Amendment or the freedom of religion, and the Court considered the defense on the merits, suggesting that constitutional defenses to a taking are at least cognizable. *See id.* at 321–22.

It is thus baffling for the Government to say that "federal courts would have blocked each of those condemnations" if the Diocese's position here "had legal merit." MJP 11–12. The Government does not explain how it thinks RFRA or the First Amendment would have come up in those cases given that the parties never raised those defenses. Courts are not required—and indeed, are not permitted under the rules of waiver and forfeiture—to *sua sponte* raise RFRA or the First Amendment any time a religious organization is a party to a case. And the fact that RFRA and the First Amendment never came up in the cited condemnation actions says nothing about whether those laws can provide a cognizable defense in a condemnation proceeding where they actually are raised.

As the Government all but acknowledges, the Third Circuit's decisions in *Adorers of the Blood of Christ v. FERC* (*Adorers I*), 897 F.3d 187 (3d Cir. 2018), and *Adorers of the Blood of Christ United States Province v. Transcontinental Gas Pipe Line Co (Adorers II)*, 53 F.4th 56 (3d Cir. 2022), are no help to the Government because the court resolved those cases on separate procedural grounds. The Third Circuit held only that in a case arising under the Natural Gas Act, the challengers were required to first raise their RFRA defenses in statutorily mandated administrative proceedings. But the Third Circuit never suggested that RFRA is broadly inapplicable to condemnation actions.[1]

Finally, the Government invokes general statements from the Supreme Court indicating that judicial review in eminent domain actions is limited. *See* MJP 20; *see also, e.g.*, *Berman v. Parker*, 348 U.S.

---

[1] The Government again invokes *United States v. 162.20 Acres of Land, More or Less Situated in Clay County, Mississippi*, 639 F.2d 299, 303 (5th Cir. Unit A Mar. 1981), MJP 14–15, but as explained in the Diocese's opposition to the Government's possession motion, that case recognizes that condemnations under the Declaration of Taking Act are subject to the requirements of other statutes, like RFRA, Opp'n to Possession Mot. 5–6.

26, 32 (1954) ("The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one."). But those decisions are concerned with cutting off second-guessing of Congress's choices of which construction projects to pursue. They did not deal with assertions of individual constitutional and statutory rights, much less with invocations of religious liberty. Indeed, the cited cases were decided before RFRA was even enacted. There is nothing in Supreme Court precedent to suggest that eminent domain is exempt from compliance with RFRA and the First Amendment.

**3.** In any event, even if the Government were correct that judicial review is limited to determining whether the "taking serves a valid and congressionally authorized public use," MJP 23, the Diocese could still raise its RFRA and First Amendment defenses in that context. The Government identifies provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) as authorizing the taking of property for purposes of constructing the border wall and a 2025 appropriations act as providing the relevant funding. *See* MJP 8–9 (citing 8 U.S.C. § 1103(b) & note (Sept. 30, 1996); Pub. L. No. 119-21, § 90001, 139 Stat. 72, 357–58 (July 4, 2025)). But those statutes, like all others, are subject to the limitations of RFRA and the First Amendment. *See Hobby Lobby*, 723 F.3d at 1146. Congress thus authorized the use of eminent domain and provided funding for border-wall construction only to the extent such actions do not impermissibly infringe on the free exercise of religion. So, if the Diocese can show that its religious rights were violated, then the taking would not be for a congressionally authorized public use.

The Government recognizes the Diocese's argument that RFRA and the First Amendment "*modify* the authorities" in question and require the Government to respect the Diocese's free-exercise rights. MJP 10–11. But the Government says that the "plain reading of the relevant statutes" shows that they include no religious exceptions. *Id.* at 11. The same was true of the text of the contraceptive

mandate under the Affordable Care Act, and yet the Supreme Court held in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014), that it was subject to RFRA. The exception is provided by RFRA itself.

Nothing in IIRIRA or the appropriations act precludes application of RFRA and the First Amendment. IIRIRA requires installation of "additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." 8 U.S.C. § 1103(b) & note (Sept. 30, 1996). And a 2008 amendment to IIRIRA is even more discretionary, directing construction of "reinforced fencing along not less not less than 700 miles of the southwest border *where fencing would be most practical and effective*." *Id.* (emphasis added). IIRIRA's mandate is thus not construction of border wall along every square inch of the U.S.-Mexico border, regardless of religious objections or any other statutory or constitutional limitations. The 2025 appropriations act likewise designates funding for border-wall construction generally without mandating construction at any particular site. Pub. L. No. 119-20, § 90001, 139 Stat. at 357–58. There is thus nothing inconsistent between accommodating religious objections, as required by RFRA and the First Amendment, and fulfilling IIRIRA's and the 2025 appropriation act's dictates of constructing the border wall where appropriate.

