UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

Plaintiff,

vs.

14.259 ACRES OF LAND, MORE OR LESS, SITUATE IN DOÑA ANA COUNTY, STATE OF NEW MEXICO; CATHOLIC DIOCESE OF LAS CRUCES; AND DOÑA ANA COUNTY TREASURER.

Defendants.

Civil No. 2:26-CV-01458-KG-GBW

**PLAINTIFF UNITED STATES OF AMERICA'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

## I. INTRODUCTION

Federal condemnation actions operate within a deliberately narrow framework grounded in the Constitution and reaffirmed by decades of precedent. U.S. Const. amend. V. From the founding of this country, the power of eminent domain has been understood as "essential to a sovereign government," one that must include "the right to appropriate" land whenever "the United States has determined its need for certain land for a public use." *United States v. Carmack*, 329 U.S. 230, 236 (1946). The Constitution's declaration that federal law is the "supreme law of the land" necessarily means that "the power of eminent domain, when exercised by Congress within its constitutional powers, is equally supreme." *Id.* at 240. As the Supreme Court recognized in *Carmack*, the powers vested in the federal government "demand for their exercise the acquisition of lands in all the States," and those powers cannot be rendered "nugatory" or dependent upon "the will of a State, or even…a private citizen." *Id.* at 237. The Fifth Amendment's Takings Clause

thus reflects preexisting federal authority to take property for public use, subject only to the requirement of just compensation. *See* U.S. Const. amend. V.

Consistent with that constitutional design, judicial review in federal condemnation actions is sharply constrained. At the pleading stage, "[t]he only question for judicial review" is "whether the purpose for which the property was taken is for a Congressionally authorized public use." *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993). Expanding that inquiry—as demanded by the Diocese—would undermine the "expeditious procedure" Congress created in the Declaration of Taking Act. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 4 (1984).

Here, that narrow inquiry is easily satisfied. Congress has authorized the United States to acquire land for construction of border security infrastructure in New Mexico, and the Government has exercised that authority to condemn the Subject Property. Once Congress's authorization and the public purpose are established, the inquiry ends. No factual allegation or affirmative defense can overcome the federal government's constitutionally grounded and congressionally delegated power to condemn land for a valid public use.

## II. ARGUMENT

### A. Federal Eminent Domain is a Constitutionally Supreme Power that Neither RFRA Nor the First Amendment Supersede.

#### *i. Eminent domain is an essential power of the United States.*

"The right of eminent domain is an 'inseparable incident of sovereignty.'" *Kohl v. United States*, 91 U.S. 367, 370 (1875) (internal citations omitted). Underpinning the Fifth Amendment, statutory law, and federal case law, is the understanding that the United States must be able to take property quickly and efficiently if needed for a public purpose; allowing landowners to challenge this inherent right undermines the ability of the sovereign to act in the best interest of its people. *See Carmack*, 329 U.S. at 237. From the outset, the Supreme Court has made clear that judicial

review in federal condemnation actions is narrowly confined. Once Congress has authorized the taking and identified a public use, the courts' role is "exhausted." *Shoemaker v. United States*, 147 U.S. 282, 298 (1893). For this reason, the only permissible defense to the validity of a federal condemnation is a challenge to the congressional authority for the acquisition. *See Kirby Forest*, 467 U.S. at 4; *Shoemaker*, 147 U.S. at 298. Any attempt—like the Diocese's—to expand judicial review beyond that limited inquiry revives a role the Supreme Court has repeatedly rejected.