## II. The Diocese Has Adequately Pleaded RFRA and First Amendment Defenses.

Beyond arguing that the United States can exercise its power of eminent domain free from any RFRA or First Amendment constraints, the Government also contends that the Diocese fails to adequately allege defenses under those provisions. MJP 15–21. The Government is mistaken.

### A. RFRA

RFRA prohibits the Government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), unless

the Government's actions are "the least restrictive means of furthering [a] compelling governmental interest," *id.* § 2000bb-1(b). A "government act imposes a 'substantial burden' on religious exercise if it: (1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief." *Hobby Lobby*, 723 F.3d at 1138 (internal quotation marks and alteration omitted). As set forth in greater detail in the Diocese's opposition to the Government's motion for immediate possession, the Government's condemnation imposes the second type of substantial burden in at least three ways. Opp'n to Possession Mot. 13–22. First, despite its assurances to the contrary, the Government's plans to deface Mount Cristo Rey so that it can build a border wall jeopardize the mountaintop shrine and access to it. Am. Answer ¶¶ 25–30. Second, the border wall that the Government plans to construct is contrary to Catholic values and teachings that migrants must be protected and defended. *Id.* ¶ 31. The presence of the border wall on Mount Cristo Rey would therefore profane that holy site and dilute the religious experience for any faithful able to access the shrine. *Id.* ¶¶ 32–39. Finally, the Government's condemnation of the land will deprive the Diocese of its ability to act as a steward of its land by ensuring that successor landowners do not use Diocesan property in ways that are inconsistent with Catholic values and teachings. *Id.* ¶¶ 40–46. Notwithstanding these detailed allegations, the Government contends that the Diocese fails to adequately allege a RFRA defense for a number of reasons, none of which are availing.

First, the Government insists in conclusory fashion that construction of a border wall a mere 1,000 feet from the shrine atop Mount Cristo Rey "will not physically interfere with the shrine or access to it" and that religious exercise on the mountain will be able to continue "exactly as it did before the Government filed this action." MJP 15–17. Even if the Diocese were required to support

its defense with factual allegations, *contra Lane*, 272 F.R.D. at 594, the Diocese has done so, Am. Answer ¶¶ 25–30. And the Government's alternative facts have no place in the Court's consideration of the motion for judgment on the pleadings. For purposes of that motion, the Court must accept the allegations in the Diocese's amended answer as true. *Colony Ins. Co.*, 698 F.3d at 1228. The Diocese alleges that "the Government's defacement of Mount Cristo Rey to construct the border wall would jeopardize the mountaintop shrine and access to it." Am. Answer ¶ 25. Indeed, the Government has "already begun blasting activity at the base" of Mount Cristo Rey that it describes as a "'face lift'" to the mountain. *Id.* ¶ 28 (quoting El Paso Sector Border Patrol (@USBPChiefEPT), X (Feb. 4, 2026, 11:48 AM), https://tinyurl.com/5n6yceea). One need not traverse an inferential chasm to conclude that similar activity a mere 1,000 feet from the mountaintop shrine would jeopardize the sacred site and access to it. The Diocese has thus sufficiently pleaded a risk of damage to the shrine.

Second, the Government argues that the border wall's affront to Catholic values and teaching is no basis for a RFRA defense because the Government is not "forcing the Diocese to affirmatively perform an act that violates its faith." MJP 15. Nonsense. This case concerns the Government's exercise of its power of eminent domain to forcibly take land owned by the Diocese for the purpose of building a border wall fundamentally at odds with Catholic values and teachings. Am. Answer ¶¶ 32–39. As the Government has previously acknowledged, condemnation is an "exercise of government coercion against a person's property" because it amounts to "tak[ing] somebody's property from them without their consent." Oral Argument at 58:25–35, *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc), *available at* https://tinyurl.com/2vn25ryc. When that coercive power is exercised to facilitate the use of a religious landowner's property in way that is

inconsistent with their religious beliefs, that amounts to "a substantial burden," as the Government has previously "conced[ed]." *See id.*[2]

Third, the Government suggests that the Diocese's moral objections to the border wall are not a "central tenet" of its faith and therefore cannot form the basis for a RFRA defense. MJP 16–17 (quoting *Thiry III*, 78 F.3d at 1493). But the Supreme Court has rejected an inquiry of this sort. "[I]t is not for [a court] to say that [a RFRA claimant's] religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725; *see also* 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" as used in RFRA to "include[] any exercise of religion, whether or not compelled by, or central to, a system of religious belief"). When a RFRA claimant asserts a sincerely held religious belief, as the Diocese does here, a court "can't interpret his religion for him." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.).