*ii. Courts have routinely held that the only defense to a federal condemnation is lack of statutory authority — and the Diocese concedes this taking is authorized.*

Federal law generally recognizes only one valid objection to a condemnation proceeding: that the United States' land acquisition is not for a congressionally authorized public use. *See Wilson v. United States*, 350 F.2d 901, 906 (10th Cir. 1965) ("the nature or extent of the interest to be acquired is not reviewable"); *see also Berman v. Parker*, 348 U.S. 26, 32-33 (1954); *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240-41 (1984). As such, in condemnation proceedings, "[t]he only question for judicial review" at the pleading stage is whether the property is taken for a Congressionally authorized public use. *0.95 Acres of Land*, 994 F.2d at 698; *Shoemaker*, 147 U.S. at 298("while the courts have power to determine whether the use for which private property is authorized by the legislature to be taken is in fact a public use, yet, if this question is decided in the affirmative, the judicial function is exhausted. . .); *see also United States v. 397.51 Acres*, 692 F.2d 688, 692 (10th Cir. 1982) ("In the absence of bad faith, a condemnation for a public use is a matter for the legislative branch and not open to judicial determination. The nature or extent of the interest to be acquired is not reviewable.").

It is undisputed that this condemnation is for a public purpose—to secure the United States' borders. Am. Answer, ECF No. 59 at ¶ 5 ("The Diocese recognizes that the United States has the

right to protect its sovereignty by reasonable means and to secure its borders…"). *See* United States' Motion for Judgment on the Pleadings, ECF No. 63 at 9. This public purpose is authorized by a congressional statute, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Division C, Section 102, 110 Stat. 3009-546, 3009-554-55, as amended and codified at 8 U.S.C. § 1103(b) & note (Sept. 30, 1996). IIRIRA has been challenged on constitutional grounds, including challenges based on RFRA, and courts have routinely upheld it. *See La Posta Band of Diegueno Mission Indians of La Posta Rsrv. v. Trump*, 828 F. App'x 489 (9th Cir. 2020); *Tohono O'odham Nation v. Mullin,* 2026 WL 2363980, at *8 (D.D.C. Aug. 14, 2026).

With this authority clearly established, the United States' power to take the Subject Property cannot be limited, and this motion for judgment on the pleadings should be granted.

*iii. No federal court has recognized RFRA or the First Amendment as a defense to invalidate a federal taking.*

In its Response, the Diocese did not cite a single case that holds that RFRA or the First Amendment are defenses to a federal condemnation action. *See generally* ECF No. 64. Instead, the Diocese cites to *state* and *municipal* takings cases that are inapposite. *See Thiry v. Carlson*, 78 F.3d 1491 (10th Cir. 1996); *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 868–72 (2d Cir. 1988). Neither of the condemnations in *Yonkers* or *Thiry* were brought under Rule 71.1, the Declaration of Taking Act, or the Fifth Amendment. For example, the Diocese relies on *Thir*y to assert that RFRA is an available defense against condemnation. ECF No. 64 at 6. *Thir*y analyzed the legality of a state condemnation action by the Kansas Department of Transportation to acquire land containing a gravesite of the landowners' daughter. *Thiry*, 78 F.3d at 1493. The landowners challenged the action based on alleged violations, in part, to RFRA and the First Amendment. However, the Tenth Circuit allowed the condemnation to proceed and held the land acquisition

was religion-neutral, did not violate the landowners' free exercise of religion, and did not substantially burden their exercise of religion . *Id*.

Similarly, the Diocese's reliance on *Yonkers* is equally unavailing. *Yonkers* involved a municipal condemnation proceeding pursuant to state law to implement a federal consent decree; it did not involve the exercise of federal eminent domain. *See* Yonkers, 858 F.2d at 868–72. Because local and state condemnations are subject to different statutory constraints than direct federal takings, the Diocese's attempt to apply *Yonkers* to this federal proceeding is misplaced. While the Diocese asserts that no case explicitly states "RFRA and the First Amendment are invalid defenses," ECF No. 64 at 9, the Diocese fails to cite a single case where RFRA and the First Amendment claims have been relied on to invalidate a federal condemnation. Nonetheless, there is a litany of case law, including Supreme Court precedent, that holds the *only* defense to a condemnation action is lack of congressional authorization or public purpose. *See e.g., Berman*, 348 U.S. at 32 (citing *Old Dominion Land Co. v. U.S.*, 269 U.S. 55, 66, (1925)).