Finally, the Government contends that the Diocese's argument that a border wall would profane Mount Cristo Rey is foreclosed by *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988). MJP 16–17. *Lyng* is inapposite because it concerned religious objections to how the Government used "its *own* land." 485 U.S. at 454 (emphasis added). "[T]he government's use of its property involves significantly different considerations than the taking by the government of privately-owned religious property." *Yonkers Racing Corp.*, 858 F.2d at 871 (citing *Wilson v. Block*, 708 F.2d 735, 742 n.3 (D.C. Cir. 1983)). That is because, as discussed, condemnation is "an exercise of government coercion." Oral Argument at 58:25–35, *Apache Stronghold*, *supra*. The "governmental compulsion" that is absent when the Government uses its own property in a way that is objectionable

[2] The Government has argued that judicial estoppel does not preclude it from taking a contrary position here. Pl.'s Resp. to Def.'s Notice of Suppl. Auth., ECF No. 55. Fair enough. But the Government offers no explanation for why its concession in *Apache Stronghold* was wrong. The Government was right in *Apache Stronghold*; it is wrong now.

to people of faith is therefore present in this case. *Lyng*, 485 U.S. at 448 (quoting *Bowen v. Roy*, 476 U.S. 693, 700 (1986)).[3]

Because the Diocese has adequately pleaded that the Government's exercise of eminent domain would substantially burden its free exercise of religion, the condemnation can proceed only if it is "the least restrictive means of furthering" its border-security objectives. 42 U.S.C. § 2000bb-1(b). This is an "affirmative defense" to a RFRA claim, and "the burden is placed squarely on the Government" to establish it. *Ghailani v. Sessions*, 859 F.3d 1295, 1306 (10th Cir. 2017) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). The Government does not and cannot carry that burden through a motion for judgment on the pleadings.

**B. First Amendment**

In addition to RFRA, the Government's condemnation also violates the First Amendment. The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly," but "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). But a governmental act does not qualify as "generally applicable" if it amounts to an "individualized governmental assessment" or provides "a mechanism for individualized exemptions." *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990) (internal quotation marks omitted).

[3] Notably, the Government does not even acknowledge the Diocese's allegations that the condemnation will "prevent[]" the Diocese from acting as steward of its land consistent with Catholic teachings and values. *Hobby Lobby*, 723 F.3d at 1138 (internal quotation marks omitted); *see also* Am. Answer ¶¶ 40–46.

The Government's condemnation here triggers both carveouts from *Smith* and thus strict scrutiny. First, decisions to condemn land are necessarily individualized assessments and thus are not generally applicable. Am. Answer ¶ 54. The exercise of eminent domain is a "subjective assessment system[] that 'invite[s] consideration of the particular circumstances.'" *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006) (quoting *Smith*, 494 U.S. at 884). "[C]ase-by-case inquiries are routinely" and, indeed, necessarily made in the process of selecting particular private land for condemnation. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004); *see also Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1223 (C.D. Cal. 2002) (holding that a government agency's "efforts to condemn . . . land [were] individualized assessments"). Where, as here, the Government targets land owned by and sacred to a religious landowner for condemnation, in a manner that burdens the landowner's exercise of religion, strict scrutiny applies.

Second, the Government has declined to build the border wall along various stretches of the U.S.-Mexico border based on secular considerations, but it has not treated the Diocese's religious exercise as favorably. Am. Answer ¶ 54. Before the Supreme Court's recent ruling in *Fulton*, decisions from the Tenth Circuit had "rejected a *per se* approach" that would "require[e] that any land use regulation which permits any secular exception satisfy a strict scrutiny test to survive a free exercise challenge." *Grace United Methodist Church*, 451 F.3d at 651. But the Supreme Court's more recent Free Exercise Clause precedent, particularly cases striking down land-use policies implemented during the COVID-19 pandemic, explicitly reject the Tenth Circuit's prior approach. The Supreme Court has now held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise," and "[i]t is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at

issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17–19 (2020) (per curiam)).