*iv. The Diocese's own authorities, and its failure to address controlling Supreme Court precedent, ultimately support the United States' inherent power to condemn.*

Although the Diocese relies heavily on decisions involving state and municipal condemnation, it avoids or minimizes the relevant Supreme Court precedent relied on by the Government. *See e.g.*, *Shoemaker*, 147 U.S. at 298; *Berman*, 348 U.S. at 32-33. Contrary to the Diocese's assertion that "[t]here is nothing in Supreme Court precedent to suggest that eminent domain is exempt from compliance with RFRA and the First Amendment," ECF No. 64 at 11, these decisions confirm the core principle that when Congress authorizes a public use, "the judicial function is exhausted" and collateral objections based on other statutory or constitutional theories cannot prevent the taking. *See Shoemaker*, 147 U.S. at 298. *Berman* confirms that when Congress

identifies a legitimate public purpose—such as redevelopment of blighted properties in that case or border security here—the role of the judiciary is extremely narrow, and courts may not second-guess Congress's judgment about either the wisdom of the project or the means chosen to execute it. *Berman*, 348 U.S. at 32-33.

The Diocese's criticism of the United States' reliance on *24.728 Acres*, *23.311 Acres*, and *162.20 Acres* fares no better. ECF No. 64 at 8-9. These cases demonstrate that federal courts in a condemnation action routinely strike affirmative defenses that fall outside the narrow universe of cognizable objections, such as public use or congressional authorization. *United States v. 24.728 Acres of Land, More or Less, Situate in Starr Cnty., Tex.*, No. 7:25-CV-00229, 2025 WL 3146046, at *2 (S.D. Tex. Oct. 15, 2025); *accord United States v. 23.311 Acres of Land*, No. 7:19-CV-00407, 2020 WL 4724332, at *5-7 (S.D. Tex. Mar. 4, 2020). Along with *Berman, Shoemaker* and *Old Dominion*, these federal cases demonstrate exactly what longstanding eminent domain doctrine requires here: once Congress authorizes the project and the taking is for a public purpose, the United States' condemnation authority cannot be blocked, expanded, or conditioned by additional statutory or constitutional defenses.

**B. The Diocese's Attempt to Manufacture Strict Scrutiny Under *Smith* and *Tandon* Fails as a Matter of Law.**

*i. Federal condemnation is neither an individualized assessment under Smith nor a land use regulation.*

The Diocese baldly claims that "decisions to condemn land are individualized assessments," citing only its Amended Answer rather than supporting case law. ECF No. 64 at 17. The Diocese then cherry-picks fragments of quotes from inapposite decisions addressing entirely different contexts—such as state unemployment benefits, university speech codes, and local municipal zoning—to construct a constitutional conflict where none exists. *See Emp. Div. v. Smith*,

494 U.S. 872, 884 (1990); *Axson-Flynn v. Johnson,* 356 F.3d 1277, 1298 (10th Cir. 2004); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006); *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2002).

*Smith* stands for the proposition that, "where a State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason," thereby triggering strict scrutiny. *Smith*, 494 U.S. at 884. But the law challenged in *Smith* was a state unemployment law containing a "good cause" clause which inherently triggered individual assessments. *Id*. Similarly, *Axson-Flynn* involved a Free Exercise and free speech challenge by a public university student seeking a religious exemption from performing offensive language in a theater program. *Axson-Flynn,* 356 F.3d at 1281. The Diocese seizes on a fragment of a quote from *Axson-Flynn* to claim that because condemnation requires selecting a specific parcel of land, it necessarily constitutes an "individualized assessment." ECF No. 64 at 17 ("'[C]ase-by-case inquiries are routinely' and, indeed, necessarily made in the process of selecting particular private land for condemnation."). But the full quote from *Axson-Flynn* reveals the flaw in the Diocese's logic:

> [S]uch a system [of individualized exemptions] is one in which case-by-case inquiries are routinely made, such that there is an 'individualized governmental assessment of the reasons for the relevant conduct' that 'invites considerations of the particular circumstances' involved in the particular case…"

*Id*. at 1297. The court went on to cite as a benchmark example a system of unemployment benefits which subjectively require claimants to show "good cause" as to why they cannot find work—a vast difference from the federal legislation at issue here, authorizing the United States to exercise eminent domain to secure an international border. Choosing a specific tract of land for infrastructure is a routine operational determination, not a discretionary exemption system. If evaluating unique parcels of land constituted an "individualized assessment" under *Smith*, the

federal government could never exercise eminent domain for roads, borders, or public buildings without triggering strict scrutiny—a result entirely contrary to constitutional law.