The Government's border-wall construction has treated comparable secular interests more favorably than the Diocese's religious objections, and the Government must therefore satisfy strict scrutiny to justify condemning Mount Cristo Rey. Over the past few months, while the Government has been rushing past every obstacle in its single-minded pursuit of border-wall construction on Diocese property, it has "declined to build the border wall along various stretches of the U.S.-Mexico border based on secular considerations." Am. Answer ¶ 54. Earlier this year, U.S. Customs and Border Protection (CBP)'s plans to build the wall through Big Bend National Park prompted "community leaders in the region, including five sheriffs, [to] plead[] with the Trump Administration not to build a wall through the natural landscape." Anna Giaritelli, *Trump's Top Border Official, Rodney Scott, Unpacks Wins and Path Forward*, Wash. Exam'r (May 4, 2026), https://perma.cc/296B-RP2C.

Based on that public outcry, DHS announced that "there would be no 30-foot steel wall built in Big Bend Ranch State Park, Big Bend National Park or the Black Gap Wildlife Management Area, instead prioritizing 'sensors and cameras' and 'low-profile' vehicle barriers." Sam Karas, *Former National Park Superintendents Ask DHS Not to Waive Laws for Border Wall Construction*, Big Bend Sentinel (May 27, 2026), https://perma.cc/475B-KW9Q. CBP has confirmed, at least for now, that plans to build a 30-foot wall through Big Bend National Park are off, meaning that well over 100 miles of the border will be exempt from wall construction. *See* Ayden Runnels, *Big Bend Border Wall Plans Canceled for National Park After Backlash, Border Patrol Commissioner Says*, Tex. Trib. (May 8, 2026), https://perma.cc/724G-9QLR; *see also* J. David Goodman, *Border Construction in Big Bend Is Halted After Drawing Criticism*, N.Y. Times (Aug. 17, 2026), https://tinyurl.com/2pcvrzcd (reaffirming that "[f]ederal officials are no longer planning a 30-foot wall" in the Park and reporting that even less

intrusive construction had been temporarily paused after the public outcry). The Government's provision of that secular exemption for the Big Bend region treats secular activities within the National Park more favorably than religious exercise at Mount Cristo Rey. That differential treatment triggers strict scrutiny.

The Government does not respond these arguments for why the Free Exercise Clause triggers strict scrutiny in this context. Instead, the Government attempts to distinguish the First Amendment case law on which the Diocese relies on the ground that those cases involve "direct coercion." MJP 18–21. But, as discussed, *see supra* pp. 14–15, a sovereign's exercise of eminent domain *is* coercive, as the Government has previously conceded, Oral Argument at 58:25–35, *Apache Stronghold*, *supra*. And, in any event, coercion is not an element of the *Smith* carveouts for individualized assessments or exemptions. *See Smith*, 494 U.S. at 884.

As with the Diocese's RFRA defense, "the government has the burden to establish that the challenged [government action] satisfies strict scrutiny." *Tandon*, 593 U.S. at 62. To do so, it must demonstrate that securing the border with alternatives to a physical barrier would be "more dangerous" in the vicinity of Mount Cristo Rey than in other places along the U.S.-Mexico Border where the Government has opted not to construct the barrier. *See id.* at 63. Again, a motion for judgment on the pleadings is not the proper vehicle for the Government to shoulder that burden, and it makes no attempt to do so.

## CONCLUSION

This Court should deny the Government's motion for judgment on the pleadings. And because the Diocese has adequately pleaded viable RFRA and First Amendment defenses, the Court should also deny the Government's pending motion for immediate possession, ECF No. 22, and "fix

the time" at which the Diocese must surrender possession—if ever—until the Diocese's defenses are resolved. *See* 40 U.S.C. § 3114(d)(1).

Dated: August 25, 2026

Respectfully submitted,

*/s/ Jonathan L. Backer*

Jonathan L. Backer*
Mary B. McCord*
William Powell*
Seth Wayne
INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, DC 20001
(202) 662-4912
sw1098@georgetown.edu

*/s/ Kathryn Brack Morrow*

Kathryn Brack Morrow
MANN MORROW, PLLC
1730 Tierra de Mesilla, Suite 4
Las Cruces, NM 88005
Phone: 575-440-0300
Katy.Morrow@MannMorrow.com

**Admitted pro hac vice*

*Attorneys for Defendant Roman Catholic Diocese of Las Cruces*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 25, 2026, I electronically filed the foregoing with the Clerk of the Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

*/s/ Jonathan L. Backer*
Jonathan L. Backer