The Diocese's entire First Amendment arguments are also flawed because they rely on the false premise that condemnation is a land use regulation, citing cases like *Grace United* and *Cottonwood* for the proposition that eminent domain is a "subjective assessment system[] that 'invite[s] consideration of the particular circumstances.'" ECF No. 64 at 17. In *Grace v. City of Cheyenne*, a church challenged a city zoning variance that limited its ability to conduct religious instruction on its property. 451 F.3d at 647-48. In *Cottonwood*, the dispute centered on a city's denial of a land use permit, exercise of eminent domain, and other zoning actions pertaining to a commercial retail project on a church property. 218 F. Supp. 2d 1203. By contrast, this case involves the supreme, inherent sovereign power of the *federal* government executing a mandatory congressional directive to secure the national border under IIRIRA. Local municipal permitting disputes and commercial redevelopment takings do not alter the settled rule that direct federal eminent domain for a constitutional public use cannot be second-guessed or defeated by collateral religious liberty defenses.

Condemnation is the act of taking property under sovereign authority, while land use regulation is the act of regulating how property may be used. Because these powers are distinct in nature, purpose, and legal structure, arguments rooted in land-use doctrine do not apply to eminent domain. *See St. John's United Church of Christ v. City of Chi.,* No. 03 C 3726, 2005 U.S. Dist. LEXIS 28072 (N.D. Ill. Nov. 11, 2005) (emphasizing that "eminent domain does not constitute a 'land use' regulation subject to RLUIPA," and suggesting that if Congress had intended otherwise, it would have said so explicitly).

The Diocese attempts to manufacture a basis for this Court to employ a strict scrutiny analysis in a federal condemnation action despite being contrary to Supreme Court precedent. *Berman* at 32-33. Furthermore, the cases upon which the Diocese relies are not persuasive as they do not involve federal condemnations. If the Diocese had applied federal condemnation law, precedent would show that the only basis for challenging a federal condemnation is an attack on the congressional authority and funding. *Id.*; *see also Wilson*, 350 F.2d at 906 ("the nature or extent of the interest to be acquired is not reviewable"); *Hawaii Housing Authority*, 467 U.S. at 240-41.

*ii. IIRIRA Does Not Contain "Secular Exceptions" Under Tandon.*

Next, the Diocese argues that the United States treats secular areas like Big Bend National Park differently and therefore, the instant condemnation is not neutral and generally applicable, thereby triggering strict scrutiny. This position misconstrues both the holding in *Tandon* and border wall condemnations in general. *Tandon* dealt with state COVID restrictions that limited religious gatherings more strictly than comparable secular activities. *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam). The restrictions at issue in *Tandon* contained several exceptions and accommodations for secular activities that were missing for religious activities. *Id*.

Border wall condemnations authorized by IIRIRA fall entirely outside the framework envisioned by *Tandon*. *See* 110 Stat. 3009 at 554-55. Unlike the COVID-19 regulations in *Tandon*, which featured explicit secular exemptions, Sec. 102 of IIRIRA contains no exceptions for categories of land based on use, ownership, or location. *Id*. CBP's adjustment of tactical methods—such as deploying sensors instead of physical barriers across remote national park terrain—reflects operational security discretion rather than a regulatory exemption favoring secular conduct over religious exercise. *Contra* ECF No. 64 at 18-19.

As noted earlier, once it is established that there is congressional authority and funding for a federal condemnation, a court's inquiry into the validity of the taking ends and "the nature and extent of the interest to be acquired is not reviewable." *397.51 Acres*, 692 F. 2d at 692. Despite this clear principle in federal condemnation jurisprudence, that is exactly what the Diocese is asking this Court to do—consider the manner and means by which the federal government exercises its congressionally authorized authority to condemn land for border security in New Mexico. For these reasons, the Court should reject the Diocese's opposition and grant the United States' motion for judgment on the pleadings so this case can proceed to ensure the Diocese receives the just compensation it is rightfully owed for this taking.

**C. There are No Facts the Diocese Could Plead that Constitute a Legally Cognizable Defense to a Federal Condemnation Action.**

The Diocese goes to great lengths in submitting six declarations that include general conclusory allegations that the United States' actions in condemning the subject property might impact access or use of the shrine. ECF Nos. 37-42. Even if the United States had condemned the property with knowledge that the taking might impact the shrine, that would not limit its sovereign authority to acquire the Subject Property for a valid public purpose. The United States' authority to condemn is constrained only by the need for congressional authority for a valid public purpose, and once that is provided as the Diocese has acknowledged, judicial inquiry into the validity of the taking ends. *397.51 Acres*, 692 F.2d at 692 ("The nature and extent of the interest to be acquired is not reviewable."). Despite the sweeping conclusions in the declarations submitted by the Diocese, none of them provide specific factual allegations to support claims that access to or use of the shrine will be impacted. ECF Nos. 37-42. And the Diocese admits that the taking is a quarter-mile (i.e. more than 1,000 feet) from the shrine or its access path. ECF No. 59 at ¶28.

The United States possesses the inherent authority to condemn land for border security

infrastructure. At the same time, it recognizes the cultural and religious significance of Mount Cristo Rey, which is precisely why it tailored this taking as narrowly as possible to leave the shrine and pilgrimage routes unaffected. *See* ECF No. 22 at 2; ECF No. 22-1 at 2. Congress authorized CBP to acquire land needed for border security, and CBP identified the Subject Property to close an operational gap in the existing barrier and reduce illegal crossings, doing so in a manner that preserves full access to and use of this culturally significant site.

Even accepting the Diocese's speculative concerns as true, they do not constitute valid defenses to a federal condemnation action. *See* ECF No. 63 at 15-17. Federal eminent domain is a sovereign power conditioned only on congressional authorization and a public use. So long as the Government acts within that authority, collateral objections concerning the nature or effect of the project cannot defeat a taking. *0.95 Acres of Land*, 994 F.2d at 698 ("[t]he only question for judicial review is "whether the purpose for which the property was taken is for a Congressionally authorized public use.").

Here, the record forecloses the Diocese's theory. As reflected in the legal description and survey accompanying the Declaration of Taking, showing exactly where the wall will be built, the project is strictly confined to land immediately adjacent to the United States' border with Mexico and does not approach the shrine or the pilgrimage path. ECF Nos. 2-3 and 2-4; *see also* ECF No. 59 at ¶28. The taking is geographically limited to prevent illegal border crossings; it does not alter, destroy, or obstruct access to Mount Cristo Rey. *Id.*

**CONCLUSION**

For the foregoing reasons, and those stated in the United States' Motion for Judgment on the Pleadings, the Court should grant the Government's motion, dismiss the Diocese's affirmative

defenses, deny the Diocese's opposition to immediate possession, and fix the time for surrender of possession pursuant to 40 U.S.C. § 3114(d)(1).

DATED: September 4, 2026

Respectfully submitted,

UNITED STATES OF AMERICA

By: s/ Annelise M. Pinto

CHARLOTTE HUFFMAN
Bar No. 6296779 (IL)
ANNELISE M. PINTO
Bar No. 353929 (CA)
Land Acquisition Section
Energy & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20002
Telephone: (202) 305-0282
Facsimile: (202) 514-8865
E-mail: charlotte.huffman@usdoj.gov
annelise.pinto@usdoj.gov

*Attorneys for Plaintiff United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2026, I electronically filed the foregoing United States' Reply in Support of Motion for Judgment on the Pleadings using the CM/ECF system and served a copy on all parties who are registered users of the CM/ECF system and entitled to receive automated notice of this filing.

*/s/* Annelise M. Pinto ______
ANNELISE M. PINTO
U.S. Department of Justice